11 CV 0404

JUDGE CASTEL

George S. Canellos
**REGIONAL DIRECTOR**
Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281-1022
(212) 336-0589 (Howard Fischer, Senior Trial Counsel)
Email: Fischerh@sec.gov



RECEIVED
JAN 20 2011
U.S.D.C. S.D. N.Y.
COMPLETED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>   v.<br><br>WILLIAM LANDBERG, KEVIN KRAMER, STEVEN GOULD, JANIS BARSUK, WEST END FINANCIAL ADVISORS LLC, WEST END CAPITAL MANAGEMENT LLC, and SENTINEL INVESTMENT MANAGEMENT CORPORATION,<br><br>     Defendants,<br><br>     and<br><br>LOUISE CRANDALL and L/C FAMILY LIMITED PARTNERSHIP,<br><br>     Relief Defendants. | 11 Civ. No. \_\_\_\_<br><br><br>**COMPLAINT** |

  Plaintiff Securities and Exchange Commission ("Commission") for its Complaint against

William Landberg ("Landberg"), Kevin Kramer ("Kramer"), Steven Gould ("Gould"), Janis

Barsuk ("Barsuk"), West End Financial Advisors LLC ("WEFA"), West End Capital

Management LLC ("WECM"), and Sentinel Investment Management Corporation ("Sentinel")

(collectively, "Defendants"), and Louise Crandall ("Crandall") and L/C Family Limited Partnership ("L/C Family") (collectively, "Relief Defendants") alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This action involves a fraudulent scheme led by Landberg, the former chief executive of a number of related entities, including WEFA and WECM, that collectively did business as West End Financial Advisors ("West End"), and carried out by Landberg and other senior executives at West End, including Kramer, Gould, and Barsuk. West End is a New York-based, unregistered investment adviser that Landberg owned and controlled. West End is affiliated with Sentinel, a registered investment adviser for which Landberg served as the President and Chief Compliance Officer until June 2009. Kramer served as West End's President/Chief Operating Officer, Gould as its Chief Financial Officer, and Barsuk as its Controller. As of May 2009, Landberg managed over $66 million, primarily in three funds that specialized in making real estate investments and loans to restaurant franchisees (the "West End funds").

2.      From at least January 2008 through May 2009, by means of offering documents and other correspondence, Landberg, Kramer, and West End misled fund investors into believing that their money was held in stable, safe investment vehicles designed to provide steady streams of income. In reality, throughout most of that period, West End faced deepening financial problems stemming from Landberg's failed investment strategies. Starved for cash to meet obligations of the West End funds or various personal needs, Landberg misused investor assets, fraudulently obtained over $8.5 million from WestLB AG ("WestLB"), a German bank that provided loans to finance certain investments by West End, and used millions of dollars from an interest reserve account for unauthorized purposes. Landberg used substantial amounts of the

fraudulently obtained loan proceeds to make distributions to certain West End fund investors, thereby sustaining the illusion that West End's investments were performing well. At the same time that he was committing these frauds, Landberg misappropriated at least $1.5 million for himself and his family, including Crandall and L/C Family.

3.      Gould and Barsuk knew, or were reckless in not knowing, that Landberg was defrauding WestLB by, among other things, misusing funds in the interest reserve account. They nevertheless participated in the fraud by facilitating Landberg's misappropriations from that account. Kramer knew, or was reckless in not knowing, that West End faced severe financial problems and had difficulty obtaining sufficient financing to sustain its investment strategy. Nevertheless, Kramer failed to disclose those material facts to investors as he continued to market the funds to new and existing investors through April 2009.

4.      During 2009 alone, West End raised over $4.7 million from investors by touting false positive returns, while concealing its failed investment strategy, its cash flow problems, Landberg's fraud in connection with the $8.5 million in loans, and the misuse of investor assets.

5.      As a result of the fraudulent scheme, Defendants jeopardized the West End funds' access to financing and its ability to fulfill fund obligations. WestLB refused to extend additional loans to West End. Another German bank, DZ Bank AG ("DZ Bank"), which provided loans to a West End fund, issued a notice of default.

## VIOLATIONS AND RELIEF SOUGHT

6.      By virtue of the conduct alleged herein:

    a.      Landberg, Kramer, Gould, WEFA, WECM, and Sentinel, directly or

        indirectly, singly or in concert, have engaged in acts, practices, and

        courses of business that constitute violations of Section 17(a) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

b.    Barsuk, directly or indirectly, singly or in concert, has engaged in acts, practices, and courses of business that constitute aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

c.    Landberg, WEFA, WECM, and Sentinel, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

d.    Kramer, Gould, and Barsuk, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute aiding and abetting violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

e.    Landberg, WEFA, and WECM, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 206(4)-8];

f.    Kramer, Gould, Barsuk, and Sentinel, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute aiding and abetting violations of Section 206(4) of the Advisers

Act [15 U.S.C. §§ 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 206(4)-8]; and

g.  Crandall and L/C Family obtained ill-gotten proceeds of Defendants' fraudulent conduct that they have no legitimate claim to retain.

7.  Unless permanently restrained and enjoined, Defendants will again engage in the acts, practices, transactions and courses of business set forth in this Complaint and in acts, practices, transactions and courses of business of similar type and object.

8.  The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], seeking a final judgment: (i) restraining and permanently enjoining Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein; (ii) requiring Landberg, WEFA, WECM, and Sentinel, on a joint and several basis, to disgorge the ill-gotten gains they received, if any, as a result of their violations, and to pay prejudgment interest thereon; (iii) requiring Kramer to disgorge the ill-gotten gains he received, if any, as a result of his violations, and to pay prejudgment interest thereon; (iv) imposing civil monetary penalties upon Landberg, Kramer, Gould, and Barsuk pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and/or Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and/or Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; (v) requiring the Relief Defendants to disgorge any and all ill-gotten gains they received, and to pay prejudgment interest thereon; and (vi) appointing an independent monitor with respect to WEFA, WECM, and Sentinel.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

10.      Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain of the transactions, acts, practices and courses of business alleged in this Complaint occurred in the Southern District of New York. Specifically, Defendants operated from West End's office, which is located in New York, New York.

11.      In connection with the transactions, acts, practices and courses of business alleged in this Complaint, Defendants, directly or indirectly, singly or in concert, have made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## DEFENDANTS AND RELIEF DEFENDANTS

12.      **Landberg**, age 58, resides in New York, New York.  Landberg is the former chief executive of West End and was primarily responsible for managing all West End funds prior to June 2009.  Landberg was also the President and Chief Compliance Officer of Sentinel.

13.      **Kramer**, age 59, resides in Wilmington, Delaware.  Kramer was the President and Chief Operating Officer of West End from at least 2006 through June 2009.

14.     **Gould**, age 45, resides in Plainview, New York.  Gould is a certified public accountant licensed in New York, and was the Chief Financial Officer of West End from September 2006 through May 2009.

15.     **Barsuk**, age 59, resides in Tenafly, New Jersey.  Barsuk was the Controller of West End from January 2006 to at least May 2009.

16.     **WEFA** is a Delaware Limited Liability Company formed in 2000 with its principal place of business in New York, New York.  WEFA served as investment manager and/or general partner to various West End limited partnerships.  WEFA is wholly-owned by L/C Family.  Neither WEFA nor its securities is registered with the Commission.

17.     **WECM** is a Delaware Limited Liability Company formed in 2006 with its principal place of business in New York, New York.  WECM served as the general partner to at least one West End limited partnership.  At all relevant times, WEFA and WECM did business as West End.  Neither WECM nor its securities is registered with the Commission.

18.     **Sentinel** is a New York corporation formed in 1986 with its principal place of business in New York, New York.  Sentinel, an affiliate of West End, has been registered with the Commission as an investment adviser since 1986.  Landberg served as Sentinel's President and Chief Compliance Officer.  Landberg and Crandall co-owned the firm through L/C Family.

19.     **Crandall**, age 68, resides in New York, New York.  Crandall, a Relief Defendant, is Landberg's wife.

20.     **L/C Family**, a Relief Defendant, is a New York domestic limited partnership with its principal place of business in New York, New York.  L/C Family, which is comprised solely of Landberg and Crandall, is the entity through which Landberg and Crandall owned WEFA and Sentinel.  L/C Family is not registered with the Commission.

## RELATED PARTIES

21.    **West End/Mercury Short Term Mortgage Fund (the "Hard Money Fund")** is a Delaware limited partnership formed in 2007 with its principal place of business in New York, New York.  Landberg and Kramer marketed the Hard Money Fund to investors as a safe investment fund whose assets would be primarily invested in short-term commercial real estate mortgages.

22.    **West End Mortgage Finance Fund I LP (the "Franchise Fund")** is a Delaware limited partnership formed in 2004 with its principal place of business in New York, New York. Landberg and Kramer marketed the Franchise Fund to investors as a safe investment fund whose assets would be primarily invested in loans to restaurant franchisees.

23.    **West End Income Strategies Fund LP (the "Income Strategies Fund")** is a Delaware limited partnership formed in 2007 with its principal place of business in New York, New York.  The Income Strategies Fund was a fund-of-funds set up primarily as a conduit for investment in the Hard Money Fund and the Franchise Fund.

## FACTS

24.    In the early 2000s, Landberg managed assets of clients through the registered investment adviser Sentinel, which he owned and controlled.  At various times, Sentinel managed as many as 70 separate client accounts, including various Individual Retirement Accounts.  Beginning in at least 2003, Landberg created, and solicited investors for, a series of unregistered, private limited partnerships aimed at generating returns for investors by following a variety of investment strategies.

25.    Over time, Landberg transferred many of his Sentinel clients' assets into these unregistered limited partnerships.  By 2008, Landberg had invested the majority of these clients'

8

assets in three funds that he created at the end of 2007 and the beginning of 2008. In two of these funds, the Franchise Fund and the Hard Money Fund, Landberg used investor money and loans from financial institutions to invest in the restaurant franchise and real estate markets. The third fund, the Income Strategies Fund, was a fund-of-funds that invested in both the Franchise Fund and the Hard Money Fund. As of May 2009, the West End funds had approximately 94 investors who invested a total of approximately $66.7 million in the funds.

### West End's Leveraged Funds

26.     Landberg designed the Hard Money Fund to achieve short-term, high-yield interest income through participations in short-term commercial real estate mortgage loans. The fund targeted annual returns of eleven to thirteen percent. A "hard money" loan is typically a short-term loan to a real estate developer, for the purpose of funding construction or other aspects of an ongoing real estate investment. Such loans are typically collateralized by the property under development.

27.     From approximately December 2007 to May 2009, a German bank, WestLB, provided eighty percent of the capital for the loans that the Hard Money Fund made to real estate developers. Hard Money Fund investors contributed the remaining twenty percent.

28.     Income earned from the Hard Money Fund's investments was required to first be used to repay the eighty percent loan from WestLB, with any remainder (after WECM's fees and expenses) distributed to West End investors.

29.     The Hard Money Fund's limited partnership agreement specifically provided that the General Partner could not do any act which would make it impossible to carry on the ordinary business of the Partnership.

30.     WEFA served as the investment manager to the Hard Money Fund and was entitled to an annual two percent management fee based on the assets invested by the fund's limited partners. WECM served as the fund's general partner and was entitled to an annual fifteen percent "carried interest allocation" of any net profit of the fund.

31.     Landberg was primarily responsible for the Hard Money Fund's investment decisions. Marketing materials for the Hard Money Fund advertised returns with "low levels of volatility" and steady growth over time.

32.     Landberg signed a "Credit and Security Agreement" (the "Agreement") that set forth the terms of WestLB's loans to the Hard Money Fund. The Agreement provided for the creation of an "Interest Reserve Account." Certain Hard Money Fund agreements with real estate developers required the developers to deposit money into the Interest Reserve Account, a means of reducing some of WestLB's risks because the bank was authorized to draw upon funds in the account in the event that the borrower missed an interest payment. The Agreement required West End to maintain the account in trust for WestLB and prohibited the commingling of funds in the Interest Reserve Account with any other account.

33.     In addition to signing the Agreement, Landberg acknowledged in a June 2008 email that he was not supposed to "touch" the money in the Interest Reserve Account.

34.     Landberg designed the Franchise Fund to generate returns primarily through commercial loans to restaurant franchisees, including franchisees affiliated with Yum! Brands and Burger King Corporation. These loans were collateralized by the underlying franchise property and equipment. Marketing materials for the Franchise Fund promoted the fund's objective "to achieve consistent levels of current income and stability of principal" and advertised annual returns of seven to nine percent.

35.     Similar to the Hard Money Fund, the Franchise Fund obtained eighty percent of its capital from a German bank, DZ Bank, with the remaining twenty percent coming from West End investors.

36.     The Franchise Fund was required to use income earned from its investments first to repay the eighty percent loan from DZ Bank, with the remainder (after WEFA's fees and expenses) distributed to investors.

37.     WEFA served as the Franchise Fund's general partner and was entitled to collect an annual one percent fee based on the percentage of gross assets (including loan proceeds) of the Franchise Fund.  Landberg was primarily responsible for investment decisions made on behalf of the Franchise Fund.

38.     Landberg designed the Income Strategies Fund as a fund-of-funds that invested in the Franchise and Hard Money Funds.  The Income Strategies Fund offering materials provided that the fund's objective was "to achieve superior returns with relatively low volatility." Marketing materials for the Fund stated that the fund was designed to generate a "stable stream of income" of "9 to 11% annually" with "low levels of volatility."

39.     WEFA served as the Income Strategies Fund's general partner.  Landberg controlled the fund's day-to-day operations and was responsible for its investment decisions. The Income Strategies Fund was charged the same management and incentive fees that the Hard Money Fund and Franchise Fund charged to their other investors.

11

Landberg Defrauds West End Investors

40.    Prior to 2008, Landberg created and managed over 30 different funds and related investment entities, with names like the Special Opportunity Fund and the Absolute Return Fund. By early 2008, the primary investments of these other funds consisted of loans to, and investments in, the Franchise Fund and Hard Money Fund.

41.    In 2008, as a result of Landberg's mismanagement, West End's overall financial condition was poor and worsening. Only the Franchise Fund and the Hard Money Fund had any potential of earning positive returns for investors, and these returns were not enough to satisfy West End's obligations, such as paying distributions to investors in those funds and the firm's operating expenses. In addition, the Franchise Fund had contractual commitments to fund loans to certain franchisees. However, Landberg did not have, and often could not obtain, a sufficient stream of investor capital with which to fund such loans.

42.    To deal with these shortfalls, Landberg at first improperly treated all of the funds under his management as one large pool of cash, using the commingled assets to satisfy obligations as they occurred – regardless of which fund incurred the obligation. Barsuk, who was West End's Controller and had control over the fund accounts, facilitated Landberg's improper use of fund assets by moving money between various funds, sometimes at Landberg's direction.

43.    Beginning in at least April 2008, Landberg orchestrated a further fraud to deal with West End's financial difficulties. Landberg used the Interest Reserve Account, which was to be held for the benefit of WestLB alone, as just another source of cash to meet any of the financial needs of West End. Landberg took money from the Interest Reserve Account as needed. For example, on at least two occasions, Landberg, Barsuk and Gould used Interest

Reserve Account funds to cover overdrafts in other West End fund accounts.  Specifically, in April and again in May 2008, Barsuk transferred approximately $500,000 from the Interest Reserve Account to cover overdrafts in other West End accounts.  On another occasion, Landberg and Gould used Interest Reserve Account funds to make a $1.5 million investment in a Florida bank.

44.      Landberg, Barsuk and Gould concealed these improper withdrawals by transferring money into the Interest Reserve Account at the end of each month – when WestLB drew upon funds in the account – so that WestLB would not know of the pilfering that occurred from the account.  The money used to cover the shortfall in the Interest Reserve Account came from wherever Landberg, Barsuk and Gould could find it, including various fund accounts.  For example, to cover anticipated shortfalls in the Interest Reserve Account in July 2008, Landberg and/or Barsuk transferred approximately $1.755 million into that account from ten fund accounts, including accounts of the Finance Fund and the Income Strategies Fund.

45.      A forensic analysis completed at West End's direction in September 2009 found approximately $3.3 million in improper withdrawals from the Interest Reserve Account from January 2008 to April 2009.  As of May 2009, after Landberg left West End, approximately $400,000 was missing from the account and had to be repaid by West End.

46.      In addition, Landberg submitted three fraudulent loan requests to WestLB in 2009 and obtained a total of over $8.5 million.  In January 2009, Landberg submitted a request to WestLB on behalf of the Hard Money Fund for a loan of $3.948 million.  Landberg misrepresented to WestLB that the Hard Money Fund would use the proceeds to fund a loan to develop real property on Long Island.  However, upon receiving the $3.948 million loan, Landberg misappropriated most of the money and used it for the benefit of other funds and for

himself. He used $2 million of the loan proceeds to fund commitments of the Franchise Fund, paid $350,000 to investors as purported earnings on their investments, and diverted over $100,000 to his own personal accounts.

47.      In February 2009, Landberg submitted a second fraudulent loan request to WestLB on behalf of the Hard Money Fund for a $3.08 million loan. Landberg misrepresented to WestLB that the Hard Money Fund would use the proceeds to fund a loan to develop commercial real estate in Florida. Upon receipt of this second loan from WestLB, Landberg again diverted the loan proceeds for various other purposes, including an approximate $2 million mortgage payment on an unrelated property.

48.      In April 2009, Landberg submitted a third fraudulent loan request to WestLB, this time for $1.68 million. Landberg misrepresented to WestLB that the Hard Money Fund would use the  proceeds to fund a loan to develop commercial real estate in Alabama. Instead of using the proceeds to make the loan, Landberg diverted the entire proceeds to fund a loan made by the Franchise Fund.

49.      From April 2008 to May 2009, Landberg also ignored the investment parameters of the Income Strategies Fund and treated investments in that fund as another piggy bank. Landberg represented to investors that the Income Strategies Fund was a fund-of-funds that would, at least initially, invest in the Hard Money Fund and Franchise Fund. Instead, Landberg used money in the Income Strategies Fund for whatever purpose he wished.

50.      For example, in April 2008, West End's CFO Gould emailed Landberg that the Income Strategies Fund had lent the West End Special Opportunities Fund ("WESOF"), one of Landberg's older funds, approximately $1.8 million. Gould informed Landberg that this loan to WESOF did not comply with the stated investment objectives and parameters of the Income

Strategies Fund. According to Gould's email, "[the Income Strategies Fund] should be making investments in [the Franchise Fund] as part of the objective of the fund." Gould was aware that Landberg had regularly orchestrated a number of transactions between the various West End funds, so Gould designed a way for West End to, in Gould's words, "clean up" its accounting for certain related party loans. Gould's efforts facilitated Landberg's fraud by disguising certain improper transactions between the West End funds.

51.     In addition, in April 2009, Landberg misappropriated money from the Income Strategies Fund bank account to make a $50,000 investment in a public company with which Landberg had substantial ties.

52.     A forensic analysis completed at West End's direction in September 2009 found at least $2.5 million in net transfers out of the Income Strategies Fund bank account to other West End accounts unrelated to the Hard Money Fund or the Franchise Fund.

53.     Landberg's fraud enabled West End to continue to market the West End funds to new investors throughout 2008 and 2009, while sustaining the illusion that the returns generated from the funds' investments were in line with defendants' representations to investors. Hard Money Fund offering materials provided to investors in that time period specifically stated that money borrowed from WestLB would only be used to fund investments made by the Hard Money Fund (and certain reserve and fee obligations related to such investments). Thus, Landberg had no authority to use loans obtained from WestLB for any other purpose, such as the payment of distributions to investors or the funding of investments by the Franchise Fund.

54.     In the Hard Money Fund Limited Partnership Agreement, Landberg, on behalf of WECM, also promised investors not to do any act "which would make it impossible to carry on

the ordinary business" of the Hard Money Fund, a promise he reneged on as soon as he began plundering the Interest Reserve Account.

55.     Further, certain marketing materials that West End sent to its fund investors falsely showed that the West End funds were earning steady monthly returns. For example, marketing materials sent to investors in March 2009 showed steady monthly returns for the West End funds for the period January 2009 of 1.09% for the Hard Money Fund and 0.81% for the Income Strategies Fund. These returns were false and misleading because they did not result from successful investment but rather were obtained only because Landberg diverted proceeds of a loan he had fraudulently obtained from WestLB. Specifically, Landberg used $350,000 from a $3.9 million loan from WestLB in January 2009 to pay investor distributions. Gould aided in the preparation of these marketing materials.

56.     Landberg also informed multiple investors that West End's goal was preservation of investor capital. He emphasized how West End's investments were not tied to the stock market and thus investor money was safe, when in reality he was commingling investor funds and using them for inappropriate purposes.

57.     As a result of West End's ongoing solicitation efforts, nineteen investors invested at least $4.7 million in the Income Strategies Fund in 2009.

58.     Landberg, Crandall, and their limited partnership L/C Family personally benefitted from the fraud. Between January 2008 and April 2009 alone, Landberg, Crandall, and L/C Family received at least $1.5 million from the West End funds. Landberg and Crandall used this money to enjoy a lavish lifestyle, including a luxury apartment on Fifth Avenue in Manhattan, a house in the Hamptons, an apartment in Palm Beach, and several luxury automobiles.

Gould Participated in and Barsuk Facilitated Landberg's Fraudulent Scheme

59.     Gould, a certified public accountant since 1991, served as West End's Chief

Financial Officer and reported directly to Landberg beginning in September 2006.  Gould was

responsible for the content of account statements sent to West End investors and for certain other

communications designed for West End investors, such as marketing materials summarizing the

monthly performance of the Hard Money Fund, Franchise Fund, and Income Strategies Fund.

60.     Throughout the period of Landberg's fraud in 2008 and 2009, Gould issued

account statements to West End investors that Gould knew, or was reckless in not knowing,

showed investment returns that were false and not solely the result of investments made on

behalf of the respective West End fund.  As West End's CFO, Gould had access to, and

responsibility for maintaining, all West End financial records.  Gould was therefore aware that

the returns on investments by West End funds were not adequate to meet the funds' obligations,

and he was aware of and complicit in the steps West End took to conceal this fact from investors.

61.     By April 2008, Gould knew, or was reckless in not knowing, that Landberg was

plundering the Interest Reserve Account.  Gould at times directed money transfers to and from

the Interest Reserve Account.

62.     In addition, in February or March 2009, Landberg caused West End to make an

illicit $1.5 million investment in a Florida-based bank – an investment that bore no connection to

the stated investment objectives of the Franchise Fund and the Hard Money Fund, that was

outside the scope of the investments described in the funds' offering documents, and that was not

otherwise disclosed to or authorized by the fund investors.

63.     The Hard Money Fund's limited partnership agreement prohibited the general

partner from taking any actions that would make it impossible to carry on the ordinary business

of the partnership. Landberg breached this provision by using money from the Interest Reserve Account and by fraudulently obtaining loans from WestLB as described above, thereby violating the Hard Money Fund's agreements with WestLB, which made it impossible to carry on the ordinary business of the partnership. In the case of the investment in the Florida-based bank, Gould took money from the Interest Reserve Account to make the investment, and then disguised the fact that the money had come from that account by, in Gould's words, "reclassifying" the improper loan as an investment by the Hard Money Fund in the Franchise Fund.

64.     Although West End's investment in the bank ended up on the Franchise Fund books, the certificate issued to document the investment was issued to Landberg or Crandall personally, not to the Franchise Fund, thus calling into doubt the Franchise Fund's right to its investment. West End's outside auditor for the Franchise Fund later told Gould that he was not comfortable with the method by which Gould accounted for the purported investment on behalf of the Franchise Fund in the Florida-based bank.

65.     Gould also knew, or was reckless in not knowing, that Landberg was using investments in the Income Strategies Fund for purposes other than those set forth in that fund's offering documents. On at least one occasion, Gould devised an accounting treatment to help Landberg disguise his misuse of Income Strategies Fund investments. Gould conceived a transaction involving the Franchise Fund and a third West End fund to "clean up" a "related party loan" that the Income Strategies Fund had made to the third West End fund.

66.     In addition, Gould maintained the Income Strategies Fund balance sheet which shows for December 2008 over $11 million in interparty receivables, including investments in other West End funds such as the Absolute Return Fund I (over $2.5 million), the Fixed Income

Fund (over $1.9 million), and the Special Opportunity Fund (over $2.5 million).  These interparty receivables were improper because West End represented to investors that the Income Strategies Fund was going to invest in the Franchise Fund and Hard Money Fund, not in any other West End funds.

67.     Barsuk served as West End's Controller from January 2006 through at least May 2009.  Beginning in at least April 2008, Barsuk knew, or was reckless in not knowing, that West End faced constant cash shortfalls and that Landberg was tapping funds in the Interest Reserve Account to meet these financial needs.  For example, in an August 2008 email, Barsuk informed Landberg that they needed to put over $1.25 million back into the Interest Reserve Account by the end of the month.  Barsuk at times transferred money from the Interest Reserve Account on her own initiative to pay obligations due in other West End accounts.

68.     Gould and Barsuk also knew, or were reckless in not knowing, that Landberg was treating West End as his personal piggy bank.  At times, Barsuk facilitated Landberg's use of investor money to cover his personal obligations.  On April 27, 2009, mere days before Landberg's fraud vis-à-vis WestLB came to light, Landberg asked Barsuk to confirm that his "personal [American Express] bills are current."  Barsuk responded that Landberg had over $25,000 in personal bills outstanding and asked if he wanted that paid.  Landberg instructed her to pay the bill, and Barsuk took money from a West End account to pay a portion of the bill.

69.     Landberg directed West End to pay Gould and Barsuk six-figure annual salaries.

Kramer Fails to Disclose West End's Fraudulent Practices to Investors

70.     Kramer served as West End's Chief Operating Officer from 2006 through June 2009.  In that capacity, from 2007 through 2009 Kramer solicited and obtained at least $25

million in investor capital for the West End funds.  By at least July 2008, however, Kramer was

aware that the West End funds were not performing as he and West End represented to investors.

71.     Landberg made Kramer aware in July 2008 that he was tapping the Interest

Reserve Account to satisfy West End's cash shortfalls.  For example, Landberg emailed Kramer

"we are going to be short this month [in the Interest Reserve Account] and that cannot happen."

Tellingly, Landberg added that Kramer was "acting like an ostrich."  Kramer responded that he

was not: "we are ALL acutely aware of the deadline looming and know what needs to be done.

[sic]" Kramer informed Landberg that he was talking to "EVERYONE I know this week [sic]"

to try to raise money.  Landberg was insistent: "We have to raise $2m.  Do you understand the

consequences of failing to meet that number??  That is where we are not on the same page. [sic]"

Kramer responded by asking for the "shortfall amount."  Landberg's reply demonstrates that

Kramer knew, or was reckless in not knowing, about Landberg's misuse of funds from the

Interest Reserve Account: "I am not ranting.  I am trying to get you to focus uber clearly on

reality.  We need exactly $1.7m for the interest reserve account.  Is that clear enough?  If we fail,

we are dead meat."

72.     Again in August 2008, in connection with asking Kramer to sign a personal

guarantee for a loan that West End was obtaining, Landberg informed Kramer that the "[l]oan

proceeds are net net to replace the interest reserve that was used to fund loans."

73.     In December 2008, Landberg advised Kramer that "we need a plan [because]

[t]he inflow is not keeping up with our obligations."  The same month, Landberg and Kramer

signed personal guarantees for a $500,000 unsecured bridge loan that Landberg obtained from

Herald National Bank ("Herald") to help West End pay various operating expenses.

74.    All the while, Kramer continued to solicit investors for the West End funds, using marketing materials touting the funds' steady monthly returns, without disclosing the firm's ongoing financial problems or that West End was going to use their investments to repay money that Landberg unlawfully took from the Interest Reserve Account. In December 2008, Kramer told an investor seeking to withdraw her funds that West End had a reserve to pay investor redemptions, when Kramer knew, or was reckless in not knowing, that no such reserve existed.

75.    From January 24 to March 2, Kramer solicited $313,000 in investments for West End. His solicitation efforts continued despite an email Kramer received from Landberg on February 23, 2009 that "the consequences of not dealing with the absolute minimum we need to fund comittements [sic] is going to be DEVASTATING."

76.    Kramer's solicitation efforts continued virtually until West End collapsed. For example, on March 20, 2009, the same day that Landberg emailed Kramer "we are in deep blankin s..t [sic]," Kramer responded that he was "meeting with a prospect here this evening." Kramer subsequently appeared on a Fox Business News television program on April 7, 2009 and trumpeted the safety of West End's investments.

77.    In addition to his failure to disclose to West End funds' investors the true state of the funds, Kramer attempted to withdraw his personal investments in West End at the same time that Landberg's loan fraud vis-à-vis WestLB came to light. Based on West End records, Kramer and his wife had approximately $2.3 million invested in various West End funds as of April 2009. Kramer learned about Landberg's actions with respect to WestLB on or about April 29, 2009. On the same day, Kramer sought to withdraw two of his investments, and the remaining four investments on May 6, 2009. Although he was not able to actually withdraw his

investments, Kramer sought to escape West End well in advance of virtually all the company's outside investors.

78.     Kramer benefitted from his fraud by earning a salary of at least $250,000 in 2008 and 2009.

The Fraud Cripples West End

79.     Upon learning in May 2009 of Landberg's fraudulent actions, WestLB issued a notice of default and cut off West End's access to returns on the mortgage loans made out of the Hard Money Fund.  Soon after, DZ Bank took similar steps with respect to the Franchise Fund.  The actions of WestLB and DZ Bank interrupted the stream of interest income that had been flowing to some West End investors.

Efforts to Determine and Distribute Investor Assets

80.     Of the various Landberg-directed investments, only the Franchise Fund and the Hard Money Fund are currently generating any significant cash flow, and that cash flow is dedicated to interest and other payments to lenders and for West End's operating expenses.  West End estimates that as of December 2010 the funds' net value was approximately $40 million, compared to approximately $66 million in net principal received from investors.  To date, West End has not told investors when distributions will resume; how much, if any, investor principal will be returned; or when either of those events will happen.

81.     Since June 2009, after Landberg's fraudulent activities in connection with the West End funds came to light, West End has been operated by a new general partner.  Certain West End investors have complained that the new (current) general partner has: (i) mismanaged the funds since Landberg was replaced; (ii) paid himself an excessive annual salary; (iii) wasted

money on legal expenses; (iv) not provided timely access to the funds' books and records; and

(v) not provided timely information about account balances or holdings, among other concerns.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Landberg, Kramer, Gould, WEFA, WECM, and Sentinel)

82.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 81.

83.     Landberg, Kramer, Gould, WEFA, WECM, and Sentinel in the offer or sale of

securities, by use of the means or instruments of transportation or communication in interstate

commerce, or by the use of the mails, directly or indirectly, singly or in concert, with scienter

have:

      (a) employed or are employing devices, schemes or artifices to defraud;

      (b) obtained money or property by means of untrue statements of material fact or

          by omitting to state material facts necessary in order to make the statements

          made, in light of the circumstances under which they were made, not

          misleading; or

      (c) engaged in acts, transactions, practices and courses of business which operated

          or would have operated as a fraud or deceit upon purchasers of securities.

84.     By reason of the foregoing, Landberg, Kramer, Gould, WEFA, WECM, and

Sentinel, directly or indirectly, violated, and unless enjoined will again violate, Section 17(a) of

the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

**Direct Violations (Landberg, Kramer, Gould, WEFA, WECM, and Sentinel) and Aiding and Abetting Violations (Barsuk) of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

85.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 84.

86.     Landberg, Kramer, Gould, WEFA, WECM, and Sentinel, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, directly or indirectly, singly or in concert, with scienter, have:

> (a) employed or are employing devices, schemes or artifices to defraud;

> (b) made untrue statements of material fact or have omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

> (c) engaged in acts, transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon any person.

87.     The misstatements and omissions of fact detailed above were material.

88.     By reason of the foregoing, Landberg, Kramer, Gould, WEFA, WECM, and Sentinel, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

89.     By facilitating Landberg's looting of the Interest Reserve Account and his misuse of investor assets, Barsuk, by use of the means or instrumentalities of interstate commerce, or of the mails, with scienter, aided and abetted Landberg, Gould, WEFA, WECM, and Sentinel in their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

**Direct Violations (Landberg, WEFA, WECM, and Sentinel) and Aiding and Abetting Violations (Kramer, Gould, and Barsuk) of Sections 206(1) and 206(2) of the Advisers Act**

90.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 89.

91.     At all relevant times, Landberg, WEFA, WECM, and Sentinel acted as investment advisers, as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], to the West End funds and also to certain investors in those funds.

92.     Landberg, WEFA, WECM, and Sentinel, by engaging in the acts and conduct alleged above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce, or by the use of the mails, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities, with scienter, have:

> (a) employed devices, schemes, or artifices to defraud investors or prospective investors; or

> (b) engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon investors or prospective investors.

93.     By reason of the foregoing, Landberg, WEFA, WECM, and Sentinel, directly or indirectly, violated, and unless enjoined will again violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

94.     By soliciting West End investors by making untrue statements of material facts, or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, Kramer, by use of the means or

instrumentalities of interstate commerce, or of the mails, with scienter, aided and abetted

Landberg, WEFA, WECM, and Sentinel in their violations of Sections 206(1) and 206(2) of the

Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

95.     By facilitating Landberg's looting of the interest reserve account and his misuse

of investor assets, Gould and Barsuk, by use of the means or instrumentalities of interstate

commerce, or of the mails, with scienter, aided and abetted Landberg, WEFA, WECM, and

Sentinel in their violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-

6(1), 80b-6(2)].

### FOURTH CLAIM FOR RELIEF

**Direct Violations (Landberg, WEFA, and WECM) and Aiding and Abetting Violations
(Kramer, Gould, Barsuk, and Sentinel) of Section 206(4) of the Advisers Act and Rule
206(4)-8 Thereunder**

96.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 95.

97.     At all relevant times, Landberg, WEFA, and WECM, acted as investment

advisers, as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], to the

West End funds and also to certain investors in those funds.

98.     Landberg, WEFA, and WECM, by engaging in the acts and conduct alleged

above, directly or indirectly, through use of the means or instruments of transportation or

communication in interstate commerce, or by the use of the mails, and while engaged in the

business of advising others for compensation as to the advisability of investing in, purchasing, or

selling securities, with scienter, have:

(a) engaged in acts, practices, and courses of business which were fraudulent,

deceptive, or manipulative; or

26

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in a pooled investment vehicle.

99.     By reason of the foregoing, Landberg, WEFA, and WECM, directly or indirectly, violated, and unless enjoined will again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

100.     By soliciting West End investors by making untrue statements of material facts, or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, Sentinel and Kramer, by use of the means or instrumentalities of interstate commerce, or of the mails, with scienter, aided and abetted Landberg, WEFA, and WECM in their violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

101.     By facilitating Landberg's looting of the interest reserve account and his misuse of investor assets, Gould and Barsuk, by use of the means or instrumentalities of interstate commerce, or of the mails, with scienter, aided and abetted Landberg, WEFA, and WECM in their violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## FIFTH CLAIM FOR RELIEF
**(Relief Defendants Louise Crandall and L/C Family Limited Partnership)**

102.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 101.

103.    Crandall and L/C Family received, directly or indirectly, funds and/or other assets

from the Defendants, which either are the proceeds of, or are traceable to the proceeds of, the

unlawful activities alleged herein and to which they have no legitimate claim.

104.    Crandall and L/C Family obtained the funds and assets as part of and in

furtherance of the securities violations alleged herein and under circumstances in which it is not

just, equitable, or conscionable for them to retain the funds and assets, and accordingly, the

Relief Defendants have been unjustly enriched by ill-gotten gains.

105.    The Commission is entitled to an order requiring that Crandall and L/C Family

disgorge these funds and assets plus prejudgment interest thereon.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court issue a

Final Judgment:

**I.**

Permanently restraining and enjoining:

(a) Landberg, Kramer, Gould, WEFA, WECM, and Sentinel, and their agents, servants,

    employees and attorneys, and all persons in active concert or participation with them

    who receive actual notice of the injunction by personal service or otherwise, from

    violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

(b) Landberg, Kramer, Gould, Barsuk, WEFA, WECM, and Sentinel, and their agents,

    servants, employees and attorneys, and all persons in active concert or participation

    with them who receive actual notice of the injunction by personal service or

    otherwise, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

    Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

(c) Landberg, Kramer, Gould, Barsuk, WEFA, WECM, and Sentinel, and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R.§ 275.206(4)-8].

## II.

Ordering Landberg, WEFA, WECM, and Sentinel, jointly and severally liable for disgorgement of any and all ill-gotten gains they received as a result of their violations of the federal securities laws, plus prejudgment interest thereon;

## III.

Ordering Kramer liable for disgorgement of any and all ill-gotten gains he received as a result of his violations of the federal securities laws, plus prejudgment interest thereon;

## IV.

Ordering Crandall and L/C Family liable for disgorgement of any and all ill-gotten gains they received as a result of Defendants violations of the federal securities laws, plus prejudgment interest thereon;

## V.

Ordering Landberg, Kramer, and Gould to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

**VI.**

Ordering Landberg, Kramer, Gould, and Barsuk to pay civil money penalties pursuant to

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the

Advisers Act [15 U.S.C. § 80b-9(e)];

**VII.**

Ordering that an independent monitor be appointed with respect to WEFA, WECM, and

Sentinel; and

**VIII.**

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      January 20, 2011

By   _____
      George S. Canellos
      Regional Director
      Attorney for Plaintiff
      SECURITIES AND EXCHANGE COMMISSION
      New York Regional Office
      3 World Financial Center, Suite 400
      New York, New York 10281
      (212) 336-0589
      (Howard Fischer, Senior Trial Counsel)

Of Counsel:
David Rosenfeld
Ken C. Joseph
Howard Fischer
Cynthia A. Matthews
Matthew J. Watkins