UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                  Plaintiff,

      v.

WILLIAM LANDBERG, KEVIN KRAMER, STEVEN
GOULD, JANIS BARSUK, WEST END FINANCIAL
ADVISORS LLC, WEST END CAPITAL
MANAGEMENT LLC, and SENTINEL
INVESTMENT MANAGEMENT CORPORATION,

                  Defendants,

                  and

LOUISE CRANDALL and L/C FAMILY LIMITED
PARTNERSHIP,

                  Relief Defendants.

11-CV-0404 (PKC)

---

PRE-TRIAL MEMORANDUM OF LAW
SUBMITTED BY THE
SECURITIES AND EXCHANGE COMMISSION
IN SUPPORT OF ITS CLAIMS
AGAINST DEFENDANT STEVEN GOULD

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................... iv

**INTRODUCTION** ............................................................................................ 1

**OUTLINE OF THE SEC'S CASE** .................................................................. 2

**LEGAL ELEMENTS OF THE SEC'S CASE** ................................................ 4

I.     GOULD'S INVOCATION OF HIS FIFTH AMENDMENT PRIVILEGE
ENTITLES THE SEC TO AN ADVERSE INFERENCE AND PRECLUDES
HIM FROM TESTIFYING IN HIS DEFENSE AT TRIAL ....................................... 4

     A.  The SEC Is Entitled To A Negative Inference In Its Benefit ................................. 5

     B.  Gould Must Be Precluded From Offering Evidence Regarding  Matters About
Which He Invoked His Fifth Amendment Privilege ............................................... 8

II.    GOULD IS LIABLE FOR PRIMARY VIOLATIONS OF SECTION 10(b) OF
THE EXCHANGE ACT AND EXCHANGE ACT RULE 10b-5 AS WELL AS
SECTION 17(a) OF THE SECURITIES ACT .......................................................... 9

     A.  Gould's Liability For Misrepresentations And Ommissions ............................... 11

     B.  The Information Misrepresented Or Not Disclosed Was Material ...................... 14

     C.  These Statements Were Made In Connection With The Investors' Purchases ..... 16

     D.  Gould Is Liable For Participation In A Scheme Or Artifice To Defraud ............ 16

     E.  Gould Acted With Scienter .................................................................................. 18

III.   GOULD IS LIABLE FOR AIDING AND ABETTING VIOLATIONS UNDER
THE ADVISERS ACT ............................................................................................. 21

     A.  There Were Underlying Violations of the Advisers Act ..................................... 22

     B.  Gould Knew of the Underlying Violations .......................................................... 24

     C.  Gould Rendered Substantial Assistance to the Underlying Violations ............... 24

IV.   GOULD'S CONDUCT JUSTIFIES THE IMPOSITION OF THIRD TIER
PENALTIES ............................................................................................................ 25

V.      GOULD  SHOULD BE PERMANENTLY ENJOINED FROM VIOLATING
        THE SECURITIES LAWS......................................................................................... 27

**CONCLUSION** ....................................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Abrahamson v. Fleschner*,
    568 F.2d 862 (2nd Cir. 1977)........................................................22

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..............................................................15

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976)...............................................................5

*Berko v. SEC*,
    316 F.2d 137 (2d Cir.1963)........................................................11

*Collazos v. U.S.*,
    368 F.3D 190 (2d Cir. 2004).......................................................5

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)..............................................................18

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)......................................................20

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005).............................................14

*In re Bayou Group, LLC*,
    439 B.R. 284 (Bankr. S.D.N.Y. 2012).............................................20

*In re Enron Corp. Sec. Litig.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ...........................................11

*In re Manhattan Inv. Fund Ltd*,
    359 B.R. 510 (Bankr. S.D.N.Y. 2007).............................................20

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005).............................................17

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611  (S.D.N.Y. 2007)............................................14

*In re Salomon Analyst AT&T Litig.*,
    350 F. Supp. 2d 455 (S.D.N.Y. 2004).............................................17

*In re Vivendi Universal, S.A.*,
    381 F. Supp. 2d 158  (S.D.N.Y. 2003)..................................................................14

*LiButti v. U.S.*,
    178 F.3d 110 (2d Cir. 1999)........................................................................5

*MLSMK Inv. Co. v. JPMorgan Chase & Co.*,
    651 F.3d 268 (2d Cir. 2011).......................................................................20

*SEC v. Aragon Capital Advisors, LLC*,
    2011 WL 3278907 (S.D.N.Y. 2011).............................................................21

*SEC v. Benson*,
    657 F. Supp. 1122 (S.D.N.Y. 1987)..............................................................5

*SEC v. Cassano*,
    2000 WL 777930 (S.D.N.Y. June 19, 2000) .................................................9

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998).......................................................................27

*SEC v. Coates*,
    137 F. Supp. 2d 413 (S.D.N.Y. 2001)..........................................................26

*SEC v. Collins & Aikman Corp.*,
    524 F. Supp. 2d 477  (S.D.N.Y. 2007)..........................................................14

*SEC v. Commonwealth Chem. Sec., Inc.*,
    574 F.2d 90 (2d Cir. 1978)........................................................................27

*SEC v. Credit Bancorp, Ltd.*,
    2002 WL 31422602 (S.D.N.Y. Oct. 29, 2002).............................................25

*SEC v. Credit Bancorp, Ltd.*,
    195 F. Supp. 2d 475 (S.D.N.Y. 2002)..............................................11, 16, 18

*SEC v. Czarnik*,
    2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010).......................................11, 18

*SEC v. DiBella*,
    587 F.3d 553 (2d Cir. 2009)......................................................................21

*SEC v. Dunn*,
    587 F. Supp. 2d 486 (S.D.N.Y. 2008)..........................................................19

*SEC v. Espuelas*,
   698 F. Supp. 2d 415 (S.D.N.Y. 2010)................................................................14, 19

*SEC v. Forest Res. Mgmt. Corp.*,
   2010 WL 2077202 (S.D.N.Y. May 18, 2010) .......................................................25, 26

*SEC v. Gabelli*,
   2010 WL 1253603 (S.D.N.Y. 2010)............................................................................21

*SEC v. Haligiannis*,
   470 F. Supp. 2d 373 (S.D.N.Y. 2007).........................................................................18

*SEC v. Hasho*,
   784 F. Supp. 1059 (S.D.N.Y. 1992)............................................................................16

*SEC v. Invest Better 2001*
   2005 WL 2385452 (S.D.N.Y. May 4, 2005) ...............................................................5

*SEC v. Kenton Capital*,
   69 F. Supp. 2d 1 (D.D.C. 1998)..................................................................................26

*SEC v. Kimmes*,
   799 F. Supp. 852 (N.D. Ill. 1992) ..............................................................................10

*SEC v. Landberg*,
   __ F. Supp. 2d __, 2011 WL 5116512 (S.D.N.Y. Oct. 26, 2011)....................14, 17, 21

*SEC v. Lee*,
   720 F. Supp. 2d 305 (S.D.N.Y. 2010)................................................................... 16-17

*SEC v. Management Dynamics, Inc.*,
   515 F.2d 801 (2d Cir. 1975).......................................................................................27

*SEC v. Manor Nursing Ctrs., Inc.*,
   458 F.2d 1082 (2d Cir. 1972)......................................................................................27

*SEC v. Mayhew*,
   121 F.3d 44 (2d Cir. 1997)..........................................................................................15

*SEC v. McGinn, Smith & Co., Inc.*,
   752 F. Supp. 2d 194 (N.D.N.Y. 2010)..........................................................................5

*SEC v. McNulty*,
   137 F.3d 732 (2d Cir. 1998)........................................................................................18

*SEC v. Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999)............................................................11

*SEC v. Moran*,
    922 F. Supp. 867 (S.D.N.Y. 1996) ..............................................10

*SEC v. Murphy*,
    626 F.2d 633  (9th Cir. 1980) ......................................................15

*SEC v. North Am. Research & Dev. Corp.*,
    424 F.2d 63 (2d Cir. 1970)......................................................11, 15

*SEC v. Opulentica, LLC*,
    479 F. Supp. 2d 319 (S.D.N.Y. 2007).........................................26

*SEC v. Palmisano*,
    135 F.3d 860 (2d Cir. 1998)........................................................25

*SEC v. Pattison*,
    2011 WL 723600 (N.D. Cal. Feb. 23, 2011) ..............................26

*SEC v. Pentagon Capital Mgmt*,
    612 F. Supp. 2d 241(S.D.N.Y. 2009)..........................................11

*SEC v. Pentagon Capital Mgmt*,
    __ F. Supp. 2d __, 2012 WL 479576 (S.D.N.Y. Feb. 14, 2012) ............................4, 16

*SEC v. Pittsford Capital Income Partners, LLC*,
    2007 WL 2455124 (W.D.N.Y. Aug. 23, 2007)  ...........................8, 9, 16, 20

*SEC v. Power*,
    525 F. Supp. 2d 415 (S.D.N.Y. 2007).........................................27

*SEC v. Razmilovic*,
    __F. Supp. 2d __, 2011 WL 4629022 (E.D.N.Y. Sept. 30, 2011) ............................26

*SEC v. Rana Research, Inc.*,
    8 F.3d 1358 (9th Cir. 1993) ...................................................15, 16

*SEC v. Saltzman*,
    127 F. Supp. 2d 660  (E.D. Pa. 2000) .........................................15

*SEC v. Softpoint, Inc.*,
    958 F. Supp. 846 (S.D.N.Y. 1997) ..............................................27

*SEC v. Stanard,*
    2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ....................................................16, 18

*SEC v. Steadman,*
    967 F.2d 636 (D.C. Cir. 1992) ...................................................................23

*SEC v. Suman,*
    684 F. Supp. 2d 378 (S.D.N.Y 2010) ...........................................................5

*SEC v. Tecumseh Holdings Corp.,*
    765 F. Supp. 2d 340 (S.D.N.Y. 2011)...................................................... 18-19

*Steadman v. SEC,*
    450 U.S. 91 (1981) ...................................................................................10

*U.S. v. Bonnano Organized Crime Family,*
    683 F. Supp. 1411 (E.D.N.Y. 1988) .............................................................5

*U.S. v. Brown,*
    555 F.2d 336 (2d Cir. 1977)......................................................................10

*U.S. v. Certain Real Property and Premises Known As: 4003-4005 5th Ave.,*
    *Brooklyn, NY,* 55 F.3d 78 (2d Cir. 1995) ................................................... 8-9

*U. S. v. Finnerty,*
    533 F.3d 143(2d Cir. 2008)..................................................................11, 16

*U.S. v. Jensen,*
    608 F. 2d 1349 (10th Cir. 1979) ...............................................................10

*U.S. v. Johnson,*
    354 F. Supp. 2d 939 (N.D. Iowa 2005).......................................................21

*U.S. v. Naftalin,*
    441 U.S. 768 (1979).................................................................................10

*U.S. v. Village of Island Park,*
    888 F. Supp. 419 (E.D.N.Y. 1995) ...............................................................9

*VanCook v. SEC,*
    653 F.3d 130, 138 (2d Cir. 2011).........................................................10, 18

**Other Sources**

Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles,
    SEC Release No. IA-2628 (Aug. 3, 2007)...................................................23

4 Moore's Federal Practice ¶ 26.60 [6] (2nd ed. 1987) ...............................................................9

The Securities and Exchange Commission ("SEC") respectfully submits this pretrial memorandum of law supporting its claims to be presented at the upcoming trial of Defendant Steven Gould ("Gould").

## INTRODUCTION

As set forth in greater detail in the SEC's March 2, 2012 Proposed Findings of Fact and Conclusions of Law ("Findings of Fact" or "FOF"), this civil enforcement action involves a fraudulent scheme at a small complex of investment funds affiliated with West End Financial Advisors LLC ("WEFA"), West End Capital Management LLC, and Sentinel Investment Management Corporation ("Sentinel") (collectively, "West End"), from at least January 2008 through April 2009.  Gould served as West End's Chief Financial Officer ("CFO") during that period (FOF ¶¶ 16, 51), and thus played an integral part in furthering and concealing the scheme in order to prevent the house of cards from collapsing, as it finally did in May 2009.

West End was a New York-based, unregistered investment adviser that from 2000 onward created and offered investors a number of private funds.  (FOF ¶¶ 1-12.)  As early as 2006, the investment strategies of most of these funds had failed, and West End was having difficulties meeting its financial obligations on a regular basis.  (FOF ¶¶ 157-172; SEC Exhibits 1, 18, 203-210.)  By January 2008, West End's business had settled on two primary funds, one that invested in loans to restaurant franchises (the "Franchise Fund"), and another that invested in "hard money" or short-term real estate mortgage loans (the "Hard Money Fund").  (FOF ¶¶ 23-36.)

As the Declarations and Exhibits submitted by the SEC establish, Gould repeatedly ignored his duties as CFO and was deeply implicated in West End's fraud.  Not only did he periodically meet with and reassure West End investors (FOF ¶¶ 79-80), he also prepared and

had the ultimate responsibility for misleading materials, such as account statements, sent to investors. (FOF ¶¶ 76-78, 81-83, 270-71; SEC Exs. 46-51, 68-72, 97, 100, 168-69, 171-72, 174-82.) He also oversaw and was instrumental in the improper commingling and use of investor funds, improper use of certain bank accounts, improper valuation of investments, and violations of financing obligations with banks that occurred at West End from at least January 2008 to April 2009. (FOF ¶¶ 173-269.) When the SEC presented Gould with the opportunity to explain his involvement, and respond to documents that illustrated that involvement in damning detail, Gould declined, asserting his Fifth Amendment privilege against self-incrimination. (FOF ¶¶ 147-151; SEC Ex. 248.)

## OUTLINE OF THE SEC'S CASE

The SEC's case against Gould is set forth in the accompanying Proposed Findings of Fact and Conclusions of Law, which relies on the Declarations of Janis Barsuk ("Barsuk Decl."), Katherine Baum ("Baum Decl."), Chris Efstratiou ("Efstratiou Decl."), Raymond J. Heslin ("Heslin Decl."), Michael Raounas ("Raounas Decl."), Michael Rhodes ("Rhodes Decl."), and Raymond T. Sloane ("Sloane Decl."), and the Exhibits submitted therewith. The SEC's case is additionally buttressed by the fact that at his deposition Gould asserted his Fifth Amendment privilege in response to any question posed concerning West End. *See* SEC Ex. 248. This evidence demonstrates that:

- Gould personally met with investors on a regular basis to reassure them about the safety of their investments, in the process making explicit misrepresentations about the security of those investments and concealing information about, among other things, West End's lack of solvency and about the commingling of investor assets. (FOF ¶¶ 79-80; *see* Raounas Decl. ¶¶ 10-12; Barsuk Decl. ¶ 8-10; SEC Exs. 3, 5, 11-14, 185-91.)

- Gould prepared and had the ultimate responsibility for the preparation of account statements to investors.  (FOF ¶¶ 61-66, 148, 151; *see, e.g.*, Barsuk ¶ 22-25; Heslin ¶ 8-10; SEC Exs. 97, 100, 168-69, 171-72, 174-82.)

- Gould received daily notifications of overdrafts in the bank accounts of West End funds and other affiliates, and was involved in and complicit with West End's improper commingling and looting of investor accounts, such that Gould knew, or was reckless in not knowing, that that the returns reported on account statements provided to investors were not accurate.  (FOF ¶¶ 93-103; 173-212, 235-242, 270-71; Heslin Decl. ¶ 26-28; *see, e.g.,* Barsuk Decl. ¶¶ 35-57; Efstratiou Decl. ¶¶ 20-25, 33-36; Sloane Decl. ¶¶ 8-9; Rhodes Decl. ¶¶ 27-42; SEC Exs. 1, 137-67, 173, 209-223.)

- Gould prepared, on the basis of information he knew or recklessly disregarded was false, marketing materials known as "tear sheets" which were presented to existing and potential investors, which misstated various funds investment strategy, assets under management, and earnings.  (FOF ¶¶ 81-83; *see, e.g.*, Heslin Decl. ¶ 13; SEC Exs. 46-51, 68-72.)

- Gould violated his duty as CFO and allowed West End to loot an Interest Reserve Account set up to segregate funds for the benefit of a West End lender.  (FOF ¶¶ 120-25; 243-52; *see, e.g.*, Heslin Decl. ¶¶ 33-38; Barsuk Decl. ¶¶ 58-66; SEC Exs. 77, 224-27; SEC Ex. 1 at pp. 25-26; SEC Ex. 248 at pp. 19-20.)

- Gould facilitated improper investments and valuations of investments at West End.  (FOF ¶¶ 213-16, 220-21, 246, 253-64; *see* Rhodes Decl. ¶¶ 46-50; SEC Exs. 5, 7, 15, 19, 29-33, 36, 41-43, 45, 98-99, 172, 197.)

- Gould failed to blow the whistle on the misappropriation of loan money from a lender to a West End fund.  (FOF ¶¶ 105-110, 265-69; Barsuk Decl. ¶¶ 67-72; Heslin Decl. ¶ 43; SEC Exs. 229-31.)

Based on these incontrovertible facts, Gould is liable under section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 201.10b-5]; section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and for aiding and abetting violations of sections 206(1), 206(2), and 206(4)of the Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1), (2) and 4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].[1]

## LEGAL ELEMENTS OF THE SEC'S CASE

### I.

### GOULD'S INVOCATION OF HIS FIFTH AMENDMENT PRIVILEGE ENTITLES THE SEC TO AN ADVERSE INFERENCE AND PRECLUDES HIM FROM TESTIFYING IN HIS DEFENSE AT TRIAL

When presented with the opportunity to defend his acts or failures to act, Gould declined, invoking instead his Fifth Amendment privilege at his September 8, 2011 deposition.  (FOF ¶¶ 147-51; SEC Ex. 248.)  At the beginning of the deposition, the following discussion occurred:

Gould's Counsel:    I would like to say that Mr. Gould will assert his Fifth Amendment privilege with regards to any questions about West End and any affiliated entities.

SEC Counsel:    Just to make sure the record is clear, Mr. Gould, you understand that an adverse inference may be taken against you in connection with any taking of the Fifth Amendment rights with respect to answering any questions?

---

[1]    While others at West End were also involved in these schemes, it is well-established that, as joint and several liability is the standard in cases of securities laws violations, *see, e.g., SEC v. Pentagon Capital Mgmt*, __ F. Supp. 2d __, 2012 WL 479576, at *44, (S.D.N.Y. Feb. 14, 2012), the fact that these other persons at West End were involved in and liable for the fraud alleged by the SEC does not render Gould immune.

| Gould: | Yes. |
|---|---|
| SEC Counsel: | And all that has been explained to you, and there is no doubt in your mind that there may be some adverse consequences because of that? |
| Gould: | Yes. |

(FOF ¶ 149; SEC Ex. 248 at p. 6.)  This strategic choice on Gould's part has two ramifications, as set forth below.

### A.  <u>The SEC Is Entitled To a Negative Inference In Its Benefit</u>

Courts in this Circuit have frequently drawn adverse inferences in SEC enforcement cases (as well as in other enforcement contexts) based on a defendant's invocation of the Fifth Amendment.  *See, e.g. Collazos v. U.S.*, 368 F.3d 190, 203-04 (2d Cir. 2004) (determining that the defendant deprived the government of the opportunity to conduct a deposition and that in itself is sufficient to support an adverse inference); *see also LiButti v. U.S.*, 178 F.3d 110, 120 (2d Cir. 1999) ("An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader."); *SEC v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y 2010), *citing Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *SEC v. McGinn, Smith & Co., Inc.*, 752 F. Supp. 2d 194, 209, 214 (N.D.N.Y. 2010); *SEC v. Invest Better 2001*, 2005 WL 2385452, at *2 (S.D.N.Y. May 4, 2005); *U.S. v. Bonnano Organized Crime Family*, 683 F. Supp. 1411, 1449-50 (E.D.N.Y. 1988); *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987).

Here, Gould refused to answer the SEC's questions about West End and several subjects which form the basis of the SEC's allegations against him.  In particular, Gould took the Fifth and refused to answer questions regarding:

- His suicide attempt on May 12, 2009, just as the fraud at West End was being discovered (SEC Exhibit 248 at pp. 7-8);

- His responsibilities with respect to compiling the financial records of the funds, including performance data and account statements (pp. 9-10);

- His preparation of the marketing materials referred to as "tear sheets" that were distributed to existing and potential investors, and his understanding that these were intended for marketing (pp. 10, 97-98, 100-103; SEC Exs. 46-49, 51);

- The fact that these "tear sheets" misrepresented the funds' compliance with their stated investment objectives and investment returns, overstated assets under management, and failed to state that the funds were close to insolvent (pp. 103-111; SEC Exs. 51, 69, 71);

- His responsibilities for the valuation of securities or investments held by West End (pp. 10-11);

- His direction and management of all areas of West End's financial and accounting operations (p. 12);

- His responsibility for maintaining the balance sheets for the various West End funds (pp. 87-90, 117-122; SEC Exs. 211-15);

- His responsibility for dealings with West End's banks, including DZ Bank and WestLB (pp. 12-13, 125-127);

- His knowledge of the improprieties in West End's dealings with DZ Bank and WestLB (pp. 125-27, 130-133; SEC Ex. 26);

- His responsibility for assuring compliance with West End's loan facilities (pp. 19-21, 130);

- West End's noncompliance with the undertakings and representations to investors set out in the offering memoranda for the various West End funds (pp. 13-19, 91-92; SEC Ex. 210);

- His concerns since at least 2007 concerning the solvency of West End and his communication of those concerns to William Landberg ("Landberg"), West End's CEO, and Kevin Kramer ("Kramer"), West End's COO (pp. 22-24, 127-130; SEC Exs. 24, 208);

- That West End had trouble paying its rent in a timely fashion (pp. 123-124; SEC Ex. 66);

- Repeated, almost daily communications from West End's bank, Signature Bank, from at least 2007 regarding substantial overdrafts in the individual accounts for the various West End funds (pp. 24-29, 34-37, 40-45, 50-53; SEC Exs. 144, 147, 152, 154-56, 159, 162, 203, 209, 227);

- His authority with respect to monitoring and resolving the overdraft situation (pp. 26-28, 39-40; SEC Ex. 155);

- The fact that, numerous times, various investment funds lacked the money to pay overdrafts and that moneys had to be transferred from other investment funds to cover these overdrafts (pp. 32-33; SEC Ex. 150);

- The use of investor funds to pay overdrafts and debts of Landberg's family members (pp. 28-29, 37-38, 51; SEC Exs. 147, 154, 162);

- The constant intrafund transfer of assets between investment funds without any legitimate business purpose, and his efforts to conceal it (pp. 111-115, 117-122, 135-138; SEC Exs. 27-28, 218, 212-15);

- The improper use of funds from the Interest Reserve Account to pay unrelated West End obligations (pp. 30-32, 45-46; SEC Ex. 227);

- The use of investor funds to pay off shortfalls in the Interest Reserve Account (pp. 30-32, 62-63, 64-65; SEC Ex. 224-26);

- The use of investor funds to pay off Landberg's personal debts (pp. 46-50; SEC Ex. 204);

- Any investments by West End in Century Bank (pp. 57-61; SEC Ex. 19);

- Investments by West End in Geneva, the effect of the valuation of that investment on the reported earnings of various West End funds, and his role in that valuation (pp. 65-79; SEC Exs. 29-40);

- His knowledge that shares of Geneva, which had sold for as little as eight cents a share, were valued by West End at $1.20 per share, or **15 times its actual trading price**, and his responsibility for that valuation (pp. 79-82, 83-87; SEC Exs. 41-44);

- The reclassification of intercompany loans as investments (p. 61);

- His direct communications with investors (pp. 82-83, 96-97; SEC Exs. 5, 23);

- Communications with an investor in which, in early 2008, the investor stated that the facts led her to believe West End was a Ponzi scheme (pp. 92-93; SEC Ex. 21);

- Communications between him and other West End employees in early 2008 regarding enforcement actions against individuals who worked at investment funds that turned out to be Ponzi schemes (pp. 116-117; SEC Ex. 20);

- Correspondence between him and Kramer and Landberg in July, 2008 in which Gould and Kramer expressed concern about West End's financial viability (pp. 94-96; SEC Ex. 22).

The SEC is therefore entitled to the benefit of a negative inference on each of these subjects since Gould's invocation of his Fifth Amendment privilege kept the SEC from obtaining information to which it was otherwise entitled. *See SEC v. Pittsford Capital Income Partners, LLC*, 2007 WL 2455124, at *14 (W.D.N.Y. Aug. 23, 2007) ("litigants denied discovery based upon an assertion of the privilege may ask the court to draw a negative inference from the invocation of that right").

**B.  Gould Must Be Precluded From Offering Evidence Regarding Matters About Which He Invoked His Fifth Amendment Privilege**

Gould should not be permitted to escape the consequences of his strategic decision to invoke his Fifth Amendment privilege.  To prevent just such an abuse of the Fifth Amendment privilege by defendants who obstruct discovery only to subject the plaintiff to surprise testimony at trial, courts recognize the appropriateness of precluding a defendant from offering evidence at trial related to all matters for which he asserted the Fifth Amendment privilege during discovery. *See United States v. Certain Real Property and Premises Known As: 4003-4005 5th Ave.,*

8

*Brooklyn, NY*, 55 F.3d 78, 85-86 (2d Cir. 1995) (affirming the lower court's decision that

defendant could not present "any" evidence relating to material previously claimed to be within

Fifth Amendment protection); *Pittsford*, 2007 WL 2455124, at *14 ("[w]hen a party invokes the

Fifth Amendment privilege in a civil case, courts may then preclude that party from introducing

evidence [through affidavits ] that was not previously available to his or her adversary due to the

party's invocation of the privilege"); *SEC v. Cassano*, 2000 WL 777930, at *1 (S.D.N.Y. June

19, 2000) (precluding defendants who asserted Fifth Amendment privilege during discovery

period from testifying at trial); *United States v. Village of Island Park*, 888 F. Supp. 419, 431

(E.D.N.Y. 1995) ) (precluding defendants from presenting their testimony through affidavits);

*see also* 4 Moore's Federal Practice ¶ 26.60 [6] (2nd ed. 1987).

## II.
## GOULD IS LIABLE FOR PRIMARY VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND EXCHANGE ACT RULE 10b-5 AS WELL AS SECTION 17(a) OF THE SECURITIES ACT

Section 10(b) of the Exchange Act prohibits any person, using the mails or any

instrumentality of interstate commerce or any facility of any national securities exchange, from

employing, in connection with the purchase or sale of any security, "any manipulative or

deceptive device or contrivance in contravention of [SEC] rules and regulations."  15 U.S.C. §

78j(b).

Exchange Act Rule 10b-5 makes it unlawful for any person, directly or indirectly, by the

use of any means or instrumentality of interstate commerce, or of the mails or of any facility of

any national securities exchange:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were
made, not misleading, or

(c) To engage in any act, practice, or course of business which
operates or would operate as a fraud or deceit upon any person, in
connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5; *see VanCook v. SEC*, 653 F.3d 130, 138 (2d Cir. 2011).

As the Second Circuit recognized in *VanCook*, these remedial statutes should be broadly

construe:

The Supreme Court has directed lower courts to interpret Section
10(b) and Rule 10b–5 flexibly and broadly, rather than technically
[or] restrictively.  Section 10(b) was designed as a catch-all clause
to prevent fraudulent practices, including not just garden type
variet[ies] of fraud but also unique form[s] of deception involving
[n]ovel or atypical methods.

*VanCook*, 653 F.3d at 138 (internal citations and quotations omitted).

Like the antifraud provisions of the Exchange Act, the provisions of § 17(a) of the

Securities Act are to be construed broadly.  *U.S. v. Naftalin*, 441 U.S. 768, 778 (1979); *U.S. v.

Jensen*, 608 F. 2d 1349, 1354 (10th Cir. 1979) ("Courts have recognized that section 17(a) must

be given broad scope and flexible interpretation") (*citing U.S. v. Brown*, 555 F.2d 336 (2d Cir.

1977)); *SEC v. Kimmes*, 799 F. Supp. 852, 858 (N.D. Ill. 1992) (17(a) "is given broad scope and

flexible interpretation").

To prove a violation of Section 10(b) of the Exchange Act or Exchange Act Rule 10b-5,

the Commission must prove, by a preponderance of the evidence,[2] that a defendant: "(1) made a

material misrepresentation or a material omission as to which he had a duty to speak, or used a

---

[2]     The evidentiary standard applicable in a civil enforcement action is a preponderance of
the evidence.  *Steadman v. SEC*, 450 U.S. 91, 95 (1981); *SEC v. Moran*, 922 F. Supp. 867, 888
(S.D.N.Y. 1996).

fraudulent device;[3] (2) with scienter; (3) in connection with the purchase or sale of securities."
*Pentagon Capital*, 612 F. Supp. 2d at 258; *see SEC v. Monarch Funding Corp*., 192 F.3d 295,
308 (2d Cir. 1999); *SEC v. Czarnik*, 2010 WL 4860678, at *3 (S.D.N.Y. Nov. 29, 2010).

Essentially the same elements required for a claim under the Exchange Act are required
to establish a violation of Section 17(a) of the Securities Act, although no showing of scienter is
required to prove a violation of Sections 17(a)(2) and (3).  *Pentagon Capital*, 612 F. Supp. 2d at
258; *Monarch Funding*, 192 F.3d at 308.  Any person who directly or indirectly engages in a
manipulative or deceptive act as part of a scheme to defraud can be held liable as a primary
violator.  *Pentagon Capital*, 612 F. Supp. 2d at 260 n.3; *In re Enron Corp. Sec. Litig.*, 529 F.
Supp. 2d 644, 707 (S.D. Tex. 2006).[4]

### A.  Gould's Liability for Misrepresentations and Omissions

As set forth more fully below, the SEC has offered proof that Gould is liable under these
provisions of the securities laws in several ways, each of which independently provides a basis
for liability:

---

[3]      This element of an Exchange Act Section 10(b) claim is satisfied when any
"manipulative or deceptive device or contrivance" is utilized in the scheme.  "Conduct itself can
be deceptive, and so liability under §10(b) or Rule 10b-5 does not require a specific oral or
written statement.  Broad as the concept of deception may be, it irreducibly entails some act that
gives the victim false impression."  *SEC v. Pentagon Capital Mgmt*, 612 F. Supp. 2d 241, 261
(S.D.N.Y. 2009); *see U.S. v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).

[4]      As Judge Sweet ruled in the *Credit Bancorp* case, "the SEC does not need to prove
investor reliance, loss causation, or damages in an action under Section 10(b) of the Exchange
Act, Rule 10b–5, or Section 17(a) of the Securities Act."  *SEC v. Credit Bancorp, Ltd.*, 195 F.
Supp. 2d 475, 491 (S.D.N.Y. 2002), *citing SEC v. North Am. Research & Dev. Corp.*, 424 F.2d
63, 84 (2d Cir.1970) (reliance not an element of a Rule 10b–5 claim in the context of an SEC
proceeding) and *Berko v. SEC*, 316 F.2d 137, 143 (2d Cir.1963) (reliance, loss causation and
damages not relevant).

(1) Gould is liable for making specific misrepresentations and omissions, both in oral statements made directly by him to investors, and in written materials prepared by him that were given to investors;

(2) Gould is liable for his acts in employing a "device, scheme or artifice to defraud" and in engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit."

*First*, the SEC's evidence demonstrates that Gould made numerous material misrepresentations and omissions orally to investors, in periodic meetings he held with them, as set forth in outline above and in greater detail in the Declarations and Exhibits the SEC has submitted. *See, e.g.*, FOF ¶¶ 79-81; Baum Decl. ¶¶ 8-10; Raounas Decl. ¶¶ 10-12. During his meeting and calls with those investors, Gould failed to disclose to them material information in his possession about West End, including information about West End's deteriorating financial condition, millions of dollars of intercompany loans between and amongst West End entities, virtually daily emails from Signature concerning overdrafts in West End accounts, inappropriate use of investor funds, misuse of the Interest Reserve Account, and Landberg's improper valuation of investments. *See* FOF ¶ 270. Furthermore, because Gould invoked his Fifth Amendment privilege about these issues, the SEC is entitled to an adverse inference with respect to these matters. *See* FOF ¶¶ 151; SEC Ex. 248 at pp. 82-83, 96-97.

*Second*, the SEC's evidence demonstrates that Gould bore responsibility for creating misleading materials that were presented to investors. Two key elements that enable an investment fraud such as the one at West End to sustain itself are the account statements that misrepresent to investors what the actual state of their investment is, and offering and marketing materials that use phony investment results to entice new investors into the fraud. Both aspects

12

were present at West End.  Gould, as CFO, was responsible for the content of the account statements and marketing materials.  *See* FOF ¶¶ 61-66, 81-83, 148, 151; Barsuk ¶¶ 22-25; Heslin ¶¶ 8-10, 13; SEC Exs. 46-51, 68-72, 97, 100, 168-69, 171-72, 174-82, 191-94, 198-200.

Like his oral statements and emails to investors, the account statements and marketing materials that Gould prepared were false and misleading, and Gould had every reason to know that that was the case.  *See generally* FOF ¶ 270.  From at least January 2006 through approximately April 2009, West End had financial problems, including paying bills in a timely fashion.  *See, e.g.,* FOF ¶¶ 157-62; Barsuk Decl. ¶¶ 27-33; Efstratiou Decl. ¶ 23; Sloane Decl. ¶ 8(b)-(c); SEC Exs. 18, 203-210.  Gould was aware of West End's financial problems on a contemporaneous basis, including overdrafts in West End bank accounts totaling hundreds of thousands of dollars and lasting for weeks at a time.  *See, e.g.*, FOF ¶¶ 162-172; SEC Exs. 18, 24, 137-67, 203-210; Barsuk Decl. ¶¶ 28-33.  For example, on December 28, 2007, Gould emailed William Landberg, West End's Chief Executive, that he had concerns about "how much longer Signature [West End's bank] will cover the OD's [overdrafts]" in West End accounts.  FOF ¶ 165; SEC Ex. 18.  At other times, Gould voiced concerns about how West End would make payroll, or pay its rent.  *See* FOF ¶¶ 167, 169; SEC Exs. 205, 207.

Gould was also aware, through his access and use of West End bank accounts and his compilation of West End financial records, of massive commingling between West End funds.  The commingling was apparent, among other ways, through the millions of dollars of intercompany loans that Gould used to account for it.  *See* FOF ¶¶ 173-204.  Gould knew, or was reckless in not knowing, that the extent of the intercompany loans, which Gould knew to total over $54 million, *see* FOF ¶ 188, SEC Ex. 27, was a massive red flag indicative of fundamental problems with West End's business model.  An outside auditor who began looking at the

13

intercompany loans in approximately April 2009 quickly recognized this red flag.  *See* FOF ¶¶

190-99; Rhodes Decl. ¶¶ 27-42.  Gould also knew that the commingling resulted in the use of

investor funds that was not consistent with the expectations of investors in those funds.  *See* FOF

¶¶ 205-12.  For example, the December 2008 balance sheet for the Income Strategies Fund, a

fund-of-funds marketed to investors as investing in the Franchise Fund and Hard Money Fund,

showed that of the fund's $19.9 million in purported assets, roughly $11.5 million consisted of

"loans" to West End funds besides the Franchise Fund and the Hard Money Fund.  *See* FOF ¶

211; SEC Ex. 211; Barsuk Decl. ¶¶ 49-50.  None of these so-called loans were ever disclosed to

Income Strategies Fund investors.

Of course, when the SEC tried to ask Gould about all of these topics, he asserted his Fifth

Amendment privilege.  *See* FOF ¶ 151.[5]

### B.  The Information Misrepresented or Not Disclosed Was Material

By law, a false statement or omission is "material" where a substantial likelihood exists

that a reasonable investor would consider it important in making an investment decision.  *See*

---

[5]      In addition, as this Court held previously in this action, under the group pleading doctrine, the SEC need demonstrate no more than that Gould was, as CFO, part of a group of individuals with direct involvement in managing the West End funds, in order to satisfy its legal obligation.  *SEC v. Landberg*, ___ F. Supp. 2d ___, 2011 WL 5116512, at *6 (S.D.N.Y. Oct. 26, 2011)  The group pleading doctrine creates "'a presumption that statements in prospectuses, registration statements, annual reports, press releases, [and] group-published information . . . are the collective work of those individuals with direct involvement in the everyday business of the company.'"  *SEC v. Collins & Aikman Corp.*, 524 F. Supp.2d 477, 489  (S.D.N.Y. 2007) (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) (internal citations omitted)); *see SEC v. Espuelas*, 698 F. Supp. 2d 415, 425 (S.D.N.Y. 2010); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005).   As West End's CFO, Gould is precisely the type of individual to which group pleading doctrine has been repeatedly applied. *See Espuelas*, 698 F. Supp. 2d at 425 (noting that the Commission "may rely on the group pleading doctrine" for "high-level corporate insiders"); *Collins & Aikman Corp.*, 524 F. Supp. 2d at 494 (applying group pleading to the CFO); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 191-92 (S.D.N.Y. 2003) (applying group pleading to the CFO because he "was not a person merely affiliated with the defendant corporation, but rather was a clearly cognizable corporate insider with an active daily role")(internal citations omitted).

*Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *SEC v. Mayhew*, 121 F.3d 44, 51 (2d Cir. 1997).  The information need not be of a type that necessarily would cause an investor to change his or her investment decision, but is material as long as the "investor would have viewed it as significantly altering the 'total mix' of information available."  *Mayhew*, 121 F.3d at 52 (citation omitted).

Thus, the Commission need not prove that the false or baseless information at issue actually caused a specific investor to change his or her investment decision.  *See SEC v. Rana Research, Inc*., 8 F.3d 1358, 1363-64 (9th Cir. 1993); *North Am. Research & Dev. Corp*., 424 F.2d at 84.

From at least January 2008 to April 2009, Gould failed to disclose a host of information that was material to West End investors, including, among other things, West End's deteriorating financial condition, millions of dollars of intercompany loans between and amongst West End entities, virtually daily emails from Signature concerning overdrafts in West End accounts, inappropriate use of investor funds, misuse of the Interest Reserve Account, Landberg's improper valuation of investments, and Landberg's misappropriation of money from WestLB.  *See generally* FOF ¶¶ 157-271.

The fraud described here, which ultimately led to West End's bankruptcy filing and caused millions of dollars of losses to investors, was material because reasonable investors undoubtedly would have considered such facts to be important information in deciding whether to invest and/or continue investing their money with West End.  *See, e.g., SEC v. Murph*y, 626 F.2d 633, 653 (9th Cir. 1980) (failure to disclose that issuer was commingling funds from various partnerships, or information relating to "financial condition, solvency and profitability" is material); *SEC v. Saltzman*, 127 F. Supp. 2d 660, 666-67 (E.D. Pa. 2000) (general partner's

undisclosed transfers from limited partnership organized for investment purposes and failure to

disclose material facts in partnership's annual financial statements were deemed material

misrepresentations and omissions); *Pittsford*, 2007 WL 2455124, at *11-12 (failure to disclose

improper transfers of funds from companies invested in by investors or improper commingling

of funds is material).

### C.  These Statements Were Made In Connection With The Investors' Purchases

A statement is "in connection with" the purchase or sale of a security for the purpose of

Section 10(b) of the Exchange Act if it "somehow touches upon" or has "some nexus" with "any

securities transaction."  *Rana Research*, 8 F.3d at 1362; *see Credit Bancorp*, 195 F. Supp. 2d at

491; *SEC v. Stanard*, 2009 WL 196023, at *27 (S.D.N.Y. Jan. 27, 2009); *SEC v. Hasho*, 784

F.Supp. 1059, 1106 (S.D.N.Y. 1992) ('in connection' factor is "construed broadly").

Gould's failure to disclose information about ongoing fraud at West End from at least

January 2008 to April 2009 was in connection with the purchase or sale of securities.  As was

held in *Pittsford*, the "in connection requirement is satisfied where, as here, the "failure to inform

investors of the truth meant that many investors kept their notes and did not seek a redemption

longer than they otherwise would have."  2007 WL 2455124, at *13; *see* FOF ¶¶ 79-80; Raounas

Decl. ¶¶ 10-12; Baum Decl. ¶¶ 8-10.

### D.  Gould Is Liable for Participation In A Scheme or Artifice To Defraud

In addition to misrepresentations and omissions, Rule 10b-5 also prohibits the use of any

device, scheme, or artifice to defraud and any act, practice, or course of business which operates

as a fraud or deceit upon any person in connection with the purchase or sale of any security.  *See*

*id*. §§(a),(c); *see, e.g., Pentagon Capital,* 2012 WL 479576, at *31 ("Conduct itself can be

deceptive, and so liability under § 10(b) or Rule 10b-5 does not require a specific oral or written

statement."), *quoting Finnerty*, 533 F.3d at 148 (2d Cir. 2008); *see also SEC v. Lee*, 720 F. Supp.

16

2d 305, 334 (S.D.N.Y. 2010); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 502 (S.D.N.Y.

2005); *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 472-74 (S.D.N.Y. 2004).

Indeed, in denying Gould's motion to dismiss the Amended Complaint, this Court

recognized that "Rule 10b-5 provides additional bases for the SEC's claim beyond the making of

fraudulent statements" and found that the Amended Complaint plausibly alleged that Gould

violated Rule 10b-5 beyond the making of a statement. *Landberg*, 2011 WL 5116512, at *4.

There is ample evidence that Gould engaged in deceptive conduct with Landberg and

others at West End to defraud West End's investors.  Gould's use of accounting mechanisms,

such as intercompany loans, to conceal the inability of West End funds to meet their obligations

constituted deceptive conduct.  *See* SEC FOF ¶¶ 184-221.  Without the intercompany loans,

fueled by new contributions from West End investors over time, there can be little doubt that the

house of cards at West End would have collapsed long before May 2009.

Gould also facilitated other aspects of the scheme, such as improper investments by

Landberg.  For example, in 2008, Gould knew that Landberg took money from the Interest

Reserve Account to make a $1.5 million investment in a Florida bank.  *See* FOF ¶¶ 214-15.

Gould was aware, or was reckless in not being aware, both that the Franchise Fund was not

authorized to invest in the bank and that money should not have been taken from the Interest

Reserve Account to make such an investment.  *See* FOF ¶¶ 213, 246.  Nevertheless, Gould

devised an intercompany loan to make it appear as if the money used to make the investment

came from the Franchise Fund.  *See* FOF ¶ 216.  When an outside auditor questioned the

transaction, Gould told him, falsely, that the Franchise Fund could not hold the stock of the bank

due to a regulatory constraint, and not to any investment constraint of the Franchise Fund.  *See*

FOF ¶¶ 220-21; Rhodes Decl. ¶¶ 46-50.

17

### E.  **Gould Acted With Scienter**

In the context of the securities fraud statutes, scienter means the "intent to deceive, manipulate, or defraud; or at least knowing misconduct." *VanCook*, 653 F.3d at 138 (citation omitted); *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

Scienter may also be "established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (citations and internal quotation marks omitted).  Especially pertinent here, the law provides that "an egregious refusal to see the obvious, or to investigate the doubtful, may also give rise to an inference of recklessness.  Accordingly, a defendant cannot plead ignorance of facts where there are warning signs or information that should have put him on notice of either misrepresented or undisclosed material facts." *Stanard*, 2009 WL 196023 at *27 (citations omitted); *see Credit Bancorp*, 195 F. Supp. 2d at 493 ("The conscious avoidance of knowledge constitutes sufficient scienter under the federal securities laws.").  Simply put, a defendant like Gould cannot "escape liability for fraud by closing his eyes to what he saw and could readily understand." *Czarnik*, 2010 WL 4860678 at *9 (citation omitted).

The SEC's evidence clearly establishes Gould's scienter in several ways, each of which, standing alone, would satisfy the legal requirements.

***First***, where, as here, a defendant is involved in the distribution of false and misleading information to investors, either in oral statements to investors or in written materials, scienter is clearly demonstrated.  *See, e.g., SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 357-58 (S.D.N.Y. 2011) (scienter found where senior officer knew or was reckless in not knowing that company income projections given to investors were baseless); *SEC v. Haligiannis*, 470 F. Supp.

18

2d 373, 381-82 (S.D.N.Y. 2007) (scienter demonstrated by sending statements to investors with

false account values).  Gould's statements to investors and preparation of account statements and

marketing materials that he knew, or should have known, were false and misleading establishes

his scienter.  *See* FOF ¶¶ 76-83, 270; SEC Exs. 51, 68-72, 97, 100, 168-69, 171-72, 174-82, 191-

94, 198-200.

> **Second**, Gould's scienter is amply demonstrated by specific allegations that he was aware

that West End was not achieving the results it promised investors.  Gould's scienter is

demonstrated through his awareness of West End's significant cash flow problems and that

returns were not as advertised to investors.  *See, e.g.*, FOF ¶¶ 165, 271; SEC Ex. 18.  The

evidence identifies more than one case where Gould devised transactions to cover-up Landberg's

financial chicanery, including facilitating extensive intercompany transfers between West End

funds throughout 2008 and 2009.  *See, e.g.*, FOF ¶¶ 184-89, 213-221; Barsuk Decl. ¶¶ 47-49;

SEC Exs. 7, 15, 19, 27, 98-99, 211-223.

> **Third**, Gould's scienter is established through his knowledge or reckless disregard of a

litany of red flags at West End from at least January 2008 through April 2009.  For example,

knowledge of improper intrafund transfers can be a red flag sufficient to demonstrate scienter.

*See Espuelas*, 767 F.Supp. 2d at 476.  Here, Gould oversaw $54 million of intercompany loans.

*See* FOF ¶¶ 184-204; *see*, *e.g.*, SEC Ex. 27; *see also* SEC Ex. 248 at pp. 137-38.  As West End's

CFO and a certified public accountant, Gould should have known that intercompany transfers

represented a bright red flag.  *Cf. SEC v. Dunn*, 587 F. Supp. 2d 486, 507 (S.D.N.Y. 2008)

(holding CFO's failure to investigate proprietary of certain transactions constituted an extreme

departure from the standards of ordinary care).[6]  For the sake of comparison, an outside auditor reviewing only one West End fund in the first half of 2009 quickly recognized that the intercompany loans were a red flag.  *See* FOF ¶¶ 190-99; Rhodes Decl. ¶¶ 27-42.

Another red flag that Gould chose to ignore while serving as West End's CFO was the fact that the Income Strategies Fund, a West End fund-of-funds designed to invest in the Franchise and Hard Money Funds, was actually making other investments.  *See* FOF ¶¶ 205-12; SEC Exs. 218, 211, 173, 209.  Gould emailed Landberg in April 2008 that the fund-of-funds "should be making investments in [the Franchise Fund] as part of the objective of the fund" and offered an accounting method that would "clean" the "related party loans where possible."  FOF ¶ 207; SEC Ex. 218.  When the SEC asked Gould to explain this transaction, Gould declined, citing his Fifth Amendment rights.  *See* FOF ¶ 151; SEC Ex. 248 at 112-114.  The law firmly establishes this as evidence of scienter.  *See Pittsford*, 2007 WL 2455124, at *14 (knowledge of violation of terms of offering documents and of commingling of investor funds establishes scienter); *see also* FOF ¶¶ 235-42 (showing Gould's awareness of improper commingling of investor assets in another West End fund).

Further evidence of Gould's scienter is established by his suicide attempt as the fraud at West End was being discovered.  *See* FOF ¶¶ 152-156.  Gould also declined to answer questions about the incident during his deposition.  *See* FOF ¶ 156; SEC Ex. 248 at p. 8.  The allegations are relevant to Gould's state of mind in May 2009, and suggest a guilty conscience, further

---

[6]     Courts have repeatedly found that the kind of practices employed at West End, such as shifting funds from some investors to pay others, or where an unprofitable company continually operates at a loss and would collapse if not for new investors, constitute frauds and elements of Ponzi schemes.  *See MLSMK Inv. Co. v. JPMorgan Chase & Co.*, 651 F.3d 268, 268 n.1 (2d Cir. 2011); *In Re Manhattan Inv. Fund Ltd*, 359 B.R. 510, 517 (Bankr. S.D.N.Y. 2007) (*citing Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995); *see also In Re Bayou Group, LLC*, 439 B.R. 284, 307 (Bankr. S.D.N.Y. 2012)).

evidencing Gould's scienter.  *See U.S. v. Johnson*, 354 F. Supp. 2d 939, 958 (N.D. Iowa 2005)

(suicide attempt can be probative of consciousness of guilt).

## III.
## GOULD IS LIABLE FOR AIDING AND ABETTING VIOLATIONS
## UNDER THE ADVISERS ACT

The SEC's evidence further establishes that Gould is liable for aiding and abetting

violations of the Advisers Act by Sentinel, West End, and Landberg.

Section 209(d) of the Advisers Act permits the Commission to bring an action against

those who aid and abet violations of the Act.  *SEC v. DiBella*, 587 F.3d 553, 568-69 (2d Cir.

2009); *Landberg*, 2011 WL 5116512, at *7; *SEC v. Aragon Capital Advisors, LLC*, 2011 WL

3278907, at *15 (S.D.N.Y. 2011).

As the Second Circuit held in *DiBella*:

> "Liability for aiding and abetting can be established by showing
> that the defendant joined the specific venture and shared in it, and
> that his efforts contributed to its success, or, in other words, by
> showing that the defendant consciously assisted the commission of
> the specific crime in some active way.  Specific to securities
> violations, the government must prove: (1) the existence of a
> securities law violation by the primary (as opposed to the aiding
> and abetting) party; (2) knowledge of this violation on the part of
> the aider and abettor; and (3) substantial assistance by the aider
> and abettor in the achievement of the primary violation."

*DiBella*, 587 F.3d at 566 (internal citations and quotations omitted); *see Aragon Capital*, 2011

WL 3278907, at *15.  Aiding and abetting liability attaches even where the underlying violations

are negligence based.  *DiBella*, 587 F.3d at 569 ("the SEC may seek an enforcement action

against aiders and abettors of 'a violation of any provision' of the Advisers Act, 15 U.S.C. § 80b-

9(d), which would include certain negligent acts in violation of the Advisers Act").  A defendant

may also be liable for being reckless in not knowing of the violation.  *SEC v. Gabelli*, 2010 WL

1253603, at *9 (S.D.N.Y. 2010), *rev'd on other grounds*, 653 F.3d 49 (2d Cir. 2011).

A.  **There Were Underlying Violations of the Advisers Act**

Landberg, West End and Sentinel qualify as investment advisers, and each violated the

applicable provisions of the Advisers Act.

An "investment adviser" is defined in Section 202(a)(11) of the Advisers Act as any

person who, for compensation, is in the business of advising others as to the value or advisability

of investing in securities.  Sentinel, a registered investment adviser that Landberg controlled,

advised separately managed accounts regarding investments in securities, including limited

partnerships in the West End funds.  Additionally, West End, through Landberg and others,

managed the West End funds' investments by maintaining control over the investment portfolios,

brokerage accounts, and bank accounts of the West End funds, and making their investment

decisions.  *See* FOF ¶¶ 1-12.  Sentinel and West End charged fees for their advisory services,

which satisfies the "compensation" element of Section 202(a)(11).  *See* SEC Exs. 97, 100, 168-

69, 171-72, 174-82, 191-94, 198-200 (capital summaries).  Sentinel, Landberg and West End are

therefore investment advisors and subject to the antifraud provisions of Advisers Act Section

206, which applies to "any investment adviser" whether or not registered.  *See, e.g., Abrahamson*

*v. Fleschner*, 568 F.2d 862, 870 (2nd Cir. 1977) (holding that "persons who manage[] the funds

of others for compensation are 'investment advisers' within the meaning of the statute").

Sections 206(1) and 206(2) of the Advisers Act make it unlawful for an investment

adviser to employ any device, scheme, or artifice to defraud clients or prospective clients or to

engage in any transaction, practice, or course of business that defrauds clients or prospective

clients.  Section 206(1) requires a showing of scienter; Section 206(2) does not.  *SEC v.*

*Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992).

Landberg and West End violated Sections 206(1) and 206(2) of the Advisers Act when they breached their fiduciary duties to the West End funds and engaged in fraudulent activity by commingling and misappropriating the funds' assets.  Landberg's submission of false loan requests to WestLB, among other things, demonstrates his scienter.  *See* FOF ¶¶ 84-125.  Similarly, Sentinel, through Landberg, violated Sections 206(1) and (2) by investing its clients' assets in the West End funds  without disclosing the fraud.  *See* FOF ¶¶ 84-125.  Because Landberg controlled West End and Sentinel, Landberg's misconduct is legally imputed to those entities.

Furthermore, Section 206(4) of the Advisers Act prohibits an investment adviser from, directly or indirectly, engaging in any act, practice, or course of business which is fraudulent, deceptive, or manipulative, and Rule 206(4)-8 thereunder prohibits investment advisers to pooled investment vehicles (including "hedge funds") from defrauding investors or prospective investors in those funds.  *See* Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, SEC Release No. IA-2628 (Aug. 3, 2007).  Scienter is not required to prove a violation of Section 206(4) and Rule 206(4)-8 thereunder -- conduct that is negligently, recklessly, or deliberately deceptive is sufficient.  *Steadman*, 967 F.2d at 647.  Landberg and West End also violated Section 206(4), as defined by Rule 206(4)-8, when they made material misrepresentations and false statements to West End investors concerning, for example, the manner in which the funds would be operated and the funds' performance.  *See* FOF ¶¶ 84-125.

Sentinel, West End and Landberg have settled the SEC's charges against them in this proceeding.  Landberg has pleaded guilty to one count of securities fraud relating to this conduct and is due to be sentenced shortly.  *See* FOF ¶¶ 143-46.

B.  **Gould Knew of the Underlying Violations**

There can be no doubt that Gould was aware of the underlying violations, in a variety of

ways:

- He received almost daily notifications of overdrafts in the West End fund accounts, and knew of and facilitated transfers from these accounts to cover the overdrafts.  *See* FOF ¶¶ 161-183; SEC Exs. 137-67.

- He prepared monthly balances sheets that showed that many of the West End funds' assets were comprised almost entirely of intercompany loans.  *See* FOF ¶¶ 184-204; *e.g.*, SEC Exs. 211-15.

- He chose to ignore the fact that the Income Strategies Fund, a West End fund-of-funds designed to invest in the Franchise and Hard Money Funds, was actually making other investments.  *See* FOF ¶¶ 205-12; SEC Exs. 218, 211, 173, 209.

- He chose to ignore the fact that Landberg attempted to grossly overvalue a significant stock investment of several West End funds in early 2009.  *See* FOF ¶¶ 253-64.

- He chose to ignore the fact that Landberg was paying one West End investor $60,000 per month well after that investor had exhausted his equity at West End, despite Gould's knowledge that the payments had negative consequences for West End's cash flow situation.  *See* FOF ¶¶ 222-34; *e.g.*, SEC Ex. 236.

- Finally, when asked about each of these at his deposition, he declined to answer on Fifth Amendment grounds, entitling the SEC to the adverse inference that he was fully aware of the underlying fraud.  *See* FOF ¶¶ 151.

C.  **Gould Rendered Substantial Assistance to the Underlying Violations**

As West End's CFO, Gould was instrumental in facilitating the underlying Advisers Act

fraud.  Among other acts, Gould:

- facilitated the transfer of money to and from the Interest Reserve Account, which disguised from investors the growing financial problems that the West End funds faced in 2008 and 2009.  *See* FOF ¶¶ 243-52.

- on at least one occasion, devised a transaction enabling Landberg to hide a fraudulent transaction from Franchise Fund investors.  *See* FOF ¶¶ 213-21.

24

- extended the life of the fraud by compiling false and misleading "tear sheets" and account statements.  *See* FOF ¶¶ 76-83, 270; SEC Exs. 51, 68-72, 97, 100, 168-69, 171-72, 174-82, 191-94, 198-200.

- aided and abetted the underlying fraud by personally meeting with investors and assuring them their investments continued to be secure.  *See* FOF ¶¶ 79-81, Baum Decl. ¶¶ 8-10, Raounas Decl. ¶¶ 10-12.

**IV.**
**GOULD'S CONDUCT JUSTIFIES THE IMPOSITION OF THIRD TIER PENALTIES**

The Commission respectfully submits that the Court should impose civil monetary penalties against Gould under Section 21(d)(3) of the Exchange Act, Section 20(d) of the Securities Act, and Section 209(e) of the Advisers Act, as amended by 17 C.F.R. § 201.1003.

Courts recognize that a "monetary penalty is necessary to appropriately punish and deter . . . fraudulent activities." *SEC v. Forest Res. Mgmt. Corp.*, 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010).

Section 21(d)(3) of the Exchange Act, Section 20(d) of the Securities Act, and Section 209(e) of the Advisers Act all provide three separate tiers of potential penalties that increase depending upon the seriousness of the violation.  "The first tier of fines applies to all securities law violations; the second provides higher maximum fines for violations that involved fraud; and the third provides the highest maximums for violations that involved fraud and 'resulted in substantial losses or created a significant risk of substantial losses to other persons.'" *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998) (citation omitted); *see SEC v. Credit Bancorp, Ltd.*, 2002 WL 31422602, at *2 (S.D.N.Y. Oct. 29, 2002).

The applicable penalty provision for each of these statutes provides that the amount of the penalty shall be determined by the Court "in light of the facts and circumstances." *See id.* "Factors for the Court to consider include '(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial

losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.'" *Forest Res. Mgmt. Corp.*, 2010 WL 2077202, at *2 (citation omitted); *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).

Here, the SEC respectfully submits that the facts will demonstrate that it would be appropriate for the Court to assess Gould a "third tier" penalty.   As discussed above, Gould's conduct clearly involved fraud, deceit, and deliberate or reckless disregard for regulatory requirements.  Gould's conduct also clearly resulted in substantial losses to investors.  *See* FOF ¶¶ 126-142.  Third tier penalties are justified by the fact that the pervasive fraud at West End persisted for several years, and "involve[ed] fraud, deceit, manipulation . . . which either resulted in substantial losses to [] investors or, at the very least, created a risk of substantial losses." *SEC v. Razmilovic*, __ F. Supp. 2d __, 2011 WL 4629022, at *33-34 (E.D.N.Y. Sept. 30, 2011).

In counting the number of violations for the purpose of assessing the amount of a penalty, courts have counted each separate act as an individual violation.  *SEC v. Pattison*, 2011 WL 723600, at *5 (N.D. Cal. Feb. 23, 2011) ("Court may assess a penalty for each distinct violation, *e.g.*, each time Defendant falsified a record"); *SEC v. Kenton Capital*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (holding that defendant should be assessed a third tier penalty for each investor defrauded); *SEC v. Coates*, 137 F. Supp. 2d 413 (S.D.N.Y. 2001) (each Exchange Act violation justifies a separate penalty).

Thus, Gould can be assessed a third tier penalty for each misrepresentation or omission made to an investor, either directly or through the sending of account statements, or for every act in furtherance of the fraud, including each and every commingling of assets between fraud, each

time he approved the looting of the Interest Reserve Account, or any other act that constituted a violation of any statute.

**V.**

**GOULD SHOULD BE PERMANENTLY ENJOINED FROM VIOLATING THE
<u>SECURITIES LAWS.</u>**

The Commission is not an ordinary litigant but rather acts as the "statutory guardian charged with the safeguarding the public interest in enforcing the securities laws."  *SEC v. Management Dynamics, Inc*., 515 F.2d 801, 808 (2d Cir. 1975).  Accordingly, once the Commission establishes a violation of the federal securities laws, a permanent injunction against future violations should be granted if the defendant's past conduct indicates "a reasonable likelihood of further violation[s] in the future."  *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978) (citations omitted);  *see SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *SEC v. Manor Nursing Ctrs., Inc*., 458 F.2d 1082, 1100 (2d Cir. 1972) ("[t] he critical question is whether there is a reasonable likelihood that the wrong will be repeated") (citation omitted); *SEC v. Power*, 525 F. Supp. 2d 415, 427 (S.D.N.Y. 2007).

In this regard, courts consider (1) the fact that the defendant has been found liable for illegal conduct; (2) the degree of scienter; (3) whether the violations were isolated or *repeated;* (4) whether the defendant has accepted blame for his conduct; and (5) whether, due to the defendant's professional occupation, he might be in a position where future violations could be anticipated.  *Cavanagh*, 155 F.3d at 135 (citations omitted and emphasis supplied); *see SEC v. Softpoint, Inc*., 958 F. Supp. 846, 867 (S.D.N.Y. 1997).  In addition, "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations."  *Manor Nursing Ctrs*., 458 F.2d at 1100.

Here, these factors militate strongly in favor of the injunctive relief sought by the SEC. The fraud at issue went on for at least 16 months, and was facilitated on an almost daily basis by Gould.  Gould, unlike every other defendant in this action (all of which have agreed to such injunctive relief), has shown no appreciation of his wrongdoing nor acknowledged in any way how the fraud at West End has impacted investors.  (By contrast, two of Gould's co-conspirators, Kramer and Barsuk, have consented to pay civil penalties of $200,000 and $25,000, respectively. Landberg faces substantial jail time and has consented to a money judgment of over $8.7 million in parallel criminal proceedings against him.)  Finally, as a certified public accountant Gould will, unless enjoined, have many further opportunities to directly commit fraud or facilitate its being committed.

## **CONCLUSION**

Based principally on the foregoing evidence and law, the SEC respectfully requests that after trial the Court (i) find Gould liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; Section 17(a) of the Securities Act; and for aiding and abetting violations of Sections 206(1), 206(2), and 206(4)of the Advisers Act, and Rule 206(4)-8 thereunder; (ii) enter an Order enjoining Gould from future violations of these provisions, and (ii) impose a substantial penalty upon him pursuant to Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the Advisers Act, as amended by 17 C.F.R. § 201.1003.

Dated: New York, NY
      March 2, 2012

By:  Howard A. Fischer
     Matthew J. Watkins

Securities and Exchange Commission
New York Regional Office
3 World Financial Center, Suite 400
New York, New York  10281
Telephone (212) 336-0589