UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM LANDBERG, KEVIN KRAMER, STEVEN GOULD, JANIS BARSUK, WEST END FINANCIAL ADVISORS LLC, WEST END CAPITAL MANAGEMENT LLC, and SENTINEL INVESTMENT MANAGEMENT CORPORATION,<br><br>Defendants,<br><br>and<br><br>LOUISE CRANDALL and L/C FAMILY LIMITED PARTNERSHIP,<br><br>Relief Defendants. | 11-CV-0404 (PKC) |

TRIAL OF STEVEN GOULD

SEC'S PROPOSED FINDINGS OF FACT

AND CONCLUSIONS OF LAW

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

**FINDINGS OF FACT**.................................................................................... 1

I.  **BACKGROUND** ................................................................................... 1

    A.  West End Financial Advisors and Its Affiliates.................................... 1

    B.  The Franchise Fund, the Hard Money Fund, and the Income Strategies Fund ...... 5

    C.  Steven Gould's Role and Responsibilities at West End ........................ 9

    D.  Gould's Communications with West End Investors.............................. 13

II. **DISCOVERY OF FRAUD AT WEST END AND ITS SUBSEQUENT COLLAPSE** .................................................................... 14

    A.  Improper Money Movements and Account Commingling................... 15

    B.  Improper Use of Loan Proceeds .......................................... 18

    C.  Improprieties Involving the Interest Reserve Account ..................... 20

    D.  West End's Bankruptcy and Investor Losses............................... 21

    E.  Landberg's Guilty Plea ................................................. 24

III. **GOULD'S INVOCATION OF HIS FIFTH AMENDMENT PRIVILEGE**.............. 24

IV. **GOULD'S SUICIDE ATTEMPT** ................................................. 27

V.  **GOULD'S PARTICIPATION IN THE FRAUD AT WEST END** ........................... 28

    A.  Gould's Awareness of West End's Financial Problems and Failure to Disclose That Information to Investors ...................... 28

    B.  Gould's Knowledge of Commingling and Misuse of Investor Money and Failure to Disclose That Information to Investors ............. 30

        i.    *Intercompany Loans*........................................... 32

        ii.   *Income Strategies Fund* ........................................ 34

        iii.  *Franchise Fund Investment in Century Bank* ..................... 36

        iv.   *SIMCO* ....................................................... 37

        v.    *Dividend Strategy Fund* ........................................................... 39

   C.    Gould's Participation in the Misuse of the Interest Reserve Account ................. 40

   D.    Gould's Awareness of Landberg's Improper Valuation of West End Investments........................................................................... 42

   E.    Gould's Awareness of Misappropriation of Money from WestLB .................... 43

   F.    Gould's Knowledge that Returns Were Not as Reported to Investors ................ 44

**CONCLUSIONS OF LAW** ........................................................................................ 46

**I.**    **THE CONSEQUENCES OF GOULD'S INVOCATION OF HIS FIFTH AMENDMENT PRIVILEGE** ................................................................ 46

   A.    The SEC Is Entitled To A Negative Inference.................................... 47

   B.    Gould Is Precluded From Offering Evidence In His Behalf................................ 47

**II.**    **GOULD'S LIABILITY FOR VIOLATIONS OF THE EXCHANGE ACT AND SECURITIES ACT** ........................................................................ 48

   A.    Gould Is Liable For Misrepresentations and Omissions........................................ 51

   B.    The Information Misrepresented or Not Disclosed Was Material........................ 51

   C.    Gould's Misstatements and Omissions Were Made In Connection With Securities Transactions By Investors ........................................................ 52

   D.    Gould Can Also Be Held Liable For Participating In a Scheme or Artifice to Defraud .................................................................................... 53

   E.    Gould Acted With Scienter.............................................................. 53

**III.**    **GOULD'S LIABILITY FOR AIDING AND ABETTING VIOLATIONS OF THE ADVISERS ACT** ........................................................ 55

   A.    There Were Underlying Violations of the Advisers Act ..................................... 56

   B.    Gould Knew of the Underlying Violations............................................ 57

   C.    Gould Rendered Substantial Assistance to the Underlying Violations ............... 58

**IV.**    **THE PENALTIES THE COURT SHOULD IMPOSE** ................................................. 59

**V.**    **FULL INJUNCTIVE RELIEF SHOULD BE IMPOSED** ........................................... 60

**CONCLUSION** ........................................................................................ 61

# TABLE OF AUTHORITIES

**Cases**

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)................................................................51

*Baxter v. Palmigiano,*
    425 U.S. 308 (1976)................................................................47

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)................................................................53

*In re Enron Corp. Sec. Litig.,*
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ........................................50

*In re Parmalat Sec. Litig.,*
    376 F. Supp. 2d 472 (S.D.N.Y. 2005)........................................53

*In re Refco, Inc. Sec. Litig.,*
    503 F.Supp.2d 611 (S.D.N.Y. 2007)..........................................49

*In re Salomon Analyst AT&T Litig.,*
    350 F. Supp. 2d 455 (S.D.N.Y. 2004)........................................53

*LiButti v. U.S.,*
    178 F.3d 110 (2d Cir. 1999)......................................................47

*SEC v. Aragon Capital Advisors, LLC,*
    2011 WL 3278907 (S.D.N.Y. 2011).....................................55, 58

*SEC v. Cassano,*
    2000 WL 777930 (S.D.N.Y. June 19, 2000) ...............................47

*SEC v. Cavanagh,*
    155 F.3d 129 (2d Cir. 1998)......................................................61

*SEC v. Coates,*
    137 F.Supp.2d 413 (S.D.N.Y. 2001)..........................................60

*SEC v. Collins & Aikman Corp.,*
    524 F.Supp.2d 477  (S.D.N.Y. 2007).........................................49

*SEC v. Commonwealth Chem. Sec., Inc.,*
    574 F.2d 90 (2d Cir. 1978)........................................................61

*SEC v. Credit Bancorp, Ltd.*,
     2002 WL 31422602 (S.D.N.Y. Oct. 29, 2002) .................................................59

*SEC v. Credit Bancorp, Ltd.*,
     195 F. Supp. 2d 475 (S.D.N.Y. 2002) ...................................................52, 54

*SEC v. DiBella*,
     587 F.3d 553 (2d Cir. 2009) ...............................................................55

*SEC v. Espuelas*,
     698 F. Supp. 2d 415 (S.D.N.Y. 2010) ...............................................49, 54

*SEC v. Forest Res. Mgmt. Corp.*,
     2010 WL 2077202 (S.D.N.Y. May 18, 2010) ...........................................60

*SEC v. Gabelli*,
     2010 WL 1253603 (S.D.N.Y. 2010) .....................................................56

*SEC v. Haligiannis*,
     470 F. Supp. 2d 373 (S.D.N.Y. 2007) ...................................................54

*SEC v. Hasho*,
     784 F. Supp. 1059 (S.D.N.Y. 1992) ......................................................52

*SEC v. Kenton Capital*,
     69 F. Supp. 2d 1 (D.D.C. 1998) .........................................................60

*SEC v. Kimmes*,
     799 F. Supp. 852 (N.D. Ill. 1992) .......................................................50

*SEC v. Landberg*,
     __ F. Supp. 2d __, 2011 WL 5116512 (S.D.N.Y. Oct. 26, 2011).....................49, 53, 55

*SEC v. Lee*,
     720 F. Supp. 2d 305 (S.D.N.Y. 2010) ...................................................53

*SEC v. Management Dynamics, Inc.*,
     515 F.2d 801 (2d Cir. 1975) ..............................................................60

*SEC v. Manor Nursing Ctrs., Inc.*,
     458 F.2d 1082 (2d Cir. 1972) ............................................................61

*SEC v. Mayhew*,
     121 F.3d 44 (2d Cir. 1997) ...............................................................51

*SEC v. McNulty*,
   137 F.3d 732 (2d Cir. 1998)........................................................................54

*SEC v. Monarch Funding Corp.*,
   192 F.3d 295 (2d Cir. 1999)................................................................49, 50

*SEC v. Moran*,
   922 F. Supp. 867 (S.D.N.Y.1996) ...........................................................48

*SEC v. Murphy*,
   626 F.2d 633  (9th Cir. 1980) ...................................................................52

*SEC v. Opulentica, LLC*,
   479 F. Supp. 2d 319 (S.D.N.Y. 2007).......................................................60

*SEC v. Palmisano*
   135 F.3d 860 (2d Cir. 1998)......................................................................59

*SEC v. Pattison*,
   2011 WL 723600 (N.D. Cal. Feb. 23, 2011) ...........................................60

*SEC v. Pentagon Capital Mgmt*,
   612 F. Supp. 2d 241(S.D.N.Y. 2009)..................................................49, 50

*SEC v. Pentagon Capital Mgmt*,
   __ F. Supp. 2d. __, 2012 WL 479576 (S.D.N.Y. Feb. 14. 2012) ..........50, 53

*SEC v. Pittsford Capital Income Partners, LLC*,
   2007 WL 2455124 (W.D.N.Y. Aug. 23, 2007)  .............................47, 52, 54

*SEC v. Power*,
   525 F. Supp. 2d 415 (S.D.N.Y. 2007).......................................................61

*SEC v. Razmilovic*,
   __F. Supp. 2d __, 2011 WL 4629022 (E.D.N.Y. Sept. 30, 2011)..............60

*SEC v. Rana Research, Inc.*,
   8 F.3d 1358 (9th Cir. 1993) ................................................................51, 52

*SEC v. Softpoint, Inc.*,
   958 F. Supp. 846,(S.D.N.Y. 1997) ...........................................................61

*SEC v. Stanard*,
   2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ........................................52, 54

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) .................................................................56, 57

*SEC v. Suman*,
    684 F. Supp. 2d 378 (S.D.N.Y 2010) ..........................................................47

*SEC v. Tecumseh Holdings Corp.*,
    765 F. Supp. 2d 340 (S.D.N.Y. 2011)..........................................................54

*Steadman v. SEC*,
    450 U.S. 91 (1981).........................................................................................48

*U.S. v. Brown*,
    555 F.2d 336 (2d Cir. 1977)..........................................................................50

*U.S. v. Certain Real Property and Premises Known As: 4003-4005 5th Ave.,*
    *Brooklyn, NY*, 55 F.3d 78 (2d Cir. 1995) ...................................................47

*U. S. v. Finnerty*,
    533 F.3d 143(2d Cir. 2008).....................................................................49, 53

*U.S. v. Jensen*,
    608 F. 2d 1349 (10th Cir. 1979) ................................................................50

*U.S. v. Johnson*,
    354 F. Supp. 2d 939 (N.D. Iowa 2005).........................................................54

*U.S. v. Naftalin*,
    441 U.S. 768 (1979).......................................................................................50

*U.S. v. Village of Island Park*,
    888 F. Supp. 419 (E.D.N.Y. 1995) ..............................................................48

*VanCook v. SEC*,
    653 F.3d 130, 138 (2d Cir. 2011).............................................................48, 53

**Other Sources**

Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles,
    SEC Release No. IA-2628 (Aug. 3, 2007).....................................................57

# FINDINGS OF FACT

## I.      BACKGROUND

### A.      West End Financial Advisors and Its Affiliates

1.      William Landberg ("Landberg") created West End Financial Advisors, LLC ("WEFA"), a Delaware limited liability company, in or around October 2000.  (Declaration of Raymond J. Heslin ("Heslin Decl.") ¶ 3.) (SSMAF[1] ¶ 1.)

2.      Landberg was the Chairman, Chief Executive Officer, and Manager of WEFA. (*See, e.g.*, SEC Ex. 79 at p. 35; Ex. 80 at p. 13.) (SSMAF ¶ 2.)

3.      L/C Family Limited Partnership ("L/C Family") was the sole member and owner of WEFA.  (Heslin Decl. ¶ 3.) (SSMAF ¶ 3.)

4.      Landberg and his wife, Louise Crandall, were the sole partners of L/C Family. (Heslin Decl. ¶ 3.) (SSMAF ¶ 4.)

5.      Subsequent to creating WEFA, Landberg purchased Sentinel Investment Management Corporation ("Sentinel"), a boutique investment advisory company.  (Heslin Decl. ¶ 4.) (SSMAF ¶ 5.)

6.      Landberg served as Sentinel's Chairman.  (*See, e.g.*, SEC Ex. 79 at p. 35.) (SSMAF ¶ 6.)

---

[1]      SSMAF refers to the Stipulated Statement of Mutually Agreed Facts contained in the Joint Pretrial Order, filed on March 2, 2012.  SSMAF* (with the asterisk) indicates that the Stipulated Statement of Mutually Agreed Facts contains a similar, but not identical, fact.  The SEC contends that its proof supports the fact as fully set forth in the SEC's Proposed Findings of Fact.  In cases where there is a variance between the SEC's Proposed Finding of Fact and the SSMAF, the additional or different language in the SEC's Proposed Finding of Fact is underlined.  In cases where there is no parallel fact in the SSMAF to the SEC's Proposed Finding of Fact, the SEC's Proposed Finding of Fact appears in **bold**.

7.      Initially, Sentinel managed investments for its clients in separately managed accounts.  (Heslin Decl. ¶ 4.) (SSMAF ¶ 7.)

8.      Over time, Landberg formed a number of limited partnerships <u>that purportedly pursued different investment strategies</u>.  (Heslin Decl. ¶ 4; Declaration of Janis Barsuk ("Barsuk Decl.") ¶ 7.) (SSMAF* ¶ 8.)

9.      Those limited partnerships included:

    i.      the West End Special Opportunity Fund, LP in approximately 2002 (SEC Ex. 83);

    ii.      the West End Cash Liquidity Fund I, L.P. in approximately 2003 (SEC Ex. 86);

    iii.      the West End Mortgage Opportunity Fund I, LP in approximately 2003 (SEC Ex. 89);

    iv.      the West End Mortgage Finance Fund I LP (the "Franchise Fund") in approximately 2004 (SEC Ex. 79);

    v.      the West End Real Estate Fund I, LP in approximately 2005 (SEC Ex. 91);

    vi.      the West End Special Opportunity Fund II, LP in approximately 2006 (SEC Ex. 84);

    vii.      the West End Absolute Return Fund I, LP (the "Absolute Return Fund") in approximately 2006 (SEC Ex. 82);

    viii.      the West End Private Client Income Fund L.P. (the "Private Client Fund") in approximately 2006 (SEC Ex. 90);

    ix.      West End Fixed Income Partners LP in approximately 2007 (SEC Ex. 88);

    x.      the West End Dividend Strategy Fund I, LP in approximately 2007 (SEC Ex. 85);

    xi.      the West End/Mercury Short-Term Mortgage Fund, LP (the "Hard Money Fund") in approximately 2007 (SEC Ex. 80);

    xii.      the West End Income Strategies Fund LP (the "Income Strategies Fund") in approximately 2008 (SEC Ex. 81); and

xiii.    the West End Diversified Investment Fund, L.P. (the "Diversified Investment Fund") in approximately 2008 (SEC Ex. 87).[2]

(SSMAF* ¶ 9.)

10.    In addition to the limited partnerships identified in paragraph 7, WEFA, and Sentinel, Landberg created or invested in at least 22 additional entities.[3]  (Heslin Decl. ¶ 5; SEC Ex. 197.) (SSMAF ¶ 10.)

11.    WEFA was the general partner of many of the limited partnerships created by Landberg and received fees for its administration and management of the limited partnerships. (Heslin Decl. ¶ 5.) (SSMAF ¶ 11.)

**12.    Landberg targeted Sentinel's individual private clients and convinced many of them to purchase interests in the limited partnerships that he was creating.  (Heslin Decl. ¶ 4.)**

13.    During at least 2006 to 2009, Landberg also managed investments in properties in the Hamptons and other locations, and was actively developing properties there.  (Barsuk Decl. ¶¶ 4, 12.) (SSMAF ¶ 12.)

14.    A number of the additional entities that Landberg created related to these real estate projects.  (Barsuk Decl. ¶ 12.) (SSMAF ¶ 13.)

15.    West End entities affiliated with Landberg's real estate projects included Amagansett Realty Group, Amagansett Realty Holding, Amagansett Realty SPV 1, Benedek

---

[2]  The funds referred to in paragraph 9 are sometimes collectively referred to herein as the "West End funds."

[3]  The entities referred to in paragraphs 9 and 10 are sometimes collectively referred to herein as the "West End entities."  WEFA, Sentinel and the West End Entities are sometimes collectively referred to herein as "West End."

Development Group, Edwards Avenue Realty, New Riverhead Realty, Southwood Court, and West End Sagaponack.  (Barsuk Decl. ¶ 12.) (SSMAF ¶ 14.)

16.     Steven Gould ("Gould") served as the Chief Financial Officer at West End from September 2006 to May 11, 2009.  (Answer of Defendant Steven Gould, dated March 21, 2011 ("Gould Answer") ¶ 1; *see also* SEC Ex. 79 at p. 35 (Gould "joined the General Partner [WEFA] in September 2006 as the Chief Financial Officer, where he is responsible for directing all areas of its financial and accounting operations"); Ex. 80 at p. 14; Ex. 81 at p. 22.) (SSMAF ¶ 15.)

17.     Janis Barsuk ("Barsuk") served as the controller at West End from January 2006 to October 2011.  (Barsuk Decl. ¶ 2.) (SSMAF ¶ 16.)

18.     Kevin Kramer ("Kramer") served as West End's Chief Operating Officer from 2006 through June 2009.  (Kevin Kramer's Answer to Amended Complaint, dated May 20, 2011, ¶ 2; *see also* SEC Ex. 79 at p. 35; Ex. 80 at p. 14.) (SSMAF ¶ 17.)

19.     Over time, Landberg and employees of West End working at his direction opened at least 37 bank accounts for the West End entities (the "West End Signature accounts") at Signature Bank ("Signature").  (Declaration of Chris Efstratiou ("Efstratiou Decl.") ¶¶ 9-11; Barsuk Decl. ¶ 5; SEC Exs. 101-136.) (SSMAF* ¶ 18.)

20.     Signature installed a system at West End's offices that gave West End employees access to the West End accounts through the internet.  (Efstratiou Decl. ¶ 21; Barsuk Decl. ¶ 5.) (SSMAF ¶ 19.)

21.     Landberg, Gould, and Barsuk had access to the Signature online account management system.  (Barsuk Decl. ¶ 5.) (SSMAF ¶ 20.)

22.     By approximately April 2009, West End had approximately 110 investors with approximately 154 separate accounts.  (*See* SEC Ex. 246.) (SSMAF ¶ 21.)

B.     <u>The Franchise Fund, the Hard Money Fund, and the Income Strategies Fund</u>

**23.     The Franchise Fund and the Hard Money Fund were the primary investment vehicles in which the investments of West End's individual clients were made as of the end of 2007 and the beginning of 2008.  (Heslin Decl. ¶ 6.)**

24.     WEFA was the general partner of the Franchise Fund, with Landberg and Kramer exercising primary management and control responsibilities.  (SEC Ex. 79 at p. 2.) (SSMAF ¶ 22.)

25.     The Franchise Fund was engaged in the business of making franchise loans to commercial food service franchisees.  (Heslin Decl. ¶ 6; Declaration of Michael Rhodes ("Rhodes Decl.") ¶ 9; Barsuk Decl. ¶ 8; SEC Ex. 79 at p. 1.) (SSMAF ¶ 23.)

26.     The loans were made by two special purpose funding vehicles, NFA Funding LLC and NFA Funding II LLC.  (Rhodes Decl. ¶ 9; SEC Ex. 79 at pp. 1, 20-34.) (SSMAF ¶ 24.)

27.     NFA Funding II LLC was formed in October 2007 to fund new franchise loans. (Rhodes Decl. ¶ 9; SEC Ex. 79 at pp. 28-29.) (SSMAF ¶ 25.)

28.     With respect to loans made by NFA Funding II LLC starting in 2008, the Franchise Fund provided 20% of the loan, with the remaining 80% provided by a German bank, DZ Bank AG ("DZ Bank").  (Rhodes Decl. ¶ 9; Barsuk Decl. ¶ 8; SEC Ex. 79 at pp. 29-30.) Before DZ Bank, Merrill Lynch provided the 80% of the financing.  (SSMAF ¶ 26.)

29.     The Franchise Fund generated a portion of the returns based on the difference

between the interest rate at which it borrowed money (either from Merrill Lynch Finance or from DZ Bank) and the interest rate it offered to borrowers from the Fund.  (Rhodes Decl. ¶ 9; SEC Ex. 79 at p .20.) (SSMAF ¶ 27.)

**30.     The offering documents for the Franchise Fund restricted investments in that vehicle to providing commercial loans to restaurant franchises.  (Heslin Decl. ¶ 27; SEC Ex. 79 at p. 20.)**

31.     The Hard Money Fund was in the business of making short-term real estate mortgage loans.  (Heslin Decl. ¶ 6; Rhodes Decl. ¶ 21; Barsuk Decl. ¶ 9; SEC Ex. 80 at p. 2.) (SSMAF ¶ 28.)

32.     West End Capital Management, LLC ("WECM") and WEFA served as the general partner and investment manager of the Hard Money Fund, respectively, with Landberg and Kramer exercising primary management and control responsibilities.  (SEC Ex. 80 at p. 13.) (SSMAF ¶ 29.)

33.     The Hard Money Fund would make the loans and then sell them to a subsidiary, MCC Funding, LLC ("MCC Funding"), which would purchase the loans using capital contributions from the Hard Money Fund and from WestLB AG, New York Branch ("WestLB"). (Rhodes Decl. ¶ 21; SEC Ex. 80 at pp. 2-3, 12, 16.) (SSMAF ¶ 30.)

34.     The Hard Money Fund generally contributed 20% of the loan amount, and WestLB generally contributed the remaining 80%.  (Heslin Decl. ¶ 17; Rhodes Decl. ¶ 21; Barsuk Decl. ¶ 9.) (SSMAF ¶ 31.)

**35.     Income earned from the Hard Money Fund's investments was required to**

first be used to repay the eighty percent loan from WestLB, then servicing fees, with any remainder (after WECM's fees and expenses) distributed to West End investors.  (Heslin Decl. ¶ 18; SEC Ex. 80 at pp. 17-18.)

36.     **The offering documents for the Hard Money Fund restricted investments in that vehicle to providing short-term commercial real estate mortgage loans.  (Heslin Decl. ¶ 27; SEC Ex. 80 at p. 10.)**

37.     **WestLB's contributions were governed by a Credit and Security Agreement between MCC Funding and WestLB.  (Rhodes Decl. ¶ 21; SEC Ex. 80 at pp. 2, 10-11; Ex. 78.)**

38.     The terms of the Credit and Security Agreement for the Hard Money Fund required <u>MCC Funding</u> to maintain a segregated bank account <u>to reserve</u> for up-front interest payments made by borrowers from the fund.  (Heslin Decl. ¶ 17; Rhodes Decl. ¶ 22; SEC Ex. 78 at pp. 10-11.) (SSMAF* ¶ 32.)

39.     This account was referred to as the Interest Reserve Account.  (Heslin Decl. ¶ 17; SEC Ex. 78 at p. 10.) (SSMAF ¶ 33.)

40.     Certain Hard Money Fund agreements with real estate developers required the developers to deposit money into the Interest Reserve Account, <u>a means of reducing some of WestLB's risks because the bank was authorized to draw upon funds in the account in the event that the borrower missed an interest payment</u>.  (Heslin Decl. ¶ 17; Barsuk Decl. ¶ 59.) (SSMAF* ¶ 34.)

41.     The terms of the Credit and Security Agreement required <u>West End</u> to maintain

the account in trust for WestLB and prohibited the commingling of funds in the Interest Reserve Account with any other account.  (Heslin Decl. ¶ 17; Efstratiou Decl. ¶ 25; SEC Ex. 78 at p. 10; SEC Ex. 133.) (SSMAF* ¶ 35.)

**42.      The Credit and Security Agreement also required that funds in the Interest Reserve Account were not to be disbursed other than to WestLB.  (Heslin Decl. ¶ 18; SEC Ex. 78 at p. 11.)**

**43.      Once a month, money was to be transferred from the Interest Reserve Account to another account, for eventual transfer to West LB.  (Barsuk Decl. ¶ 59; SEC Ex. 78 at p. 11.)**

44.      The Income Strategies Fund was a fund-of-funds that invested in both the Franchise Fund and the Hard Money Fund.  (Heslin Decl. ¶¶ 6, 27; SEC Ex. 81 at 16.) (SSMAF* ¶ 36.)

45.      The offering memorandum for the Income Strategies Fund provided that "[i]nitially, the General Partner intends to make investments in the [Franchise Fund] and the [Hard Money Fund] . . . ."  (SEC Ex. 81 at 16.) (SSMAF ¶ 37.)  That offering memorandum also stated that "the General Partner of West End may in its sole and absolute discretion, change the Partnership's allocation between strategies, use strategies other than those described above, or discontinue the use of any strategy, without advance notice to its limited partners." (SEC Ex. 81 at 1.)  (SSMAF ¶ 38.)

46.      Marketing materials sent by West End to investors and potential investors in 2009 concerning the Income Strategies Fund stated that it "currently invests in two separate sub-funds

managed by the General Partner" and identified the Hard Money Fund and the Franchise Fund. (SEC Exs. 71 & 72; *see also* Heslin Decl. ¶ 13.) (SSMAF ¶ 39.)

**47.     The investments in the Franchise Fund, the Hard Money Fund, and the Income Strategies Fund typically took the form of limited partnership interests.  (Heslin Decl. ¶ 7.)**

48.     The Limited Partners made equity investments where the limited partners' returns were based on the funds' performance.  (Heslin Decl. ¶ 7.) (SSMAF ¶ 40.)

49.     In some cases, these funds also <u>purported to</u> offer debt obligations known as Risk Adjusted Debt Certificates ("RAD's").  (Heslin Decl. ¶ 7; SEC Ex. 81 at 1.) (SSMAF* ¶ 41.)

50.     The RADS purported to guarantee certain annual returns.  (Heslin Decl. ¶ 7; SEC Ex. 81 at 1.) (SSMAF ¶ 42.)

C.     <u>Steven Gould's Role and Responsibilities at West End</u>

51.     Gould was hired as the Chief Financial Officer of WEFA in September 2006. (Gould Answer ¶ 1; Heslin Decl. ¶ 8; Barsuk ¶ 19.) (SSMAF ¶ 43.)

**52.     From September 2006 to at least January 2008, Gould also served as Chief Compliance Officer of Sentinel.  (SEC Ex. 243 at 1-1; Ex. 244 at p. 23; Ex. 183 at p. 2.)**

53.     From 1997 to 2005, Gould was the Chief Financial Officer of WestCom Corporation (a telecommunications company).  (SEC Ex. 79 at p. 35.) (SSMAF ¶ 44.)

54.     At WestCom Corporation, Gould was involved in several mergers and acquisitions, private placements of debt, and the sale of WestCom to a private equity firm.  (SEC Ex. 79 at p. 35.) (SSMAF ¶ 45.)

55.     From 1988 to 1997, Gould held several positions at Lawrence Heimowitz & Co. CPA.  (SEC Ex. 79 at p. 35.) (SSMAF ¶ 46.)

56.     Gould has been a Certified Public Accountant since 1991.  (SEC Ex. 79 at p. 35.) (SSMAF ¶ 47.)

57.     At the time Gould was hired by West End in September 2006, he was <u>performing freelance or per diem accountant work</u> for the accounting firm Smallberg Sorkin and Company ("Smallberg Sorkin").  (Heslin Decl. ¶¶ 8-9; Barsuk ¶ 15; Gould Answer ¶ 59.)  (SSMAF* ¶ 48.)

58.     Smallberg Sorkin provided accounting services for several of the West End entities.  (Barsuk ¶ 15.) (SSMAF ¶ 49.)

59.     While at Smallberg Sorkin, Gould prepared monthly financial reports for the Absolute Return Fund.  (Barsuk ¶ 15.) (SSMAF ¶ 50.)

60.     The monthly financial reports that Gould prepared for the Absolute Return Fund included capital account summaries and account statements that were sent to limited partners in the fund.  (Barsuk ¶¶ 16-17; Heslin ¶ 9; SEC Exs. 201-202.) (SSMAF ¶ 51.)

61.     Upon joining West End as CFO, Gould was responsible for oversight of the accounting department at West End; <u>for all the accounting for all West End funds; and for the financial records and operations of the various West End funds</u>.  (Barsuk ¶ 22; Heslin ¶ 8; *see also, e.g.*, SEC Ex. 79 at p. 35; Ex. 80 at p. 14; Ex. 81 at p. 22.) (SSMAF* ¶ 52.)

62.     As CFO, Gould was responsible for preparing a monthly compilation of <u>all</u> contributions to and disbursements from <u>each</u> of the West End funds in order to prepare monthly capital summary reports.  (Barsuk ¶ 22; Heslin ¶ 10.) (SSMAF* ¶ 53.)

63.     Gould then used the monthly capital summary reports to prepare monthly account statements that were sent to investors.  (Barsuk ¶¶ 22-25; Heslin ¶ 10; Gould Answer ¶ 59;  *see also, e.g.*, SEC Exs. 97, 100, 168-69, 171-72, 174-82, 192-94, 198-200.) (SSMAF ¶ 54.)

64.     Gould also prepared balance sheets and profit and loss statements for the West End funds.  (Barsuk ¶ 23; Heslin ¶ 10; SEC Exs. 97, 100, 168-69, 171-72, 174-82, 192-94, 198-200.) (SSMAF* ¶ 55.)

**65.     Gould was the person with the ultimate responsibility and authority for the compilation of data relating to each fund, for keeping track of and recording any contributions to and disbursements from each fund, and the preparation of monthly account statements that were distributed to investors.  (Heslin Decl. ¶ 11; *see* SEC Ex. 248 at pp. 9-10, 12; *see also, e.g.*, SEC Ex. 79 at p. 35; Ex. 80 at p. 14; Ex. 81 at p. 22.)**

**66.     As the officer with direct responsibility regarding the financial operations of the West End funds, Gould was the person with the ultimate responsibility for ensuring that the account statements sent to investors were accurate.  (Heslin Decl. ¶ 11; *see* SEC Ex. 248 at pp. 9-10, 12; *see also, e.g.*, SEC Ex. 79 at p. 35; Ex. 80 at p. 14; Ex. 81 at p. 22.)**

**67.     As Chief Financial Officer, Gould was also the person ultimately responsible for maintaining and supervising the various bank accounts maintained by the West End funds, for monitoring and supervising the audits of various West End funds, and in general, for compiling and organizing the financial records of the West End funds.  (Heslin Decl. ¶ 12; *see* SEC Ex. 248 at pp. 9-10, 12-13; *see also, e.g.*, SEC Ex. 79 at p. 35; Ex. 80 at p. 14; Ex. 81 at p. 22.)**

68.     Gould's responsibilities included monitoring the outstanding receivables for each of the West End funds and, in particular, any intrafund transfers.  (Heslin Decl. ¶ 12; *see* SEC Ex. 248 at pp. 26-28, 32-33, 39-40, 87-90, 117-122; Exs. 211-215.)

69.     Gould had the ultimate authority and responsibility for maintaining and supervising West End's bank accounts, including those at Signature Bank.  (Heslin Decl. ¶ 16; *see* SEC Ex. 248 at pp. 24- 29, 34-37, 39-45, 50-53; Exs. 144, 147, 150, 152, 154-56, 159, 162, 203, 209, 227.)

70.     Gould was also responsible for monitoring and supervising the activities in the various accounts held by the West End funds in connection with certain lines of financing.  (Heslin Decl. ¶ 17; *see* SEC Ex. 248 at pp. 125-27, 130-133; Ex. 26.)

71.     From the fall of 2007 to April 2009, Gould also worked with outside auditors who were auditing the Franchise Fund and the Hard Money Fund.  (Rhodes Decl. ¶¶ 8-45.) (SSMAF ¶ 56.)

72.     Gould earned a salary of $43,750 and bonus of $15,000, totaling $58,750, for four months of work in 2006.  (Gould Answer ¶ 69.) (SSMAF ¶ 57.)

73.     Gould earned a salary of $150,000 and bonus of $25,000, totaling $175,000, for 2007.  (Gould Answer ¶ 69.) (SSMAF ¶ 58.)

74.     Gould earned a salary of $200,000 for 2008.  (Gould Answer ¶ 69.) (SSMAF ¶ 59.)

75.     Gould earned a salary of $73,489 for 2009.  (Gould Answer ¶ 69.) (SSMAF ¶ 60.)

D.     Gould's Communications with West End Investors

76.     Gould prepared account statements for the West End funds that were sent to investors in those funds.  (Barsuk Decl. ¶¶ 23-25; SEC Exs. 97, 100, 168-69, 171-72, 174-82.) (SSMAF ¶ 61.)

77.     The account statements set forth each investor's contributions to and distributions from a particular fund.  (*See* SEC Exs. 97, 100, 168-69, 171-72, 174-82 (account statements).) (SSMAF ¶ 62.)

78.     The account statements also stated the investor's income in the fund and an estimated rate of return.  (*See* SEC Exs. 97, 100, 168-69, 171-72, 174-82 (account statements).) (SSMAF ¶ 63.)

79.     From 2007 to 2009, Gould also spoke with and emailed at least two West End investors concerning their investments in West End.  (Declaration of Katharine Baum ("Baum Decl.") ¶¶ 8-10; Declaration of Michael Raounas ("Raounas Decl.") ¶¶ 10-12; SEC Exs. 3, 5, 11-14, 185-91.) (SSMAF ¶ 64.)

**80.     Gould reassured the two investors that their investments were sound, performing according to the investors' expectations, and generating positive returns. (Baum Decl. ¶ 9; Raounas Decl. ¶ 11; SEC Ex. 5 ("Standard handholding on Baum……").)**

81.     Potential (as well as actual) West End investors were presented with summary documents called tear sheets that presented an abbreviated picture of the performance of several of the West End funds.  (Heslin Decl. ¶ 13; SEC Exs. 51, 68-72.) (SSMAF ¶ 65.)

**82.     Gould was responsible for compiling the financial information presented in**

the tear sheets, including return on investment, the kind of investments made by the respective West End funds, as well as details regarding assets under management.  (Heslin Decl. ¶ 13; SEC Exs. 46-51, 68-72.)

83.    The tear sheets misrepresented the investment activity of the respective funds, omitted to disclose that a significant portion of the assets for each fund were in the form of uncollectable loans from other funds, and misstated the returns earned by the respective funds.  (*See* Heslin Decl. ¶ 13; SEC Exs. 46-51, 68-72.)

## II.    DISCOVERY OF FRAUD AT WEST END AND ITS SUBSEQUENT COLLAPSE

84.    Raymond Heslin ("Heslin") joined WEFA as its General Counsel and Chief Compliance Officer in the first quarter of 2009.  (Heslin Decl. ¶¶ 2, 22.) (SSMAF* ¶ 66.)

85.    Not long after joining WEFA, Heslin became suspicious about the source and use of funds in connection with several loan transactions in the two major funds, as well as numerous other improprieties.  (Heslin Decl. ¶ 22.)

86.    Beginning in May 2009 Heslin caused WEFA, Sentinel, and all of the West End funds to suspend their normal operations and conducted an internal investigation that led to the discovery of improprieties at West End.  (Heslin Decl. ¶ 23.) (SSMAF* ¶ 67.)

87.    Heslin immediately suspended Landberg's involvement in the management and operation of the West End funds and notified various lenders to the West End funds of Landberg's suspected improprieties.  (Heslin Decl. ¶ 23.) (SSMAF* ¶ 68.)

88.    On June 2, 2009, Heslin secured Landberg's global resignation from all West End entities, and his appointment as Landberg's successor.  (Heslin Decl. ¶ 24; SEC Ex. 247.)

(SSMAF ¶ 69.)

89.     **Following his discovery of fraud at West End, Heslin conducted an**
**investigation that entailed his interviewing numerous business associates and other persons**
**who had business dealings with or information relevant to the business and financial affairs**
**of the West End funds and their management, including Gould.**  (Heslin Decl. ¶ 25.); *cf.*
SSMAF ¶ 70.

90.     **Heslin also reviewed thousands of documents, including information**
**collected by employees and consultants employed by the West End funds.  (Heslin Decl. ¶**
**25.)**

91.     **Heslin determined that the West End funds were being run as a Ponzi**
**scheme.  (Heslin Decl. ¶ 22.)**

92.     **Heslin discovered a number of improprieties at West End, including**
**improper movement of money and disregard of corporate formalities, improprieties**
**related to bank accounts maintained for certain West End funds, and improper use of loan**
**proceeds.  (Heslin Decl. ¶¶ 26-43; Declaration of Raymond T. Sloane ("Sloane Decl.") ¶¶ 8-**
**12; SEC Exs. 1, 73-77.)**

A.     Improper Money Movements and Account Commingling

93.     Landberg, with Gould's knowledge, consent, and assistance, transferred moneys
between and among the West End funds on an almost daily basis, without regard to the
investment purposes of the specific West End funds, whether or not there was any consideration
for the transfers, whether or not there were any legitimate business justifications for the transfer,
and without proper documentation for such transfers.  (Heslin Decl. ¶ 26-28; *see* Barsuk Decl. ¶¶

35-45; Efstratiou Decl. ¶¶ 20-25, 33-36; Sloane Decl. ¶¶ 8-9; *see, e.g.*, SEC Exs. 137-67, 209-210.) (SSMAF* ¶ 71.)

94.     While each of the West End funds had its own separate bank accounts, there were significant and substantial transfers every month among these bank accounts, and these transfers were made without observance of corporate formalities. (Sloane Decl. ¶ 8(a); *see* Barsuk Decl. ¶¶ 35-45; Efstratiou Decl. ¶¶ 20-25, 33-36; SEC Exs. 137-67, 209-210; *see also* SEC Ex. 1 at pp. 13-24; Exs. 73-77.) (SSMAF* ¶ 72.)

95.     Cash was frequently transferred among the West End funds to cover overdrawn balances, without regard to the business purpose or the propriety of the transfer. (Sloane Decl. ¶ 8(c); *see* Barsuk Decl. ¶¶ 35-45; *see, e.g.*, SEC Exs. 209-210; *see also* SEC Ex. 1 at pp. 13-24, Exs. 73-77.) (SSMAF* ¶ 73.)

**96.     Investor funds were often transferred between the West End funds without regard to which vehicle the investor had chosen to subscribe, without regard to the investment restrictions placed on those funds either by the investor or by the governing documents of the specific West End fund to which the funds were originally directed. (Heslin Decl. ¶ 29; Barsuk Decl. ¶¶ 42-45; *see, e.g.*, SEC Exs. 209-210.)**

**97.     Due to the need of the West End funds to have funds available for redemption on demand, and to create the illusion of returns needed to support representations made to investors, funds invested with the West End funds were not properly segregated or accounted for. (Heslin Decl. ¶ 30; *see, e.g.*, Barsuk Decl. ¶¶ 42-45; *see, e.g.*, SEC Exs. 209-210.)**

98.     **Investments by RAD holders, note holders, and limited partners that were designated by investors for a specific fund were used by the West End entities for whatever purposes were deemed necessary at the time.  (Heslin Decl. ¶ 30; *see, e.g.*, Barsuk Decl. ¶¶ 42-45; *see, e.g.*, SEC Exs. 209-210.)**

99.     **The bank accounts of many of the West End funds consistently had low or negative balances for extended periods of time.  (Sloane Decl. ¶ 8(b); *see* Efstratiou Decl. ¶¶ 20-25, 33-36; SEC Exs. 137-67; *see also* SEC Ex. 1 at pp. 13-24.)**

100.     **Large deposits into bank accounts were frequently followed by subsequent withdrawals and transfers to third parties, investors, or other West End funds either on the same day as the initial deposit or shortly thereafter.  (Sloane Decl. ¶ 8(d); *see also* SEC Ex. 1 at pp. 13-24; Exs. 74-77.)**

101.     There were transfers from the accounts of the West End funds to cover overdrafts in the personal bank accounts of Landberg and his family members.  (Sloane Decl. ¶ 8(e); *see also* SEC Ex. 1 at pp. 27-32; Barsuk Decl. ¶ 39; Efstratiou Decl. ¶ 29; *e.g.*, Exs. 137-38, 141-44, 146-48.) (SSMAF ¶ 74.)

102.     **Efforts by West End personnel to paper the various intrafund transfers through promissory notes purporting to substantiate cash transfers among the West End funds were blatantly pretextual.  (Sloane Decl. ¶ 9; *see also* SEC Ex. 1 at p. 36.)**

103.     **The indicia demonstrating the pretextual nature of these efforts were the fact that the promissory notes were short form, "fill-in-the-blank" templates, the majority of which were never signed, and certain of which appear to have been backdated.  (Sloane**

Decl. ¶ 9; *see also* SEC Ex. 1 at p. 36.)

    B.   <u>Improper Use of Loan Proceeds</u>

**104.   Money borrowed from WestLB that was earmarked for hard money loans was improperly transferred from the Hard Money Fund's bank account to the bank account of other of the West End funds and used for loans in those funds and other unauthorized uses.  (Heslin Decl. ¶¶ 32, 39-44, 46; SEC Exs. 73-76; *see also* SEC Ex. 1 at pp. 26-27.)**

105.   For example, on or about January 23, 2009, Landberg secured an approximately $3.948 million advance from WestLB for a land development project.  (Barsuk Decl. ¶¶ 67-68; SEC Exs. 229-230.) (SSMAF ¶ 75.)

**106.   The loan was from the Hard Money Fund to Benedek Development Group, an affiliate of West End in which Landberg had an ownership interest.  (Barsuk Decl. ¶¶ 67-68; SEC Exs. 229-230.)**

107.   Ordinarily approximately eighty percent of the loan money for a loan from the Hard Money Fund came from WestLB, and the other approximately twenty percent came from investors in the Hard Money Fund.  (Barsuk ¶ 70; Heslin Decl. ¶ 17.) (SSMAF ¶ 76.)

**108.   The loan to Benedek Development Group in January 2009 was conditioned upon West End contributing 30% as its equity participation.  (Heslin Decl. ¶ 43.)**

**109.   Landberg never provided West End's 30% equity participation in the loan. (Heslin Decl. ¶ 43; Barsuk ¶ 70.)**

110.   Landberg diverted the entire $3.948 million intended for Benedek Development

Group and used it for other purposes, including to pay investor distributions and to fund a $2 million loan from the Franchise Fund.  (Heslin Decl. ¶ 43; Barsuk Decl. ¶¶ 71-72; SEC Ex. 231.) (SSMAF* ¶ 77.)

111.    Later, in February 2009, Landberg obtained through an advanced funding request $3,080,000 from WestLB for a hard money loan to be made to "Somerset Holdings, LLC" for a property located in Florida.  (Heslin ¶ 39; SEC Ex. 73.)  He used those fund for purposes not disclosed to WestLB. (SSMAF* ¶ 78.)

**112.    Of the $3,080,000, $1,951,384.89 was in fact used to pay money owed to Century Bank by WEFA.  (Heslin ¶ 39; SEC Ex. 75.)**

113.    Century Bank was owned by a Florida-based company, and Landberg had previously invested in the Bank using money from the Franchise Fund.  (Rhodes Decl. ¶¶ 47-48; Barsuk Decl. ¶ 30; SEC Exs. 7, 15, 19.) (SSMAF ¶ 79.)

**114.    Other amounts from the $3,080,000 were used to fund the Franchise Fund's equity participation in other unspecified transactions as well as distributions to LPs and Landberg, and certain of Landberg's family members.  (Heslin Decl. ¶ 40; SEC Ex. 75.)**

**115.    This use of the funds obtained from WestLB was not consistent with the terms of the Credit and Security Agreement.  (Heslin Decl. ¶ 40; SEC Ex. 78 at pp. 12-13.)**

**116.    In addition, on or about April 20, 2009, the Franchise Fund closed a franchise loan transaction with an entity known as St. Mar Enterprises, Inc.  (Heslin Decl. ¶ 41.)**

**117.    The Franchise Fund's equity stake in the loan was $1.68 million.  (Heslin**

Decl. ¶ 41.)

118.    Of the $1.68 million, $1.64 million came from funds furnished by WestLB that were intended to be used for a hard money loan that the Hard Money Fund had agreed to make for real property in Alabama – a loan that had not closed.  (Heslin Decl. ¶ 42; SEC Ex. 74.); *cf.* SSMAF ¶ 80.

119.    This use of the $1.64 million from WestLB violated the terms of the Credit and Security Agreement.  (Heslin Decl. ¶ 42; SEC Ex. 78 at 12-13.)

C.    Improprieties Involving the Interest Reserve Account

120.    There were also numerous improprieties involving the Interest Reserve Account.  (Heslin Decl. ¶¶ 33-38; Barsuk Decl. ¶¶ 58-66; SEC Exs. 77, 224-27; *see also* SEC Ex. 1 at pp. 25-26.)

121.    Funds from the Interest Reserve Account were frequently utilized to pay overdrafts in other funds, personal expenses of Landberg and his family members, and distributions to LPs in violation of the applicable agreements with Signature Bank and WestLB.  (Heslin Decl. ¶ 34; see Barsuk Decl. ¶¶ 58-66; SEC Exs. 224-227; SEC Ex. 1 at pp. 25-26.)

122.    A forensic analysis completed at West End's direction in September 2009 found approximately $3.3 million in improper withdrawals had been made from the Interest Reserve Account from January 2008 to April 2009.  (Heslin Decl. ¶ 38; SEC Ex. 77.)

123.    As of May 2009, after Landberg left West End, over $400,000 was missing

**from the account and had to be repaid by West End.  (Heslin Decl. ¶ 38.)**

124.    In addition to the Interest Reserve Account, a separate account at Signature Bank was maintained for the purpose of receiving payments from mortgagors.  (Heslin Decl. ¶ 35.) (SSMAF ¶ 81.)

**125.    Funds were also transferred from this account into other fund accounts and into Landberg's personal accounts in violation of the applicable bank agreements.  (Heslin Decl. ¶ 35.)**

D.    <u>West End's Bankruptcy and Investor Losses</u>

**126.    On or around September 3, 2010, WEFA sent letters to West End investors advising each of them of their net contributions to the West End funds.  (SEC Ex. 245.)**

127.    WEFA's analysis showed a total net contribution by West End investors of approximately $66.5 million.  (SEC Ex. 246.) (SSMAF ¶ 82.)

**128.    West End investors are typically middle class individuals who placed all of their trust and virtually all of their financial resources in West End.  (Heslin Decl. ¶ 48.)**

129.    Since approximately May 2009, all West End investors, <u>including those who relied on a monthly distribution to live</u>, have received no distributions at all.  (Heslin Decl. ¶ 50; Baum Decl. ¶ 7; Raounas Decl. ¶ 9.) (SSMAF* ¶ 83.)

**130.    West End investors have had to sell homes in distressed real estate markets, especially outside New York City.  (Heslin Decl. ¶ 50.)**

**131.    Highly educated individuals who had invested millions each with the West End funds have had to find menial work at hourly rates of under $12 per hour, while**

others have found odd jobs such as driving neighbors to airports.  (Heslin Decl. ¶ 50.)

**132.    Retired investors have been forced to return to the workplace, or suffer the humiliation of having to be supported by their children.  (Heslin Decl. ¶ 50.)**

**133.    Several have found it difficult to pay for treatment for life-threatening illnesses, or to pay for support of disabled children.  (Heslin Decl. ¶ 50.)**

134.    On or about March 15, 2011, various of the West End entities, including WEFA and Sentinel (collectively, the "Debtors"), filed for protection in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under Chapter 11 of the U.S. Bankruptcy Code.  (Heslin Decl. ¶ 54.) (SSMAF ¶ 84.)

135.    On May 4, 2011, the Debtors filed a motion seeking the substantive consolidation of the various related Chapter 11 cases (the "Substantive Consolidation Motion"), <u>on the basis that the West End funds had so commingled their assets that it was not feasible to unravel their financial affairs</u>.  (Heslin Decl. ¶ 54.) (SSMAF* ¶ 85.)

136.    On July 25, 2011, the Bankruptcy Court entered an order granting the Substantive Consolidation Motion.  (Heslin Decl. ¶ 61.) (SSMAF ¶ 86.)

**137.    As of December 2011, the Debtor estimated that West End investors would ultimately recover between 16 and 26% of their investment principal, with distributions not expected to commence until the year 2016.  (*See infra* ¶¶ 138-42.)**

138.    On December 19, 2011, the Debtors filed a Second Amended Plan of Liquidation of West End Financial Advisors, LLC (the "Second Amended Plan").  (*See In re West End Financial Advisors, LLC*, Case No.11-11152(SMB) (Bankr. S.D.N.Y.) ("*West End Bankruptcy*"),

Doc. # 267.) (SSMAF ¶ 87.)

139.    The Second Amended Plan included a class of claimants identified as "Investor

Creditors" and defined as "those Persons who made an investment in one or more of the

Debtors" who "have not received or retained Redemption Payment(s) in an aggregate amount

equal to or greater than their Investment form the Debtor" and have asserted a claim against the

Debtor.  (*See West End Bankruptcy*, Doc. # 267, Document # 7 at ¶¶ 1.65-1.66.) (SSMAF ¶ 88.)

140.    Simultaneously with the filing of the Second Amended Plan, the Debtors filed a

document labeled "Exhibit D – Plan Supplement- Distributions to Class 4 Investor Creditors."

(*See West End Bankruptcy* Doc. # 267, Document # 5.) (SSMAF ¶ 89.)

141.    Exhibit D provided West End investors, the "Investor Creditors," with a range of

how much of their investment principle they could ultimately expect to recover, and an

approximate time period for that recovery.  (*See West End Bankruptcy* Doc. # 267, Document #

5.) (SSMAF ¶ 90.)

142.    Specifically, Ex D stated:

> "the amount and timing of the Distributions to Class 4 Investor[]
> creditors are subject to substantial uncertainty.  Distributions to
> Class 4 depend in large part on when and if the Plan Administrator
> is able to sell the Franchise Fund Portfolio or the Hard Money
> Fund Portfolio and the proceeds which are available from such
> sale.  While it is anticipated that the Plan Administrator . . . will
> seek to sell one or both of the portfolios for as much as possible . .
> . he may not succeed for a variety of reasons.  In that event,
> distribution to Class 4 Investor Unsecured Creditors will be made
> as and when the loans in the two portfolios mature and the
> proceeds are paid to the Post-Confirmation Estate.  . . . [B]ased
> upon the current estimate of Class 4 claims in the amount of
> $84,602,309, the projected range of recoveries from both portfolios
> (excluding recoveries from other estate assets) is between 16.44
> percent and 25.9 percent.  The Debtors' believe that Class 4 claims
> may ultimately be reduced to approximately $66 million, which

would result in a projected range of recoveries from both portfolios (excluding recoveries from other estate assets) of between 21.08 percent and 33.2 percent.  Note that, without a sale of one or more of the portfolios, distributions to Class 4 investors may not commence until the year 2016.

(*See West End Bankruptcy* Doc. # 267, Document # 5 at p. 1.) (SSMAF ¶ 91.)

E.    Landberg's Guilty Plea

143.    On January 13, 2010, the U.S. Attorney's Office for the Southern District of New York (the "Government") criminally charged Landberg with securities fraud in connection with certain of his conduct at West End.  (*See U.S. v. Landberg*, 1:10CR538 (S.D.N.Y.) (Swain, J.) ("*U.S. v. Landberg*") Doc # 1.) (SSMAF* ¶ 92.)

144.    On November 18, 2011, the Government filed a superseding Information against Landberg.  (*See U.S. v. Landberg Doc* # 25.) (SSMAF ¶ 93.)

145.    The superseding Information charged Landberg with one count of securities fraud in connection with his diversion of funds from WestLB from January to April 2009.  (*See U.S. v. Landberg Doc* # 25; *see also supra* ¶¶ 104-19.) (SSMAF* ¶ 94.)

146.    Landberg pled guilty to the superseding Information on November 18, 2011.  (*See U.S. v. Landberg*.) (SSMAF ¶ 95.)

## III.    GOULD'S INVOCATION OF HIS FIFTH AMENDMENT PRIVILEGE

147.    Gould testified in this case on September 8, 2011.  (Declaration of Matthew Watkins ¶ 2; SEC Ex. 248.) (SSMAF ¶ 96.)

148.    Gould asserted his Fifth Amendment privilege against self-incrimination with respect to all questions concerning West End.  (*See generally* SEC Ex. 248.) (SSMAF ¶ 97.)

149.    Gould was advised that his invocation of the Fifth Amendment could have

adverse consequences and that as a result an adverse inference could have been taken against him.  (*See* SEC Ex. 248 at p. 6.) (SSMAF ¶ 98.)

150.    Gould asserted his Fifth Amendment privilege when confronted with SEC Exhibits 5, 18-44, 46-49, 51, 69, 71, 78-81, 144, 147, 150, 152, 154-56, 159, 162, 203-04, 206-15, 218, and 224-28.  (*See generally* SEC Ex. 248.) (SSMAF ¶ 99.)

151.    In particular, Gould asserted his Fifth Amendment privilege and refused to answer questions regarding:

- His suicide attempt on May 12, 2009, just as the fraud at West End was being discovered (SEC Exhibit 248 at pp. 7-8);

- His responsibilities with respect to compiling the financial records of the funds, including performance data and account statements (pp. 9-10);

- His preparation of the marketing materials referred to as "tear sheets" that were distributed to existing and potential investors, and his understanding that these were intended for marketing (pp. 10, 97-98, 100-103; SEC Exs. 46-49, 51);

- The fact that these "tear sheets" misrepresented the funds' compliance with their stated investment objectives and investment returns, overstated assets under management, and failed to state that the funds were close to insolvent (pp. 103-111; SEC Exs. 51, 69, 71);

- His responsibilities for the valuation of securities or investments held by West End (pp. 10-11);

- His direction and management of all areas of West End's financial and accounting operations (p. 12);

- His responsibility for maintaining the balance sheets for the various West End funds (pp. 87-90, 117-122; SEC Exs. 211-15);

- His responsibility for dealings with West End's banks, including DZ Bank and WestLB (pp. 12-13, 125-127);

- His knowledge of the improprieties in West End's dealings with DZ Bank and WestLB (pp. 125-27, 130-133; SEC Ex. 26);

- His responsibility for assuring compliance with West End's loan facilities (pp. 19-21, 130);

- West End's noncompliance with the undertakings and representations to investors set out in the offering memoranda for the various West End funds (pp. 13-19, 91-92; SEC Ex. 210);

- His concerns since at least 2007 concerning the solvency of West End and his communication of those concerns to Landberg and Kramer (pp. 22-24, 127-130; SEC Exs. 24, 208);

- That West End had trouble paying its rent in a timely fashion (pp. 123-124; SEC Ex. 66);

- Repeated, almost daily communications from West End's bank, Signature Bank, from at least 2007 regarding substantial overdrafts in the individual accounts for the various West End funds (pp. 24-29, 34-37, 40-45, 50-53; SEC Exs. 144, 147, 152, 154-56, 159, 162, 203, 209, 227);

- His authority with respect to monitoring and resolving the overdraft situation (pp. 26-28, 39-40; SEC Ex. 155);

- The fact that, numerous times, various investment funds lacked the money to pay overdrafts and that moneys had to be transferred from other investment funds to cover these overdrafts (pp. 32-33; SEC Ex. 150);

- The use of investor funds to pay overdrafts and debts of Landberg's family members (pp. 28-29, 37-38, 51; SEC Exs. 147, 154, 162);

- The constant intrafund transfer of assets between investment funds without any legitimate business purpose, and his efforts to conceal it (pp. 111-115, 117-122, 135-138; SEC Exs. 27-28, 218, 212-15);

- The improper use of funds from the Interest Reserve Account to pay unrelated West End obligations (pp. 30-32, 45-46; SEC Ex. 227);

- The use of investor funds to pay off shortfalls in the Interest Reserve Account (pp. 30-32, 62-63, 64-65; SEC Ex. 224-26);

- The use of investor funds to pay off Landberg's personal debts (pp. 46-50; SEC Ex. 204);

- Any investments by West End in Century Bank (pp. 57-61; SEC Ex. 19);

- Investments by West End in Geneva, the effect of the valuation of that investment on the reported earnings of various West End funds, and his role in that valuation (pp. 65-79; SEC Exs. 29-40);

- His knowledge that shares of Geneva, which had sold for as little as eight cents a share, were valued by West End at $1.20 per share, or **15 times its actual trading price**, and his responsibility for that valuation (pp. 79-82, 83-87; SEC Exs. 41-44);

- The reclassification of intercompany loans as investments (p. 61);

- His direct communications with investors (pp. 82-83, 96-97; SEC Exs. 5, 23);

- Communications with an investor in which, in early 2008, the investor stated that the facts led them to believe West End was a Ponzi scheme (pp. 92-93; SEC Ex. 21);

- Communications between him and other West End employees in early 2008 regarding enforcement actions against individuals who worked at investment funds that turned out to be Ponzi schemes (pp. 116-117; SEC Ex. 20);

- Correspondence between him and Kramer and Landberg in July, 2008 in which Gould and Kramer expressed concern about West End's financial viability (pp. 94-96; SEC Ex. 22).

(SSMAF* ¶ 100.)

## IV.   GOULD'S SUICIDE ATTEMPT

152.    On May 12, 2009, shortly after the discovery of the fraud at West End, Gould was

hit by a Long Island Railroad train.  (Barsuk Decl. ¶ 82; Rhodes Decl. ¶ 42; Declaration of Linda

Gould ("Gould Decl.") at p. 2; Declaration of David I. Ferber ("Ferber Decl.") ¶ 10.)

(SSMAF ¶ 101.)

153.    In the days immediately prior to May 12, 2009, Gould was very anxious and

upset.  (Barsuk Decl. ¶ 81; Gould Decl. ¶¶ 7-8; Ferber Decl. ¶¶ 8-9.) (SSMAF ¶ 102.)

154.    During the same time period, Gould stopped sleeping and eating regularly and

lost substantial weight.  (Gould Decl. ¶ 8; Ferber Decl. ¶¶ 8-9.) (SSMAF ¶ 103.)

**155.    Gould's incident with the train related to Gould's employment at West End.**

**(SEC Ex. 248 at p. 8.)**

156.    When Gould was asked at his deposition if he attempted suicide on May 12, 2009,

he asserted his Fifth Amendment privilege.  (SEC Ex. 248 at p. 8.) (SSMAF ¶ 104.)

**V.    GOULD'S PARTICIPATION IN THE FRAUD AT WEST END**

> A.    Gould's Awareness of West End's Financial Problems and Failure to Disclose
> That Information to Investors

**157.    From at least January 2006 through approximately April 2009, West End**

**had financial problems, including paying bills in a timely fashion.  (Barsuk Decl. ¶ 26; SEC**

**Exs. 203-210.)**

**158.    Those problems became progressively worse over that time period.  (Barsuk**

**Decl. ¶ 26.)**

**159.    The financial problems stemmed from the fact that West End was not**

**generating adequate cash flow from the investments that it managed to pay for the many**

**financial obligations that it incurred.  (Barsuk Decl. ¶ 27; Efstratiou Decl. ¶ 23; Sloane**

**Decl. ¶ 8(b)-(c); SEC Ex. 18.)**

**160.    Those obligations included such things as paying the rent for West End's**

**offices, paying for expenses associated with the West End funds, and paying investor**

**distributions and redemptions.  (Barsuk Decl. ¶¶ 27-33; SEC Exs. 203-210.)**

161.    <u>As a result of its financial problems</u>, West End frequently had overdrafts in the West End Signature accounts, <u>often on a daily basis</u>.  (Barsuk ¶¶ 34-41; Efstratiou Decl. ¶¶ 20-21, 33-45; SEC Exs. 137-67.) (SSMAF* ¶ 105.)

162.    At times, the overdrafts were for hundreds of thousands of dollars and lasted for weeks.  (Barsuk Decl. ¶ 35; Efstratiou Decl. ¶ 20; *see, e.g.*, SEC Ex. 137-138; 141-42; 144; 146; 150; 152; 154; 157-58; 160-61; 164; 166.) (SSMAF ¶ 106.)

**163.    Gould was aware of West End's financial problems on a contemporaneous basis.  (*See* SEC Exs. 18, 24, 203-210; Barsuk Decl. ¶¶ 28-33.)**

164.    Gould was <u>also</u> aware of the <u>frequent</u> overdrafts <u>totaling hundreds of thousands of dollars in the West End Signature accounts as the overdrafts were incurred</u>.  (Barsuk Decl. ¶¶ 34-35; *see* SEC Exs. 18, 137-67.) (SSMAF* ¶ 107.)

165.    For example, on December 28, 2007, Gould sent an email to Landberg and Kramer stating: "I know these deals are good ones (WEMFF and the har [sic] money fund) however until we get some investor money the impact to cash flow is tremebdous [sic]… I have concerns about how much longer Signature will cover the OD's."  (SEC Ex. 18.) (SSMAF ¶ 108.)

166.    In the same email string, Gould also stated "Its not so much the returns . . . I know they will be there, it's the cash flow….."  (SEC Ex. 18.) (SSMAF ¶ 109.)

167.    On April 15, 2008, Gould sent an email to Landberg and Barsuk stating that "I don't want to move around money but the PAYROLL is an item in WEFA that is im [sic] jeopardy of not being paid."  (SEC Ex. 205; Barsuk ¶ 31.) (SSMAF ¶ 110.)

**168.    The email forwarded an email concerning overdrafts in West End Signature accounts totaling hundreds of thousands of dollars.  (SEC Ex. 205.)**

169.    On January 22, 2009, Gould sent an email to Landberg, Kramer and others with the subject "Rent" stating: "I understand that the December rent check was presented for payment at Signature and will not be covered by [] them since we are over drawn.  In addition, January rent hasn't been paid yet and they called looking for it.  Bill what are we going to do? I cant [sic] even try and explain to the landlord to defuse this as I can not give him a commitment as to when we can make a payment of any sort.  Help???"  (SEC Ex. 207.) (SSMAF ¶ 111.)

170.    On April 13, 2009, Kramer copied Gould on an email in which Kramer wrote "it's been 13 days since I got my paycheck – I've bounced checks piling up!!!! I don't care from which account the monies come, but I must get a wire TODAY."  (SEC Ex. 24.) (SSMAF ¶ 112.)

171.    Gould was <u>routinely</u> copied on the emails from Signature concerning overdrafts in the West End Signature accounts.  (*See* SEC Exs. 137-67.) (SSMAF* ¶ 113.)

**172.    Gould did not at any time disclose the financial problems at West End to West End investors.  (Baum Decl. ¶ 9; Raounas Decl. ¶ 12; *see* SEC Exs. 97, 100, 168-69, 171-72, 174-82, 191-94, 198-200 (account statements).)**

B.    <u>Gould's Knowledge of Commingling and Misuse of Investor Money and Failure to Disclose That Information to Investors</u>

**173.    Gould and Barsuk treated all money in the West End Signature accounts the same, regardless of the source of the money or which West End fund the money was designated for.  (Barsuk Decl. ¶¶ 42-57; *see also* Heslin Decl. ¶ 26-28; Sloane Decl. ¶¶ 8-9;**

SEC Exs. 137-67, 209-223.)

174.   **Gould moved money between West End Signature accounts to, for example, address overdrafts.  (Barsuk Decl. ¶¶ 43-46; *see, e.g.*, SEC Exs. 140, 148-49, 151, 153, 157-58, 160, 163, 167, 210.)**

175.   **For example, Gould undertook to cover over $57,000 in overdrafts on September 6, 2007.  (SEC Ex. 140.)**

176.   **Gould undertook to cover over $145,000 in overdrafts on May 2, 2008.  (SEC Ex. 148.)**

177.   **Gould covered over $31,000 in overdrafts on May 30, 2008.  (SEC Ex. 149.)**

178.   On June 6, 2008, Gould outlined nine different transfers between multiple West End accounts, apologizing for their redundancy because he needed an "audit trail."  (SEC Ex. 151.) (SSMAF* ¶ 114.)

179.   **On June 20, 2008, Gould undertook to cover approximately $200,000 in overdrafts.  (SEC Ex. 153.)**

180.   **On August 15, 2008, Gould undertook to "look into" over $290,000 in overdrafts in 13 different West End accounts.  (SEC Ex. 157.)**

181.   **On September 3, 2008, Gould undertook to take care of over $248,000 in overdrafts in 12 different West End accounts.  (SEC Ex. 158; *see also* SEC Ex. 160.)**

182.   **On October 23, 2008, Gould took care of at least one overdraft of more than $90,000.  (SEC Ex. 163.)**

183.   **On April 6, 2009, Gould covered over $79,000 in overdrafts in three different**

**West End accounts.  (SEC Ex. 167; *see also* SEC Ex. 210.)**

i.  *Intercompany Loans*

184.  At Landberg's direction, Gould accounted for the money movements between West End Signature accounts as intercompany loans.  (Barsuk Decl. ¶ 47.) (SSMAF ¶ 115.)

185.  The balance sheets for various West End funds that Gould was responsible for maintaining showed millions of dollars of intercompany loans between West End funds.  (Barsuk Decl. ¶ 47; *see, e.g.*, SEC Exs. 211-215.) (SSMAF ¶ 116.)

186.   For example, the balance sheet that Gould prepared for the Absolute Return Fund as of December 31, 2008 showed that approximately $17.6 million out of approximately $20.5 million in assets were from intercompany receivables.  (Barsuk Decl. ¶ 49; SEC Ex. 212.) (SSMAF ¶ 117.)

187.  The balance sheet that Gould prepared for the Private Client Income Fund as of December 31, 2008 showed that approximately $3.9 million out of approximately $5.8 million in assets were from intercompany receivables.  (Barsuk Decl. ¶ 49; SEC Ex. 213.) (SSMAF ¶ 118.)

188.  <u>All told</u>, Gould was aware of <u>over $54</u> million in intercompany loans between and among West End entities.  (*See* SEC Ex. 27; *see also* SEC Ex. 248 at pp. 137-38.) (SSMAF* ¶ 119.)

**189.  Beginning in 2008, Gould made repeated efforts to eliminate or "clean up" the intercompany loans.  (Barsuk Decl. ¶¶ 52; SEC Exs. 216-223.)**

**190.  An outside auditor responsible for auditing the Hard Money Fund for year-end 2008 observed during the audit that a relatively large proportion of the Hard Money**

Fund's assets were comprised of intercompany or related party loans.  (Rhodes Decl. ¶¶ 27-28; SEC Ex. 57.)

191.    Upon seeing the intercompany loans, the auditor had concerns about the collectability of the loans and whether the related party entities were so inter-related to the Hard Money Fund that the entities should be consolidated with the Hard Money Fund. (Rhodes Decl. ¶ 29.)

192.    The auditor brought his concern about the collectability of the intercompany loans to Gould's attention in April 2009.  (Rhodes Decl. ¶ 30; SEC Ex. 58.) (SSMAF* ¶ 120.)

193.    Gould responded that the auditor should talk to Landberg about the intercompany loans involving the Hard Money Fund.  (Rhodes Decl. ¶ 31; SEC Ex. 59.) (SSMAF* ¶ 121.)

194.    Later in April 2009, the auditor spoke to Landberg about the intercompany loans but Landberg did not adequately address his concerns.  (Rhodes Decl. ¶ 32.) (SSMAF ¶ 122.)

195.    After speaking to Landberg, the outside auditor began to perform his own analysis of the intercompany loans to attempt to determine what assets the related parties had and whether they were sufficient to cover the liabilities owed to the Hard Money Fund. (Rhodes Decl. ¶¶ 33-39; SEC Exs. 60-61.)

196.    During his analysis, the outside auditor noticed that the related parties that owed the Hard Money Fund money had substantial assets that were due from other related parties at West End.  (Rhodes Decl. ¶¶ 35-38; SEC Exs. 60-61.)

197.    The circularity to the pledge of assets among the various West End funds concerned the auditor.  (Rhodes Decl. ¶ 35.)

33

**198.    Later in April 2009, the auditor became sufficiently concerned that he stopped performing the analysis until he could talk to Gould.  (Rhodes Decl. ¶ 39.)**

**199.    The auditor's concerns regarding the intercompany receivables and the Hard Money Fund were never resolved.  (Rhodes Decl. ¶ 42.)**

200.    In November 2008, an employee of Signature Bank reviewing financials for the Absolute Return Fund identified over $15.7 million in intercompany receivables from two other West End funds.  (SEC Ex. 4.) (SSMAF ¶ 123.)

201.    The Signature Bank employee asked Gould: "How do these loans get repaid?" (SEC Ex. 4.) (SSMAF ¶ 124.)

202.    Gould forwarded the Signature Bank employee's response to Landberg and told Landberg "I would prefer if you answered him please."  (SEC Ex. 4.) (SSMAF ¶ 125.)

**203.    As West End's CFO, Gould knew, or should have known, that the substantial intercompany loans existing between multiple West End funds could not be repaid.  (*See supra* ¶¶ 184-202.)**

**204.    The account statements that Gould prepared for funds with assets comprised substantially of intercompany receivables (or loans) did not disclose, among other things, the circular nature of the underlying investments, and therefore materially overstated the investment returns of those funds.  (*See* SEC Exs. 97, 100, 168-69, 171-72, 174-82, 191-94, 198-200 (account statements).)**

        ii.    *Income Strategies Fund*

**205.    Gould knew that some money movements were not consistent with the terms**

of offering documents provided to investors concerning those funds.  (SEC Exs. 218, 211, 173, 209.)

206.    For example, Gould knew that the Income Strategies Fund was supposed to invest in the Franchise Fund and the Hard Money Fund.  (SEC Ex. 218.)

207.    In April 2008, Gould sent an email to Landberg and Barsuk concerning an accounting effort to "clean" related party loans in which Gould stated: "WEIS should be making investments in WEMFF as part of the objective of the fund."  (SEC Ex. 218.) (SSMAF ¶ 126.)

208.    In October 2008, Gould was copied on an email from Barsuk to Landberg concerning the use of money from the Income Strategies Fund to cover overdrafts in five other West End accounts (four of which did not involve the Franchise Fund or the Hard Money Fund), including two accounts affiliated with West End real estate entities.  (SEC Ex. 209; Barsuk ¶ 44.) (SSMAF* ¶ 127.)

209.    In April 2009, Gould sent an email to Landberg and others informing him that the Income Strategies Fund was overdrawn due to a $50,000 check to Fusion and three investor distributions totaling $26,750.00.  (SEC Ex. 210; Barsuk ¶¶ 45-46.) (SSMAF ¶ 128.)

210.    Fusion was Fusion Telecommunications International Inc., a company to which West End had loaned money.  (Barsuk ¶ 31; *see also* SEC Ex. 1 at p. 32.) (SSMAF ¶ 129.)

211.    The balance sheet that Gould prepared for the Income Strategies Fund as of December 31, 2008 shows that out of a total of approximately $19.9 million in assets, roughly $11.5 million of the Income Strategies Fund's assets were loans to West End funds besides the Franchise Fund and the Hard Money Fund.  (SEC Ex. 211; Barsuk Decl. ¶¶ 49-50.)

(SSMAF* ¶ 130.)

**212.    The account statements that Gould prepared for the Income Strategies Fund did not disclose, among other things, that the fund's assets were substantially comprised of intercompany receivables from West End entities besides the Hard Money Fund and the Franchise Fund or that money from the Income Strategies Fund was sent to Fusion.  (*See* SEC Exs. 169, 178, 191, 199-200 (account statements).)**

iii.    *Franchise Fund Investment in Century Bank*

213.    Gould was aware that according to offering documents the Franchise Fund was supposed to make franchise loans to commercial food service franchisees.  (SEC Ex. 79 at p. 1; SEC Ex. 248 at pp. 17-18.) (SSMAF* ¶ 131.)

214.    Gould was aware that in 2008 the Franchise Fund purportedly made a $1.5 million investment in Century Bank that violated the terms of the Franchise Fund's offering documents.  (*See* SEC Exs. 7, 15, 19, 98-99.) (SSMAF* ¶ 132.)

215.    Gould knew that the money used to make the investment came from the Interest Reserve Account.  (SEC Ex. 19.) (SSMAF* ¶ 133.)

**216.    Gould devised a transaction involving an intercompany loan to make it appear as if the Franchise Fund made the investment.  (SEC Ex. 19.)**

**217.    During the course of the audit of the Franchise Fund for year-end 2008, an outside auditor identified the Franchise Fund's $1.5 million purported investment in Century Bank.  (Rhodes Decl. ¶¶ 46-47.)**

**218.    Gould produced evidence to the outside auditor that a certificate evidencing**

the investment stated that the investment was made by Landberg, not by the Franchise Fund.  (Rhodes Decl. ¶¶ 48-49; SEC Exs. 64-65.)

219.  **Gould later told the outside auditor that the Century Bank stock was going to be issued in Landberg's name because the Franchise Fund could not own the stock. (Rhodes Decl. ¶ 50.)**

220.  **Gould told the outside auditor that the Franchise Fund could not own the stock due to a regulatory constraint, and not to any investment constraint of the Franchise Fund.  (Rhodes Decl. ¶ 50.)**

221.  **Gould's statement to the auditor was materially misleading because Gould knew, or should have known, that the Franchise Fund was not authorized to invest in Century Bank per the terms of its offering documents.  (*See* SEC Ex. 79 at p. 1; SEC Ex. 248 at pp. 17-18.)**

iv.  *SIMCO*

222.  SIMCO SPV 1 ("SIMCO") was an entity established between Landberg and a West End investor (the "SIMCO investor") with whom Landberg had a personal relationship. (Barsuk Decl. ¶ 74; *see, e.g.*, SEC Ex. 232.) (SSMAF ¶ 134.)

223.  Gould prepared financial statements and account statements for SIMCO.  (*See* SEC Exs. 232, 235; *see generally* Barsuk Decl. ¶¶ 22-24.) (SSMAF ¶ 135.)

224.  **Landberg managed money for the SIMCO investor and promised the SIMCO investor a certain return, but did not achieve the return that he had promised. (Barsuk Decl. ¶ 74.)**

225.    Thereafter, beginning in at least January 2007, Landberg agreed to pay, and West End paid, the SIMCO investor $60,000 per month.  (Barsuk Decl. ¶ 74; *see* SEC Exs. 233-39.) (SSMAF ¶ 136.)

226.    The $60,000 monthly payments to the SIMCO investor continued until <u>at least</u> November 2008.  (Barsuk Decl. ¶ 77; SEC Exs. 239, 40.) (SSMAF* ¶ 137.)

227.    Gould was aware of <u>and facilitated</u> the monthly $60,000 payments to the SIMCO investor.  (Barsuk Decl. ¶ 75; *see* SEC Exs. 232-39.) (SSMAF* ¶ 138.)

228.    Gould <u>kept a "scorecard" detailing</u> contributions from and distributions to the SIMCO investor <u>for Landberg</u>.  (SEC Ex. 238.) (SSMAF* ¶ 139.)

229.    By August 2007, Gould indicated to Landberg and others that the SIMCO investor had achieved "negative equity as a result of his monthly distributions."  (SEC Ex. 235.) (SSMAF ¶ 140.)

**230.    Gould recognized that these payments were not only improper, but that they endangered West End's solvency.  (SEC Ex. 236.)**

231.    In March 2008, Gould wrote to Landberg concerning the continued payments to the SIMCO investor: "This guy is so overdrawn in his capital, when are we going to halt payments.  He has already pulled out more money than he has contributed and with his losses he is way in the whole.  I think with the way our cash flow is lately we shouldn't make any more payments to him."  (SEC Ex. 236.) (SSMAF ¶ 141.)

**232.    Money was taken from any West End account with sufficient funds to make the payments to the SIMCO investor.  (Barsuk Decl. ¶ 78.)**

38

233.     SIMCO appeared as an entity that owed money to other West End funds, including the Income Strategies Fund and the Absolute Return Fund, on those funds' balance sheets.  (*See* SEC Ex. 211 (over $120,000 due from SIMCO); Ex. 214 (over $177,000 due from SIMCO); Ex. 97 (balance sheet – over $2500 due from SIMCO).) (SSMAF ¶ 142.)

**234.     The account statements that Gould prepared for the Income Strategies Fund and the Absolute Return Fund did not disclose, among other things, that the fund's assets included intercompany receivables from SIMCO.  (*See* SEC Exs. 169, 172, 178, 191 (account statements).)**

    v.     *Dividend Strategy Fund*

235.     According to its offering documents, the Dividend Strategy Fund's investment objective was to invest in closed-end mutual funds that traded at a significant discount to their reported net asset value (NAV).  (*See* SEC Ex. 85 at p. 1.) (SSMAF ¶ 143.)

236.     The fund was intended to be managed by another West End employee, J.P. Prusack, besides Landberg.  (Barsuk Decl. ¶ 79.) (SSMAF ¶ 144.)

237.     The fund had two investors.  (Barsuk Decl. ¶ 79; *see also* SEC Ex. 240.) (SSMAF* ¶ 145.)

**238.     As soon as the individuals' investments arrived at West End, their money was used immediately for intercompany loans to other West End funds.  (Barsuk Decl. ¶ 79; *see also* SEC Ex. 240 (Balance Sheet).)**

239.     Gould prepared financial statements and account statements for the Dividend Strategy Fund.  (*See* SEC Ex. 240; *see generally* Barsuk Decl. ¶¶ 22-24.) (SSMAF ¶ 146.)

39

240.    <u>Gould knew that as of</u> October 31, 2008, the assets of the Dividend Strategy Fund consisted almost entirely of related party receivables from other West End entities.  (*See* SEC Ex. 240 (Balance Sheet).) (SSMAF* ¶ 147.)

241.    Gould emailed Landberg and Kramer, among others, in November 2008 that "we should talk about actively marketing and investing in [the Dividend Strategy Fund] or we should just shut it down over the next month before year end…Kevin lets add this to our list of things to clean up."  (SEC Ex. 240.) (SSMAF ¶ 148.)

**242.    The account statements that Gould prepared for the Dividend Strategy Fund did not disclose, among other things, that the fund's assets were substantially comprised of intercompany receivables from other West End entities.  (*See* SEC Exs. 240 (account statements).)**

C.    <u>Gould's Participation in the Misuse of the Interest Reserve Account</u>

243.    Landberg, Gould and Barsuk had access to the Interest Reserve Account <u>and could control the money in the account through the</u> Signature online account management system.  (Barsuk Decl. ¶ 60.) (SSMAF* ¶ 149.)

**244.    Landberg, Gould and Barsuk treated the account like any other West End account in terms of using the account as a source of money to pay West End obligations. (Barsuk Decl. ¶ 60; Heslin Decl. ¶¶ 34-37; SEC Exs. 19, 224-227; *see also* SEC Ex. 1 at pp. 25-26.)**

**245.    Several times in 2008, Landberg, Gould and Barsuk rushed in the several days prior to when money was taken from the Interest Reserve Account to be sent to**

WestLB to ensure that there was the appropriate amount of money in the account such that WestLB would receive the amount of money it expected to receive under the terms of the Credit and Security Agreement.  (Barsuk Decl. ¶ 61; *see, e.g.*, SEC Exs. 225-26.)

246.    Gould was aware of the contractual restrictions on the use of money in the Interest Reserve Account.  (SEC Ex. 248 at pp. 19-20; SEC Ex. 78; Heslin Decl. ¶ 34.)

247.    Gould knew that the Interest Reserve Account needed to be replenished so that money could be sent from the account to WestLB.  (*See* SEC Ex. 226.)

248.    Gould was aware of the use of Landberg's personal funds to replenish the Interest Reserve Account.  (*See* SEC Ex. 226.)

249.    Gould was aware of the use of investor money to replenish the Interest Reserve Account.  (*See* SEC Ex. 224.)

250.    Gould took money from the Interest Reserve Account so that Landberg could make the $1.5 million investment in Century Bank.  (*See* SEC Ex. 19; *see supra* ¶¶ 213-21.)

251.    The outside auditor who audited the Hard Money Fund for year end 2008 sent an email to Gould in April 2009 stating: "The WestLB loan agreement requires MCC [Funding] to maintain an "Interest Reserve Account" to cover one month of interest.  To me it looks like the account is approx. $90K overdrawn.  Am I missing something?  We will likely have to disclose this unless there is some other variable that you are aware of."  (Rhodes Decl. ¶ 45; SEC Ex. 58 at pp. 5-6.) (SSMAF* ¶ 150.)

252.    Gould never responded to the auditor's concern regarding the Interest

**Reserve Account being overdrawn.  (Rhodes Decl. ¶ 45.)**

    D.    <u>Gould's Awareness of Landberg's Improper Valuation of West End Investments</u>

253.    Gould was aware that from at least 2007 to 2009 several West End funds had investments in a company called Geneva.  (*See, e.g.*, SEC Exs. 29-31, 39; Ex. 212 at p. 2; Ex. 213 at p. 2;  Ex. 214 at p.2; Ex. 215; Barsuk Decl. ¶ 49.) (SSMAF ¶ 151.)

254.    The principal amount of the investments totaled $2.68 million.  (SEC Ex. 39.) (SSMAF ¶ 152.)

**255.    In January 2008, Gould used a mark-up of the valuation of the Geneva investment to generate a purported profit in the Absolute Return Fund of $1.5 million. (*See* SEC Ex. 31; SEC Ex. 197.)**

256.    On March 20, 2008, an outside auditor conducting an audit of one of the West End funds informed Gould that "I know there is an issue with the valuation of the Geneva investment since the stock spiked on Dec. 31 and then dropped back to a much lower level." (SEC Ex. 32.) (SSMAF ¶ 153.)

257.    On March 27, 2008, Gould informed Landberg that the auditor was "having problems with the Geneva valuation."  (SEC Ex. 33.) (SSMAF ¶ 154.)

258.    In April 2008, Gould was aware that Landberg told the auditor that Landberg was valuing the Geneva investment at $1.20 per share and that Landberg noted that the "year end closing price was $1.65 and we took what we felt was an appropriate discount to reflect illiquidity and our concentrated position."  (SEC Ex. 36.) (SSMAF ¶ 155.)

259.    <u>Gould was aware that</u> on December 31, 2008, Geneva stock traded at $0.08 per

share.  (SEC Ex. 41.) (SSMAF* ¶ 156.)

260.    In February 2009, Gould asked Landberg to <u>meet to</u> discuss the valuation of Geneva for year end 2008.  (SEC Exs. 42-43.) (SSMAF* ¶ 157.)

261.    In response, Landberg told Gould that "Geneva [i]s the same as last year."  (SEC Ex. 43.) (SSMAF ¶ 158.)

**262.    Gould knew that the Geneva valuation could affect the profitability of the West End funds that were invested in Geneva.  (SEC Ex. 5 ("if I have to guess the fund will make about 550k before profit allocation…however we still need to deal with Geneva valuation").)**

**263.    Gould used the same valuation for the Geneva investment for year end 2008 as for year end 2007.  (SEC Ex. 31; Ex. 45 (Balance sheet at p. 2); Ex. 172 (Balance sheet at p. 2).)**

**264.    The account statements for funds with investments in Geneva that Gould prepared used the same valuation for the Geneva for year end 2008 as for year end 2007 and therefore materially overstated the investment returns of those funds.  (*See* SEC Exs. 45 (account statements), 172 (account statements).)**

E.    <u>Gould's Awareness of Misappropriation of Money from WestLB</u>

265.    In January 2009, Gould was aware of the $3.948 million loan to Benedek Development Group from the Hard Money Fund.  (Barsuk Decl. ¶¶ 67-69; SEC Exs. 229-230; *see supra* ¶¶ 105-10.) (SSMAF ¶ 159.)

**266.    Part of the loan to the Benedek Development Group was instead used to fund**

a $2 million loan from the Franchise Fund.  (Barsuk Decl. ¶¶ 71-72; SEC Ex. 231.)

267.    A $2 million loan was a substantial-sized loan for the Franchise Fund.

(Barsuk Decl. ¶ 73.)

268.    Gould knew about the need to fund the $2 million loan from the Franchise

Fund.  (SEC Ex. 10.)

269.    Through his access to West End books and records and responsibilities as

West End's CFO, Gould knew that the $2 million loan from the Franchise Fund was made

using money from WestLB.  (Barsuk Decl. ¶ 73.)

F.    Gould's Knowledge that Returns Were Not as Reported to Investors

270.    From at least January 2008 to April 2009, based on his knowledge of, among

other things, West End's deteriorating financial condition, millions of dollars of

intercompany loans between and amongst West End entities, virtually daily emails from

Signature concerning overdrafts in West End accounts, inappropriate use of investor

funds, misuse of the Interest Reserve Account, Landberg's improper valuation of the

Geneva investment, and Landberg's misappropriation of money from WestLB, Gould

knew, or was reckless in not knowing, that the returns reported on account statements to

investors were not accurate.  (*See supra* ¶¶ 157-269.)

271.    Gould admitted to Heslin in late April 2009 that Franchise Fund returns

were not as reported to investors and conceded that the returns were considerably less than

reported.  (Heslin Decl. ¶ 13; see also, e.g., SEC Ex. 184 (Gould email stating "I would like

to sit tomorrow to go the impact [sic] of WEMFF return and how it impacts WEMerc and

WEIS returns."); Ex. 25.)

# CONCLUSIONS OF LAW

272.    The SEC intends to establish that Gould is liable for violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C.§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 201.10b-5]; section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C.   77q(a)]; and for aiding and abetting violations of sections 206(1), 206(2), and 206(4)of the Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1), (2) and 4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. (SCOL*[4] ¶ 1.)

## I.    THE CONSEQUENCES OF GOULD'S INVOCATION OF HIS FIFTH AMENDMENT PRIVILEGE

**273.    Gould had an opportunity to defend the various acts and/or omissions and failures to act alleged in the Amended Complaint during his September 8, 2011 deposition.**

**274.    Gould declined to do so, however, and instead invoked his Fifth Amendment privilege not to answer various questions on the grounds that answering truthfully might tend to incriminate him.  *See* SEC Exhibit 248, pp. 6-7, and et seq.**

275.    Gould was advised that his invocation of the Fifth Amendment could have adverse consequences and that as a result an adverse inference could have been taken against him.  *See* Finding of Fact ("FOF") ¶ 149; SEC Ex. 248 at p. 6. (SCOL* ¶ 2.)

---

[4]        SCOL refers to the Stipulated Conclusions of Law contained in the Joint Pretrial Order, filed on March 2, 2012.  SCOL* (with the asterisk) indicates that the Stipulated Conclusions of Law contain a similar, but not identical, conclusion of law.  The SEC contends that its statement of the law herein is the accurate one.  In cases where there is a variance between the SEC's Proposed Conclusions of Law and the SCOL, the additional or different language in the SEC's Proposed Conclusion of Law is underlined.  In cases where there is no parallel conclusion of law in the SCOL to the SEC's Proposed Conclusion of Law, the SEC's Proposed Conclusion of Law appears in **bold**.

A.      The SEC Is Entitled To A Negative Inference

**276.    The SEC is entitled to the benefit of a negative inference since Gould's**
**invocation of the privilege results in a disadvantage to the SEC by keeping it from**
**obtaining information it could otherwise get.  *See SEC v. Pittsford Capital Income Partners,***
***LLC*, 2007 WL 2455124, at \*14 (W.D.N.Y. Aug. 23, 2007) ("litigants denied discovery based**
**upon an assertion of the privilege may ask the court to draw a negative inference from the**
**invocation of that right"); *see also LiButti v. U.S.*, 178 F.3d 110, 120 (2d Cir. 1999) ("An**
**adverse inference may be given significant weight because silence when one would be**
**expected to speak is a powerful persuader"); *SEC v. Suman*, 684 F. Supp. 2d 378, 386**
**(S.D.N.Y 2010), *citing Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).**

B.      Gould Is Precluded From Offering Evidence In His Behalf

**277.    The SEC intends to prove that Gould should be precluded from offering**
**evidence regarding the matters about which he invoked the privilege.  To prevent the**
**potential abuse of the Fifth Amendment privilege by defendants to obstruct discovery only**
**to waive it and subject the plaintiff to surprise testimony at trial, courts recognize the**
**appropriateness of precluding a defendant from offering evidence at trial related to all**
**matters for which he asserted the Fifth Amendment privilege during discovery.  *See United***
***States v. Certain Real Property and Premises Known As: 4003-4005 5th Ave., Brooklyn*, 55**
**F.3d 78, 85-86 (2d Cir. 1995); *Pittsford*, 2007 WL 2455124, at \*14 ("[w]hen a party invokes**
**the Fifth Amendment privilege in a civil case, courts may then preclude that party from**
**introducing evidence that was not previously available to his or her adversary due to the**
**party's invocation of the privilege"); *SEC v. Cassano*, 2000 WL 777930, at \*1 (S.D.N.Y.**
**June 19, 2000) (precluding defendants who asserted Fifth Amendment privilege during**

discovery period from testifying at trial); *United States v. Village of Island Park*, 888 F.

Supp. 419, 431 (E.D.N.Y. 1995).

278.    Accordingly, Gould is not permitted to offer his own evidence on any subject

concerning which he asserted his Fifth Amendment privilege.

## II.    GOULD'S LIABILITY FOR VIOLATIONS OF THE EXCHANGE ACT AND SECURITIES ACT

279.    The Second Count of the SEC's Amended Complaint alleges primary violations

under section 10(b) of the Exchange Act and Rule 10b-5 thereunder. (SCOL ¶ 3.)

280.    Rule 10b-5 makes it unlawful for any person, directly or indirectly, by the use of

any means or instrumentality of interstate commerce, or of the mails or of any facility of any

national securities exchange:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5; *see also VanCook v. SEC*, 653 F.3d 130, 138 (2d Cir. 2011). (SCOL ¶ 4.)

281.    Section 10(b) of the Exchange Act and Rule 10b-5 are to be interpreted

broadly.  *See VanCook*, 653 F.3d at 138.

282.    To prove a violation of Section 10(b) of the Exchange Act or Exchange Act Rule

10b-5, the Commission must prove, by a preponderance of the evidence,[5] that a defendant:  "(1)

---

[5]     The evidentiary standard applicable in a civil enforcement action is a preponderance of the evidence.  *Steadman v. SEC*, 450 U.S. 91, 95 (1981); *SEC v. Moran*, 922 F. Supp. 867, 888 (S.D.N.Y. 1996).

made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Pentagon Capital Mgmt*, 612 F. Supp. 2d 241, 258 (S.D.N.Y. 2009); *see also SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). (SCOL ¶ 5.)

**283.    This first element of an Exchange Act Section 10(b) claim is satisfied when any "manipulative or deceptive device or contrivance" is utilized in the scheme.  "Conduct itself can be deceptive, and so liability under §10(b) or Rule 10b-5 does not require a specific oral or written statement.  Broad as the concept of deception may be, it irreducibly entails some act that gives the victim false impression."  *Pentagon Capital*, 612 F. Supp. 2d at 261; *see also U.S. v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).**

**284.    In addition, the group pleading doctrine creates "'a presumption that statements in prospectuses, registration statements, annual reports, press releases, [and] group-published information . . . are the collective work of those individuals with direct involvement in the everyday business of the company.'" *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 489 (S.D.N.Y. 2007) (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) (internal citations omitted)); *see also SEC v. Landberg*, __ F. Supp. 2d __, 2011 WL 5116512, at \*6 (S.D.N.Y. October 26, 2011); *SEC v. Espuelas*, 698 F. Supp. 2d 415, 425 (S.D.N.Y. 2010).**

**285.    Under the group pleading doctrine, the SEC need demonstrate no more than that Gould was, as CFO, part of a group of individuals with direct involvement in managing the West End funds, in order to satisfy its legal obligation.**

**286.    Furthermore, it is well-established that, as joint and several liability is the standard in cases of securities laws violations, *see, e.g., SEC v. Pentagon Capital***

*Management*, __ F.Supp.2d __, 2012 WL 479576, at * 44 (S.D.N.Y. Feb. 14, 2012), the fact that others at West End were involved in and liable for the fraud alleged by the SEC does not render Gould somehow immune.

287.    The First Count of the SEC's Amended Complaint alleges primary violations of section 17(a) of the Securities Act. (SCOL ¶ 6.)

288.    The same elements required for a claim under the Exchange Act are required under Section 17(a) of the Securities Act, although no showing of *scienter* is required to prove a violation of Sections 17(a)(2) and (3). *Pentagon*, 612 F. Supp. 2d at 258; *Monarch Funding Corp.*, 192 F.3d at 308. (SCOL ¶ 7.)

289.    **Any person who directly or indirectly engages in a manipulative or deceptive act as part of a scheme to defraud can be held liable as a primary violator. *See Pentagon Capital*, 612 F. Supp. 2d at 260 n.3; *In re Enron Corp. Sec. Litig.*, 529 F. Supp. 2d 644, 707 (S.D. Tex. 2006).**

290.    **Like the antifraud provisions of the Exchange Act, the provisions of § 17(a) of the Securities Act are to be construed broadly. *U.S. v. Naftalin*, 441 U.S. 768, 778 (1979); *see also U.S. v. Jensen*, 608 F. 2d 1349, 1354 (10th Cir. 1979) ("Courts have recognized that section 17(a) must be given broad scope and flexible interpretation") (*citing U.S. v. Brown*, 555 F.2d 336 (2d Cir. 1977)); *SEC v. Kimmes*, 799 F. Supp. 852, 858 (N.D. Ill. 1992) (17(a) "is given broad scope and flexible interpretation").**

A.   Gould Is Liable For Misrepresentations and Omissions

**291.    Gould can be found liable for securities fraud under the above-cited statutes if the evidence shows that he made and is responsible for material misstatements and omissions to investors.  Gould made and is responsible for numerous material misstatements and omissions, both through his responsibility for West End financial information contained in account statements and marketing materials, and through his contact with certain West End investors.  *See, e.g.*, FOF ¶¶ 61-66, 79-83, 148, 151, 270.**

B.   The Information Misrepresented or Not Disclosed Was Material

292.    A false statement or omission is "material" where a substantial likelihood exists that a reasonable investor would consider it important in making an investment decision.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *SEC v. Mayhew*, 121 F.3d 44, 51 (2d Cir. 1997).  The information need not be of a type that necessarily would cause an investor to change his or her investment decision, but is material as long as a "reasonable investor would have viewed it as significantly altering the 'total mix' of information available."  *Mayhew*, 121 F.3d at 52. (SCOL ¶ 8.)

293.    The Commission need not prove that the false or baseless information at issue actually caused a specific investor to change his or her investment decision.  *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363-64 (9th Cir. 1993). (SCOL ¶ 9.)

**294.    From at least January 2008 to April 2009, Gould failed to disclose a host of information that was material to West End investors, including, among other things, West End's deteriorating financial condition, millions of dollars of intercompany loans between and amongst West End entities, virtually daily emails from Signature concerning overdrafts in West End accounts, inappropriate use of investor funds, misuse of the**

51

Interest Reserve Account, Landberg's improper valuation of investments, and Landberg's misappropriation of money from WestLB. *See generally* FOF ¶¶ 157-271.

295.    **Failure to disclose improper fund transfers or commingling is material.** *See Pittsford*, **2007 WL 2455124, at \*11-12 (failure to disclose improper transfers of funds from companies invested in by investors or improper commingling of funds is material);** *SEC v. Murph***y, 626 F.2d 633, 653 (9th Cir. 1980) (failure to disclose that issuer was commingling funds from various partnerships, or information relating to "financial condition, solvency and profitability" is material).**

      C.    <u>Gould's Misstatements and Omissions Were Made In Connection With Securities Transactions By Investors</u>

296.    A statement is "in connection with" the purchase or sale of a security for the purpose of Section 10(b) of the Exchange Act if it "somehow touches upon" or has "some nexus" with "any securities transaction." *Rana Research*, 8 F.3d at 1362; *see SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 491 (S.D.N.Y. 2002); *SEC v. Stanard*, 2009 WL 196023, at \*27 (S.D.N.Y. Jan. 27, 2009). (SCOL ¶ 10.)

297.    The "in connection" requirement is broadly construed. *See Credit Bancorp*, 195 F. Supp.2d at 491; *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992) ('in connection' factor is broadly construed). (SCOL ¶ 11.)

298.    **The "in connection requirement is satisfied where, as here, the "failure to inform investors of the truth meant that many investors kept their notes and did not seek a redemption longer than they otherwise would have."** *Pittsford*, **2007 WL 2455124, at \* 13.**

299.    **Gould's failure to disclose information about ongoing fraud at West End from at least January 2008 to April 2009 was in connection with the purchase or sale of securities.** *See, e.g.,* **FOF ¶¶ 79-80.**

D.     Gould Can Also Be Held Liable For Participating In a Scheme Or Artifice to
       Defraud

**300.    In addition to misrepresentations and omissions, Rule 10b-5 also prohibits the use of any device, scheme, or artifice to defraud and any act, practice, or course of business which operates as a fraud or deceit upon any person in connection with the purchase or sale of any security.  *See id*. §§(a),(c); *see, e.g., Pentagon Capital,* 2012 WL 479576, at \*31 ("Conduct itself can be deceptive, and so liability under § 10(b) or Rule 10b-5 does not require a specific oral or written statement."), *quoting Finnerty*, 533 F.3d at 148; *see also SEC v. Landberg*, 2011 WL 5116512, at \*4 (S.D.N.Y. Oct. 26, 2011); *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 502 (S.D.N.Y. 2005); *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 472-74 (S.D.N.Y. 2004).**

**301.    Gould's use of accounting mechanisms, such as intercompany loans, to conceal the fraud at West End constituted deceptive conduct.  *See* SEC FOF ¶¶ 184-221. Without the intercompany loans, undoubtedly fueled by new contributions from West End investors over time, there can be little doubt that the house of cards at West End would have collapsed long before May 2009.  Gould also facilitated other aspects of the scheme, such as improper investments by Landberg.  *See* FOF ¶¶ 214-21.**

E.     Gould Acted With Scienter

**302.    In the context of the securities fraud statutes, scienter means the "intent to deceive, manipulate, or defraud; or at least knowing misconduct."  *VanCook*, 653 F.3d at 138 (citation omitted); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).**

303.    Scienter may be "established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure

from the standards of ordinary care." *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998). (SCOL ¶ 12.)

304.    "An egregious refusal to see the obvious, or to investigate the doubtful, may also give rise to an inference of recklessness. Accordingly, a defendant cannot plead ignorance of facts where there are warning signs or information that should have put him on notice of either misrepresented or undisclosed facts." *Stanard*, 2009 WL 196023, at *27-28; *see Credit Bancorp*, 195 F. Supp. 2d at 493 ("The conscious avoidance of knowledge constitutes sufficient scienter under the federal securities laws.").

305.    Scienter can be established via proof that a defendant is involved in the distribution of false and misleading information to investors, either in direct statements to investors or in written materials. *See, e.g., SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 357-58 (S.D.N.Y. 2011) (scienter found where senior officer knew or was reckless in not knowing that company income projections given to investors were baseless); *SEC v. Haligiannis*, 470 F. Supp.2d 373, 381-82 (S.D.N.Y. 2007) (scienter demonstrated by sending statements to investors with false account values).

306.    Improper intrafund transfers can also establish a red flag sufficient to demonstrate scienter. *See Espuelas*, 767 F.Supp2d at 476.

307.    Scienter can also be established if the defendant is found to have knowledge that a fund is violating the terms of its offering materials. *See Pittsford*, 2007 WL 2455124, at * 14.

308.    A suicide attempt, if proven, can also be probative of consciousness of guilt. *U.S. v. Johnson*, 354 F. Supp. 2d 939, 957-58 (N.D. Iowa 2005).

309.    Gould's scienter is established in several ways.  Gould's statements to investors and preparation of account statements and marketing materials that he knew, or should have known, were false and misleading establishes his scienter.  *See* FOF ¶¶ 76-83, 270.  Gould's scienter is amply demonstrated by specific allegations that he was aware that West End was not achieving the results it promised investors.  *See* FOF ¶¶ 165, 184-89, 213-221, 271.  Gould's scienter is further established through his knowledge or reckless disregard of a litany of red flags at West End from at least January 2008 through April 2009, including improper intrafund transfers, millions of dollars of intercompany loans, and inappropriate use of investor funds.  *See* FOF ¶¶ 184-212, 235-42.  Further evidence of Gould's scienter is established by his suicide attempt as the fraud at West End was being discovered.  *See* FOF ¶¶ 152-156.

## III.    GOULD'S LIABILITY FOR AIDING AND ABETTING VIOLATIONS OF THE ADVISERS ACT

310.    <u>The SEC's evidence further establishes</u> that Gould is liable for aiding and abetting violations of the Advisers Act by Sentinel, West End, and Landberg. (SCOL* ¶ 13.)

311.    Section 209(d) of the Advisers Act permits the Commission to bring an action against those who aid and abet violations of the Act.  *SEC v. DiBella*, 587 F.3d 553, 568-69 (2d Cir. 2009); *Landberg*, 2011 WL 5116512, at *7; *SEC v. Aragon Capital Advisors, LLC*, 2011 WL 3278907, at * 15 (S.D.N.Y. 2011). (SCOL ¶ 14.)

312.    Aiding and abetting liability requires proof of (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.  *DiBella*, 587 F.3d at 566. (SCOL ¶ 15.)

313.   **Aiding and abetting liability attaches even where the underlying violations are negligence based.**  *See id.* **at 569 ("the SEC may seek an enforcement action against aiders and abettors of 'a violation of any provision' of the Advisers Act, 15 U.S.C. § 80b-9(d), which would include certain negligent acts in violation of the Advisers Act.")**

314.   **A defendant may also be liable for being reckless in not knowing of the violation.**  *SEC v. Gabelli*, **2010 WL 1253603, at *9 (S.D.N.Y. 2010),** *rev'd. on other grounds*, **653 F.3d 49 (2d Cir. 2011).**

A.   <u>There Were Underlying Violations of the Advisers Act</u>

315.   **Landberg, acting through West End, was the investment adviser to the West End funds.**  *See* **FOF ¶¶ 1-12.**

316.   Sections 206(1) and 206(2) of the Advisers Act make it unlawful for an investment adviser to employ any device, scheme, or artifice to defraud clients or prospective clients or to engage in any transaction, practice, or course of business that defrauds clients or prospective clients.  *See id.* (SCOL ¶ 16.)

317.   Section 206(1) requires a showing of scienter; Section 206(2) does not.  *SEC v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992). (SCOL ¶ 17.)

318.   **Landberg, West End and Sentinel violated Sections 206(1) and 206(2) of the Advisers Act when they breached their fiduciary duties to the West End funds and engaged in fraudulent activity by commingling and misappropriating the funds' assets.  Landberg's submission of false loan requests to WestLB, among other things, demonstrates his scienter.**  *See* **FOF ¶¶ 84-125.**

319.     **Similarly, Sentinel, through Landberg, violated Sections 206(1) and (2) by investing its clients' assets in the West End funds without disclosing the fraud.  *See* FOF ¶¶ 84-125.**

320.     **Section 206(4) of the Advisers Act prohibits an investment adviser from, directly or indirectly, engaging in any act, practice, or course of business which is fraudulent, deceptive, or manipulative, and Rule 206(4)-8 thereunder prohibits investment advisers to pooled investment vehicles (including "hedge funds") from defrauding investors or prospective investors in those funds.  *See* Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, SEC Release No. IA-2628 (Aug. 3, 2007).**

321.     Scienter is not required to prove a violation of Section 206(4) and Rule 206(4)-8 thereunder; conduct that is negligently, recklessly, or deliberately deceptive is sufficient. *Steadman*, 967 F.2d at 647. (SCOL ¶ 18.)

322.     **Landberg and West End violated Section 206(4), as defined by Rule 206(4)-8, when they made material misrepresentations and false statements to West End investors concerning, for example, the manner in which the funds would be operated and the funds' performance.  *See* FOF ¶¶ 84-125.**

323.     **Sentinel, West End and Landberg have settled the SEC's charges against them in this proceeding.  Landberg has pleaded guilty to criminal charges relating to this conduct and is due to be sentenced shortly.  *See* FOF ¶¶ 143-46.**

B.     <u>Gould Knew of the Underlying Violations</u>

324.     **Gould was aware of many red flags at West End from at least January 2008 through April 2009, including West End's deteriorating financial condition, millions of dollars of intercompany loans between and amongst West End entities, virtually daily**

emails from Signature concerning overdrafts in West End accounts, inappropriate use of investor funds, misuse of the Interest Reserve Account, Landberg's improper valuation of the Geneva investment, and Landberg's misappropriation of money from WestLB.  *See* FOF ¶¶ 157-269.

325.    In addition, an adverse inference that Gould knew of the underlying violations can be established through Gould's invocation of his Fifth Amendment right in refusing to answer questions on these matters.  *See* FOF ¶¶ 151.

C.    Gould Rendered Substantial Assistance to the Underlying Violations

326.    Devising transactions designed to conceal fraudulent transactions from Franchise Fund investors constitutes rendering substantial assistance.  *Aragon Capital*, 2011 WL 3278907, at *17; *see* FOF ¶¶ 213-21.

327.    Substantial assistance can also be established through evidence that Gould utilized accounting mechanisms, such as intercompany loans, to conceal the fraud at West End.  *See* FOF ¶¶ 184-204.

328.    Substantial assistance can also be established through proof that Gould facilitated the transfer of money to and from the Interest Reserve Account, which disguised from investors the growing financial problems that the West End funds faced in 2008 and 2009.  *See* FOF ¶¶ 243-52.

329.    Gould also aided and abetted the underlying fraud by personally meeting with investors and assuring them their investments continued to be secure.  *See* FOF ¶¶ 79-81.

IV.     **THE PENALTIES THE COURT SHOULD IMPOSE**

330.    Section 20(d)(2) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the Advisers Act, as amended by 17 C.F.R. § 201.1003, all provide that the SEC can seek the imposition of civil monetary penalties for violations of those statutes.  *See id.* (SCOL ¶ 19.)

331.    Those provisions further state that the amount of the penalty shall be determined by the Court "in light of the facts and circumstances."  *See id.* (SCOL ¶ 20.)

332.    Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act and Section 209(e) of the Advisers Act each provide three separate tiers of potential penalties that increase depending upon the seriousness of the violation.  *See id.* (SCOL ¶ 21.)

333.    Section 20(d)(2)(C) of the Securities Act, Section 21(d)(3)(B)(iii) of the Exchange Act, and Section 209(e)(2)(C) of the Advisers Act provide for "third tier" penalties for securities violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard for a regulatory requirement" that also "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  *See id.* (SCOL ¶ 22.)

334.    "The first tier of fines applies to all securities law violations; the second provides higher maximum fines for violations that involved fraud; and the third provides the highest maximums for violations that involved fraud and 'resulted in substantial losses or created a significant risk of substantial losses to other persons.'"  *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998) (citation omitted); *see SEC v. Credit Bancorp, Ltd*., 2002 WL 31422602, at *2 (S.D.N.Y. Oct. 29, 2002).  (SCOL* ¶ 23.)

335.    "Factors for the Court to consider include '(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's

conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.'" *SEC v. Forest Res. Mgmt. Corp.*, 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010) (citation omitted); *see also SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007). (SCOL ¶ 24.)

**336.     Third tier penalties can be justified if the facts establish that there was a pervasive fraud at West End that persisted for several years, and this was a scheme "involving fraud, deceit, manipulation . . . which either resulted in substantial losses to [investors] or, at the very least, created a risk of substantial losses."  *SEC v. Razmilovic*, __F. Supp. 2d __, 2011 WL 4629022, at *33-34 (E.D.N.Y. Sept. 30, 2011).**

**337.     In counting the number of violations for the purpose of assessing the amount of a penalty, courts have counted each separate act as an individual violation.  *SEC v. Pattison*, 2011 WL 723600, at *5 (N.D. Cal. Feb. 23, 2011) ("Court may assess a penalty for each distinct violation, *e.g.*, each time Defendant falsified a record"); *SEC v. Kenton Capital*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (defendant could be assessed a third tier penalty for each investor); *SEC v. Coates*, 137 F. Supp. 2d 413 (S.D.N.Y. 2001) (each Exchange Act violation justifies a separate penalty).**

## V.     FULL INJUNCTIVE RELIEF SHOULD BE IMPOSED

338.     The Commission is not an ordinary litigant but rather acts as a "statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  (SCOL ¶ 25.)

339.     Accordingly, once the Commission establishes a violation of the federal securities laws, a permanent injunction against future violations will be granted if the defendant's past

conduct indicates "a reasonable likelihood of further violation[s] in the future." *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978); *see SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972) ("[t]he critical question is whether there is a reasonable likelihood that the wrong will be repeated") (citation omitted); *SEC v. Power*, 525 F. Supp. 2d 415, 427 (S.D.N.Y. 2007). (SCOL* ¶ 26.)

340.    In this regard, courts consider (1) the fact that the defendant has been found liable for illegal conduct; (2) the degree of scienter; (3) whether the violations were isolated or *repeated;* (4) whether defendant has  accepted blame for his conduct; and (5) whether, due to the defendant's professional occupation, he might be in a position where future violations could be anticipated. *Cavanagh*, 155 F.3d at 135 (citations omitted and emphasis added). (SCOL ¶ 28.)

**341.    The Second Circuit has directed trial courts to consider certain factors when determining the likelihood of recurrence: "(1) the degree of scienter involved, (2) the isolated or recurring nature of the fraudulent activity, (3) the defendant's appreciation of his wrongdoing, and (4) the defendant's opportunities to commit future violations." *SEC v. Softpoint, Inc*., 958 F. Supp. 846, 867 (S.D.N.Y. 1997).**

**342.    Furthermore, "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations." *Manor Nursing*, 458 F.2d at 1100.**

## CONCLUSION

**343.    Based principally on the foregoing evidence and law, the SEC respectfully requests that after trial the Court (i) find Gould liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; Section 17(a) of the Securities Act; and for aiding and abetting violations of Sections 206(1), 206(2), and 206(4)of the Advisers**

Act, and Rule 206(4)-8 thereunder; issue an order (ii) enter an Order enjoining Gould from future violations of these provisions, and (iii) impose a substantial penalty upon him pursuant to Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the Advisers Act, as amended by 17 C.F.R. § 201.1003.

Respectfully Submitted,

Dated: New York, NY
        March 2, 2012

By:  Howard A. Fischer
     Matthew J. Watkins

Securities and Exchange Commission
New York Regional Office
3 World Financial Center, Suite 400
New York, New York  10281
Telephone (212) 336-0589